COPY

Execution Copy
(September 30, 2002)

# RESTRUCTURING AGREEMENT

DATED AS OF SEPTEMBER 30, 2002

AMONG

LIFESPAN CORPORATION,

NEW ENGLAND MEDICAL CENTER HOSPITALS, INC.

AND

NEW ENGLAND MEDICAL CENTER, INC.

TABLE OF CONTENTS

I. DEFINITIONS; CERTAIN RULES OF CONSTRUCTION. .....1

1.1 Rules of Construction .....1
1.2 Definitions.....2

II. RESTRUCTURING.....7

2.1 Governance Changes .....7
2.2 Change of Control Payment.....8
2.3 Mutual Release.....9
2.4 Settlement of Inter-Company Balances .....10
2.5 Settlement of Investment Matters .....11
2.6 Termination of MAA .....11
2.7 Transfer of Personnel.....11
2.8 Recovery of Downsizing Costs.....12
2.9 Liabilities. .....12
2.10 Medicare Depreciation Recapture.....13
2.11 On-Going Matters. .....13
2.12 The Closing.....17
2.13 Closing Deliveries.....17

III. REPRESENTATIONS AND WARRANTIES OF NEMC and THE NEMC AFFILIATES.17

3.1 Organization and Corporate Power.....18
3.2 Authorization and Enforceability.....18
3.3 Compliance; Authorization of Governmental Authorities.....18
3.4 Effect of the Contemplated Transactions.....18
3.5 Quarterly Reports.....19
3.6 Absence of Other Offers .....19
3.7 Compliance with Articles, By-Laws, Legal Requirements and Government Orders.....19
3.8 Disclosure .....19
3.9 Employee Benefit Plans.....19
3.10 Tax Status, Standing and Bond Compliance.....20

IV. REPRESENTATIONS AND WARRANTIES OF LIFESPAN.....20

4.1 Organization and Corporate Power.....20
4.2 Authorization and Enforceability.....20
4.3 Compliance; Authorization of Governmental Authorities.....21
4.4 Effect of the Contemplated Transactions.....21
4.5 Disclosure .....21

V. COVENANTS. ....................21

5.1 General....................21
5.2 Notices and Consents....................21
5.3 Operation of Business....................23
5.4 Tax Matters....................24
5.5 Notice of Developments....................24
5.6 Expenses....................24
5.7 Release from MAA....................24
5.8 Confidentiality....................25
5.9 Quarterly Reports....................25
5.10 Publicity....................25
5.11 Use of Marks....................26
5.12 Insurance....................26
5.13 Further Assurances....................26

VI. CONDITIONS TO THE CLOSING. ....................27

6.1 Representations and Warranties....................27
6.2 Performance....................27
6.3 Qualifications....................27
6.4 Absence of Governmental Orders....................27
6.5 Consents, etc....................27
6.6 Proceedings and Documents....................27
6.7 Service Agreement....................28
6.8 Agreements to be Terminated, etc....................28
6.9 Opinions of Counsel....................28
6.10 Absence of Other Negotiation....................29

VII. INDEMNIFICATION....................29

7.1 Indemnification by NEMC....................29
7.2 Indemnification by Lifespan....................30
7.3 Failure of Indemnification....................30
7.4 Third Party Claims....................30
7.5 No Circular Recovery....................32
7.6 Knowledge and Investigation....................32
7.7 Remedies Cumulative....................33

VIII. TAX MATTERS....................33

8.1 Tax Indemnification....................33
8.2 Certain Taxes and Fees....................33

IX. TERMINATION....................33

9.1 Termination of Agreement....................33
9.2 Effect of Termination....................34

9.3 Extension; Waiver ........ 34

X. MISCELLANEOUS. ........ 34

10.1 Notices ........ 34
10.2 Succession and Assignment; No Third-Party Beneficiary ........ 35
10.3 Amendments and Waivers ........ 35
10.4 Entire Agreement ........ 35
10.5 Schedules; Listed Documents, etc ........ 35
10.6 Counterparts ........ 35
10.7 Severability ........ 36
10.8 Headings ........ 36
10.9 Construction ........ 36
10.10 Specific Performance ........ 36
10.11 Obligations and Liability Joint and Several ........ 36
10.12 Waiver of Jury Trial ........ 36
10.13 Survival ........ 37

# RESTRUCTURING AGREEMENT

This Restructuring Agreement (as amended and otherwise modified from time to time, the "Agreement"), dated as of September 30, 2002 (the "Effective Date") is among Lifespan Corporation, a Rhode Island corporation ("Lifespan"), New England Medical Center Hospitals, Inc., a Massachusetts corporation ("NEMCH") and New England Medical Center, Inc. ("NEMCI" and together with NEMCH, collectively "NEMC"), and, for the purposes specified herein, Lifespan of Massachusetts, Inc., a Massachusetts corporation ("LOM").

## RECITALS

WHEREAS:

On October 20, 1997, Lifespan and NEMCI entered into an Amended and Restated Master Affiliation Agreement under which Lifespan and its then affiliates and NEMCI and its then affiliates agreed to operate as a single health care system under the common control of Lifespan (the "Affiliation"). LOM serves as the sole member of each of NEMCI and NEMCH. The individuals serving as the Board of Directors of Lifespan serve as the members of LOM.

Due to changing economic conditions, including changes in the managed care market in Massachusetts and Rhode Island, the parties desire to restructure the Affiliation and operate independently from one another.

The parties mutually desire to terminate the Affiliation and to change the corporate relationship between and among the parties so that neither Lifespan nor LOM will be the sole member of either NEMCI or NEMCH after the Closing.

In consideration of this change, NEMC will make payments to Lifespan in accordance with Section 2.2.

In addition, the parties contemplate entering into one or more service agreements in accordance with Sections 2.11.1 and 2.11.2 (each a "Service Agreement") to be negotiated during the period between the execution of this Agreement and the Closing.

The parties agree that a restructuring of their relationship best suits the goals of their respective organizations.

The Boards of Directors of the parties have approved the execution of this Agreement and the Contemplated Transactions.

NOW THEREFORE, in consideration of the premises and mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, Lifespan and NEMC hereby agree as follows:

## I. DEFINITIONS; CERTAIN RULES OF CONSTRUCTION.

1.1 Rules of Construction. Except as otherwise explicitly specified to the contrary or unless the context clearly requires otherwise, (a) references to a particular Section include all

subsections thereof, (b) the word "including" shall be construed as "including without limitation," (c) references to a particular statute or regulation include all rules and regulations thereunder and any predecessor or successor statute, rules or regulation, in each case as from time to time in effect, (d) words in the singular or plural form include the plural and singular form, respectively and (e) references to a particular Person include such Person's successors and assigns to the extent not prohibited by this Agreement.

1.2 Definitions. In addition to other terms specifically defined in this Agreement, the following terms as used herein shall have the following meanings:

"Action" means any claim, action, cause of action or suit (whether in contract or tort or otherwise), litigation (whether at law or in equity, whether civil or criminal), controversy, arbitration, investigation, hearing, charge, complaint, demand, notice or proceeding to, from, by or before any Governmental Authority.

"Adjustments" means any adjustments, corrections and other changes to any payment required to make such payment fairly represent the actual amounts due had information that was known or could have been known as of the Closing Date been applied.

"Affiliation" is defined in the Recitals.

"Affiliation Period" means the period beginning on October 31, 1997, and ending on the Closing Date.

"Agreement" is defined in the Preamble.

"Antitrust Division" is defined in Section 5.2.5.

"Applicable Policies" is defined in Section 2.8.

"Approved Capital Expenditures" is defined in Section 5.3.3.

"Articles" means the certificate or articles of incorporation or organization, statute, constitution, joint venture, limited liability company or partnership agreement or articles or other charter documents of any Person (other than a natural Person), in each case as in effect from time to time.

"Basis" means any past or present fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act or transaction that forms or could reasonably form, at the time of any such determination, the basis for any specified consequence.

"Board of Directors" of any Person, means the board of directors or board of trustees of such Person, or any other Person or group of Persons exercising authority typically exercised by a board of directors (including, in the case of any Person that is a Subsidiary of any other Person, such other Person).

"Breach" means (i) with respect to a representation or warranty in or of this Agreement or any other Contractual Obligation, any breach of, or an inaccuracy in, any such representation

or warranty at the time as of which such representation or warranty is made, (ii) with respect to any term, condition, covenant, agreement, or obligation in or of this Agreement, any other Contractual Obligation or any Articles or By-Laws, any breach of, or failure to perform or comply with, any such term, condition, covenant or obligation, including any such breach or failure to perform which could cause or allow the early termination of any Contractual Obligation or the loss or forfeiture of any asset, (iii) a default under this Agreement or any Contractual Obligation, and (iv) any event which with the passing of time or the giving of notice, or both, would constitute any of the foregoing.

"By-laws" means, with respect to any Person (other than a natural Person), all by-laws or other operating agreement relating to such Person, as from time to time amended and in effect.

"Closing" is defined in Section 2.12.

"Closing Date" means the date on which the Closing actually occurs.

"Code" means the U.S. Internal Revenue Code of 1986, as amended and in effect from time to time. Any reference to the Code or any section of the Code shall be deemed to incorporate any applicable rules or regulations promulgated thereunder, as amended and in effect from time to time.

"Contemplated Transactions" means, collectively, the transactions (other than the Service Agreements) contemplated by this Agreement, including (i) the Restructuring; and (ii) the execution, delivery and performance by Lifespan and NEMC of their respective covenants and obligations under this Agreement.

"Contractual Obligation" means, with respect to any Person, any contract, agreement, deed, mortgage, lease, license, commitment, promise, undertaking, arrangement or understanding, whether written or oral and whether express or implied, or other document or instrument (including any document or instrument evidencing or otherwise relating to any Debt but excluding the Articles or By-laws of such Person) to which or by which such Person is a party or otherwise subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

"Customizations and Special Services" is defined in Section 2.11.2.

"D & O Carrier" is defined in Section 5.12(a).

"Debt" means, with respect to any Person, all obligations (including all such obligations in respect of principal, accrued interest, penalties, fees and premiums) of such Person (a) for borrowed money (including overdraft facilities), (b) evidenced by notes, bonds, debentures or similar Contractual Obligations or other instruments, (c) for the deferred purchase price of property, goods or services (other than trade payables or accruals incurred in the Ordinary Course of Business), (d) under capital leases (in accordance with GAAP), (e) in respect of letters of credit and bankers' acceptances, (f) for swap agreements, collar agreements and other Contractual Obligations relating to interest rate protection and (g) in the nature of guarantees of the obligations described in clauses (a) through (f) above of any other Person.

"Disclosing Party" is defined in Section 5.8.

"Effective Date" is defined in the Preamble.

"Encumbrance" means any charge, claim, condition, equitable interest, lien, license, option, pledge, security interest, mortgage, right of way, easement, encroachment, servitude, right of first offer, right of first refusal or similar restriction, and any restriction or covenant with respect to, or condition governing the use, construction, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any other attribute of ownership.

"Enforceable" means, with respect to any Contractual Obligation stated to be Enforceable by or against any Person, that such Contractual Obligation is a legal, valid and binding obligation of such Person enforceable by or against such Person in accordance with its terms, except to the extent that enforcement of the rights and remedies created thereby is subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application affecting the rights and remedies of creditors and to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

"Expended Capital Costs" is defined in Section 5.3.3.

"Final Termination Date" is defined in Section 9.1(b).

"FTC" is defined in Section 5.2.5.

"FY 2003 Period" is defined in Section 5.3.3.

"GAAP" means generally accepted accounting principles for financial reporting in the United States, applied on a basis consistent with the principles applied in the preparation of the Financial Statements.

"Government Order" means any order, writ, judgment, injunction, decree, stipulation, ruling, determination or award entered by or with any Governmental Authority.

"Governmental Authority" means any United States federal, state or local or any foreign government, or political subdivision thereof, any governmental authority, regulatory or administrative agency, governmental commission, court or tribunal (or any department, bureau or division thereof), or any arbitrator or arbitral body.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Indemnified Claim" means a claim for indemnity by an Indemnified Party under Article VII.

"Indemnified Party" means the party seeking indemnity under Article VII.

"Information Services" is defined in Section 2.11.2.

"Indemnifying Party" means the party subject to a claim of indemnification under Article VII.

"Inter-company Balances" means amounts recorded as a receivable or payable of Lifespan, Lifespan Affiliates, NEMC or NEMC Affiliates for items and services provided between the parties.

"IS Agreement" is defined in Section 2.11.2.

"IRS" is defined in Section 3.10.1.

"Legal Requirement" means any United States federal, state or local or foreign law, statute, standard, ordinance, code, rule, regulation, resolution or promulgation, or any Governmental Order, or any license, franchise, permit or similar right granted under any of the foregoing, or any similar provision having the force or effect of law.

"Liability" means any liability or obligation (whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether incurred or consequential and whether due or to become due), including any liability for Taxes before during or after the Affiliation.

"License" is defined in Section 2.11.5.

"Lifespan" is defined in the Preamble.

"Lifespan Affiliates" means each Person at any time directly or indirectly controlling, controlled, in whole or in part, by or under direct or indirect common control or ownership with Lifespan, other than NEMC and the NEMC Affiliates.

"Long Term Plan" is defined in Section 2.11.2.

"Losses" is defined in Section 7.1.

"MAA" means the Amended and Restated Master Affiliation Agreement dated October 20, 1997 between NEMCI and Lifespan including all supplements and amendments thereto.

"Material Effect" means any change in, or effect on, the business, operations, assets, prospects or condition (financial or otherwise) of any party which, when considered either singly or in the aggregate together with all other changes or effects with respect to which such phrase is used in this Agreement, is material to the business, operations, assets, prospects or condition (financial or otherwise) of such party, taken as a whole.

"MDPH" means the Massachusetts Department of Public Health.

"NEMC" is defined in the Preamble.

"NEMC Affiliates" means each Person at any time directly or indirectly controlled, in whole or in part, by NEMCI or NEMCH, including, without limitation, those Persons identified on Exhibit A and Subsidiaries of NEMC.

"NEMC Physician" is defined in Section 2.11.2

"NEMC Plan" is defined in Section 3.9.

"NEMCH Bonds" means any bonds issued pursuant to the Restated Loan and Trust Agreement dated November 2, 1993 among the Massachusetts Health and Educational Facilities Authority, NEMCH, New England Medical Center Real Estate Company, Inc., First National Bank of Boston and Baybank, including any supplemental agreements and amendments thereto.

"NEMCH" is defined in the Preamble.

"NEMCH Facility" is defined in Section 2.11.2

"NEMCI" is defined in the Preamble.

"NEMCIC Retention" means funds held by Rhode Island Sound Enterprises, Inc. ("RISE") for distribution in accordance with Endorsement No. 11 to Policy No. 100197 of New England Medical Center Insurance Co., Ltd.

"Optional Services Agreement" is defined in Section 2.11.1.

"Ordinary Course of Business" means a course of business conduct (a) that is consistent with the current policies, procedures and practices of Lifespan and LOM and with Federal, state and local law; (b) that avoids all discretionary extraordinary transactions or occurrences; and (c) that avoids acts or omissions purposely intended to have a material adverse effect on the financial condition, operations or reputation of NEMC or the NEMC Affiliates.

"Permits" means, with respect to any Person, any license, franchise, permit, consent, approval, right, privilege, certificate or other similar authorization issued by, or otherwise granted by, any Governmental Authority or any other Person to which or by which such Person is subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

"Person" means any natural person, corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, business or Governmental Authority or political subdivision thereof.

"POM System" is defined in Section 2.11.5.

"Pre-Closing Tax Period" is defined in Section 8.1.

"RCO" is defined in Section 2.11.5.

"Recipient" is defined in Section 5.8.

"Representative" means, with respect to any Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Restructuring" is defined in Article II.

"Service Agreement" is defined in the Recitals.

"Subsidiary" means any Person of which NEMC or Lifespan as the case may be (or such other specified Person) shall, at the time, directly or indirectly through one or more Subsidiaries, (a) own at least 50% of the outstanding capital stock (or other shares of beneficial interest) entitled to vote generally, (b) hold at least 50% of the partnership, limited liability company, joint venture or similar interests or (c) be a general partner, managing member or joint venturer.

"Tax" or "Taxes" means (i) any and all federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar, including FICA), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind or any charge of any kind in the nature of (or similar to) taxes whatsoever, including any interest, penalty, or addition thereto, whether disputed or not, and (ii) any liability for the payment of any amounts of the type described in clause (i) of this definition as a result of being a member of an affiliated, consolidated, combined or unitary group for any period, as a result of any tax sharing or tax allocation agreement, arrangement or understanding, or as a result of being liable for another Person's taxes as a transferee or successor, by contract or otherwise.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third-Party Claim" is defined in Section 7.4.1.

"Transitional Services" is defined in Section 2.11.2.

"Vendors" is defined in Section 5.2.4.

II. RESTRUCTURING. The restructuring of the relationships between the parties shall have the components described in this Article (collectively, the "Restructuring").

2.1 Governance Changes. The Restructuring shall be structured as a change in control whereby NEMCI shall replace LOM as the sole corporate member of NEMCH and each of the other NEMC Affiliates, except for those for which NEMCH will remain the sole corporate member; LOM will relinquish all rights it presently has as the sole corporate member of NEMCH and NEMCI; and Lifespan will relinquish any reserved powers it may have with respect to NEMCH and NEMCI, all such changes to take effect at Closing. Subject to the terms and conditions of this Agreement, each party shall take all necessary action to adopt the requisite changes in the Articles, Bylaws and Boards of Directors of Lifespan, LOM, NEMC and the NEMC Affiliates to accomplish this change in control.

2.1.1 Amendment to Articles and Bylaws.

(a) Prior to the Closing, LOM and NEMC, as the case may be, shall adopt amended and restated Articles of NEMCI and NEMCH (and any other NEMC Affiliates required to accomplish the Restructuring) in a form acceptable to Lifespan and including all amendments required to accomplish the Restructuring, and shall execute and deliver each of such amended and restated Articles for filing with the Massachusetts Secretary of State. Such amended and restated Articles shall be effective as of the Closing Date and, among other things, designate NEMCI as the sole corporate member of NEMCH and remove LOM as the sole corporate member of NEMCI and NEMCH.

(b) Prior to the Closing, LOM, and NEMC as the case may be, with any required approvals from the applicable Board of Directors, shall amend and restate the Bylaws of NEMCI, NEMCH and each of the NEMC Affiliates in a form acceptable to Lifespan and including all amendments required to accomplish the Restructuring, each such amendment and restatement to be effective as of the Closing Date.

2.1.2 Directors and Officers. The parties acknowledge and agree that each party may wish to modify the composition of the respective Boards of Directors of entities that will be subject to their control after the Closing.

(a) As of the Closing, NEMC shall have obtained the written resignations of certain directors and officers as indicated on Schedule 2.1.2(a), to be effective at the Closing, and shall deliver all such written resignations at the Closing.

(b) As of the Closing, Lifespan shall have obtained the written resignations of certain directors and officers as indicated on Schedule 2.1.2(b), to be effective at the Closing, and shall deliver all such written resignations at the Closing.

2.2 Change of Control Payment. Subject to the terms and conditions of this Agreement and in consideration of LOM and Lifespan relinquishing corporate control of NEMC and granting a release to NEMC and the NEMC Affiliates of their respective obligations under the MAA in accordance with the provisions of this Agreement and as more particularly described in Section 2.2.6 below, NEMC shall deliver to Lifespan $30,000,000 structured in the following manner:

2.2.1 On or before September 30, 2002:

(i) NEMCH shall pay to Lifespan $13,000,000, $12,275,000 of which shall be in the form of cash via wire transfer to one or more accounts designated by Lifespan, in cash equivalents, or in securities, in a form and mix that are acceptable to Lifespan in its sole discretion, and $725,000 of which shall be in the form of an

offset by NEMC of the monthly payment due from Lifespan under the MAA for August, 2002; and

2.2.2 At Closing:

(i) NEMCH shall pay to Lifespan $6,128,382 in cash via wire transfer to one or more accounts designated by Lifespan, in cash equivalents, or in securities, in a form and mix that are acceptable to Lifespan in its sole discretion; and

(ii) NEMCH shall transfer to Lifespan, all of its right, title and interest to and in the NEMCIC Retention, in satisfaction of $5,381,618 of the $30,000,000 payment owed to Lifespan hereunder. The $5,381,618 value reflects NEMCH's share of the value of the NEMCIC Retention based on exhibit 1A to the most recent actuarial report dated June 12, 2002, a copy of which is attached hereto as Exhibit B. Upon completion of this transfer, NEMCH shall have no further right, title or interest in or any liability with respect to the NEMCIC Retention, regardless of the amounts of funds, if any, eventually distributed therefrom.

2.2.3 (a) Following the Closing, NEMCI (but not NEMCH) shall pay to Lifespan in cash via wire transfer to one or more accounts designated by Lifespan:

(i) On or before January 2, 2004, $1,830,000;

(ii) On or before January 2, 2006, $1,830,000; and

(iii) On or before January 2, 2007, $1,830,000.

(b) The payment obligations of NEMCI pursuant to Section 2.2.3(a) shall be guaranteed by NEMCH. At the Closing, NEMCH shall deliver to Lifespan, in a form satisfactory to Lifespan, a guaranty agreement relating to such payment obligation of NEMCI.

2.2.4 Should at any time following the Closing, NEMC close a sale or other transaction involving NEMC's interest in the property known as the Biewend Building located at 260 Tremont Street, Boston, MA, then any and all amounts that remain unpaid under this Section 2.2, whether presently due or due in the future, shall immediately become due and payable to Lifespan by NEMC.

2.2.5 Lifespan agrees that NEMC shall have no obligation to pay interest on any of the payments contemplated under Sections 2.2.2 through 2.2.4 above.

2.3 Mutual Release. (a) The parties agree that, except as otherwise specifically provided for in this Agreement, all payments by NEMC to Lifespan contemplated under this Section 2.2 are in full and complete satisfaction of the following claims that Lifespan has made

against NEMC, each of which is hereby declared null and void and forever irrevocably released, effective as of the Closing:

(i) Lifespan's claim to recover the annual $8,700,000 payments made by Lifespan to NEMC under the MAA from November 1, 1997 through August 31, 2002.

(ii) Lifespan's claim to recover amounts expended and rate increases forgone, in negotiating favorable third party payor arrangements on behalf of NEMC;

(iii) All amounts Lifespan claimed to be due from NEMC for NEMC's allocated share of corporate assets made through the period ended September 30, 2001 and valued by Lifespan at $12,887,000; and

(iv) All amounts due or claimed to be due to Lifespan by NEMC or the NEMC Affiliates under the MAA or otherwise, except as provided in Section 2.3(b) below and except as otherwise specifically provided for in this Agreement.

(b) The release provided in Section 2.3(a) shall not apply to amounts due or that may become due, to the extent provided in this Agreement, from NEMC to Lifespan for Inter-company Balances, corporate charges, capital payments, downsizing costs, loss on sale/depreciation recapture from Medicare, indemnities and clinical joint ventures, or to amounts due under agreements reached by the parties after the Effective Date.

(c) The parties agree that except as otherwise provided in Section 2.3(d) below and except as otherwise specifically provided in this Agreement, the governance changes to be adopted by Lifespan and LOM pursuant to Section 2.1 and the relinquishment by Lifespan and LOM of corporate control and reserved powers over NEMCI and NEMCH, are in complete and full satisfaction of all claims for amounts due or claimed to be due under the MAA or otherwise that NEMCI and NEMCH or any NEMC Affiliate has or may have against Lifespan, LOM, or any Lifespan Affiliate, each of which is hereby declared null and void and forever irrevocably released, effective as of the Closing.

(d) The release provided in Section 2.3(c) shall not apply to amounts due or that may become due, to the extent provided in this Agreement, from Lifespan to NEMC for Inter-Company Balances, indemnities and clinical joint ventures or to amounts due under agreements reach by the parties after the Effective Date.

2.4 Settlement of Inter-Company Balances. Lifespan and NEMC shall jointly identify, calculate and agree upon the amounts of any existing Inter-company Balances as of the month end immediately preceding the month in which the Closing occurs, which shall be incorporated into a Schedule 2.4 to be provided at the Closing. Based on such agreement, each party shall pay any amounts due to the other party in order to settle such Inter-company Balances at the Closing, and each party shall deliver to the other party documentation satisfactory to the other party evidencing such payment. Within sixty (60) days following the Closing, Lifespan

and NEMC shall calculate and agree upon remaining Inter-company Balances for the period ending with the Closing, based on actual results for that period; provided that the parties may also make at that time any mutually agreeable adjustments to Inter-company Balances for any information that becomes known after the Closing or that should have been included in the pre-Closing calculation. Such Adjustment shall be reimbursed by the appropriate party within fifteen (15) days after written notice from the other party, together with reasonable documentation regarding such Adjustment.

2.5 Settlement of Investment Matters. Schedule 2.5 hereto identifies the number of shares held by NEMC in the Lifespan investment pool which consists of bond and/or equity managers. In addition, Schedule 2.5 identifies the venture capital, real estate, oil and gas and absolute return investments in which NEMC is a participant owner along with other Lifespan Affiliates.

Lifespan will work with NEMC to transfer NEMC's share of each of these investments to a custodian of NEMC's choosing on or as soon as possible after the Closing. In some cases where fractional shares are involved, the manager will transfer cash in lieu of any fractional shares. Should transfers not be possible in a timeframe reasonably satisfactory to NEMC, NEMC may request the manager to liquidate NEMC's share of the investments and Lifespan will make every effort to honor such request. Both Lifespan and NEMC understand, acknowledge and agree that the transfer of NEMC's share of venture capital investments will require the approval of the General Partner and will require NEMC to assume NEMC's share of any unfunded commitments to affect such a transfer.

NEMC acknowledges and agrees that Lifespan is not responsible for any change in market value of NEMC's share of the above described investments between the Effective Date and the receipt by NEMC of NEMC's share of the investments.

2.6 Termination of MAA. As of the Closing, the MAA shall be terminated by the parties, and the parties thereto shall be fully released from their respective obligations thereunder, except for those provisions of the MAA that, by their terms, survive the termination of the MAA; provided, however, that Lifespan's obligation to make payments pursuant to Section 3.3 of the MAA shall cease with the August, 2002 payment, which NEMC elected to offset against amounts it owed to Lifespan pursuant to Section 2.2.1(i). If this Agreement is terminated under Section 9.1(a) or 9.1(b), the MAA shall not be terminated and Lifespan's obligation to make monthly payments under Section 3.3 of the MAA shall be reinstated as of September 1, 2002.

2.7 Transfer of Personnel. NEMC shall provide advance written notice to Lifespan identifying the name and position of each Lifespan employee to whom NEMC or a NEMC Affiliate wishes to extend an offer of employment to be effective on or after the Closing. Neither NEMC nor any NEMC Affiliate will approach any such employee to discuss possible employment until five (5) business days after delivery of the written notice described in the preceding sentence. Absent Lifespan's written consent, not to be unreasonably withheld, neither NEMC nor any NEMC Affiliate shall offer employment to a Lifespan employee to take effect prior to the Closing. In the event that NEMC or a NEMC Affiliate Breaches this Section 2.7, NEMC shall pay to Lifespan for each employee that was the subject of the Breach an amount

equal to one year's compensation for such employee under the employment arrangement between NEMC or the NEMC Affiliate and the employee that was the subject of the Breach.

2.8 Recovery of Downsizing Costs. (a) Discontinued Services. NEMC hereby agrees to assume all downsizing costs that Lifespan incurs related to Persons on the Lifespan payroll in functional areas other than information services, laundry services, purchasing/accounts payable services, payroll services and certain insurance/risk management services and that are directly attributable to the Contemplated Transactions, and not mitigated by the hiring by NEMC or any NEMC Affiliates contemplated in Section 2.7 above, including amounts due for accrued vacation (or paid time off), severance, unemployment and litigation costs; provided, however, that the severance portion of any such downsizing costs is consistent either with Lifespan's severance policies in effect immediately prior to the Effective Date, copies of which Lifespan has provided to NEMC prior to the Effective Date (the "Applicable Policies"), or with the terms of any individually negotiated arrangement in existence on the Effective Date; and provided, further, that NEMC's liability for Lifespan's downsizing costs as set forth in this Section 2.8(a) shall be capped at $500,000. Subject to the $500,000 cap, NEMC shall pay Lifespan all downsizing costs as described in this Section 2.8(a) and incurred by Lifespan at any time for any employees described in the preceding sentence who are terminated during the six-month period following the Closing. Upon NEMC's request, Lifespan shall provide to NEMC documentation reasonably satisfactory to NEMC that Lifespan or Lifespan Affiliates have incurred or are obligated to incur such costs.

(b) Purchased Services. If the parties do not enter into one or more of the Service Agreements or if any of the Service Agreements expires or is terminated by either party for any reason at any time during the first eighteen (18) months following the Closing (twenty four (24) months in the case of Information Services, as described in Section 2.11.2), then NEMC shall pay to Lifespan all downsizing costs that Lifespan incurs related to Persons on the Lifespan payroll in the functional area covered by the particular Service Agreement, including amounts due for accrued vacation (or paid time off), severance, unemployment and litigation costs, and that are directly attributable to the fact that Lifespan will not be providing the services under the particular Service Agreement, or directly attributable to the fact that Lifespan will be providing those services under the particular Service Agreement for less than eighteen (18) months following the Closing (twenty four (24) months in the case of Information Services), as the case may be, provided, however, that the severance portion of any such downsizing costs is consistent either with the Applicable Policies or with the terms of any individually negotiated arrangement in existence on the Effective Date. These additional downsizing costs, if any, shall not be subject to, or included in the calculation of, the $500,000 cap. NEMC's responsibility for downsizing costs under this Section 2.8(b) shall end after Lifespan has been reimbursed for downsizing costs it incurred with respect to any employees described herein who are terminated during the eighteen (18) month period after Closing (twenty four (24) months in the case of Information Services). Upon NEMC's request, Lifespan shall provide to NEMC documentation reasonably satisfactory to NEMC that Lifespan or Lifespan Affiliates have incurred or are obligated to incur such costs.

2.9 Liabilities.

2.9.1 NEMC Liabilities. NEMC shall retain all responsibility for all Liabilities arising from the assets, business or operations of NEMC and the NEMC Affiliates whether arising from acts, omissions or events before, during or after the Affiliation Period. The assets, liabilities, business and operations of NEMC and the NEMC Affiliates shall be returned to the exclusive control of NEMCH, NEMCI or the appropriate NEMC Affiliate as designated by NEMCI on an "as is, where is" basis and without any representations, warranties or covenants by Lifespan, except as set forth in Article IV.

2.9.2 Lifespan Liabilities. Lifespan shall retain responsibility for all Liabilities incurred by Lifespan solely for the benefit of the Lifespan Affiliates, not including LOM.

2.10 Medicare Depreciation Recapture. Lifespan and NEMC shall split on a 50/50 basis any recovery received from Medicare by NEMC or any NEMC Affiliate for the loss on sale/depreciation recapture resulting from the Affiliation.

2.11 On-Going Matters.

2.11.1 Service Agreements for Laundry Services, Payroll, Purchasing/Accounts Payable, and Insurance/Risk Management. The parties contemplate entering into Service Agreements governing the provision of laundry services, purchasing/accounts payable services, payroll services and certain medical malpractice insurance and risk management services by Lifespan to NEMC (the "Optional Services Agreements"), to be effective as of the Closing Date. It is acknowledged and agreed that neither party shall be obligated to execute any or all of the Optional Services Agreements, provided, however, that if the parties fail to enter into any of the Optional Services Agreements or if any of such Optional Services Agreements expire or are terminated by either party for any reason at any time during the first eighteen (18) months following the Closing Date, NEMC shall be required to pay additional downsizing costs, if any, as described in Section 2.8(b) of this Agreement. In addition, the parties contemplate entering into a Service Agreement governing the provision of bioengineering services by NEMC to Lifespan, to be effective as of the Closing Date; provided, however, that neither party shall be obligated to execute any such bioengineering services agreement.

2.11.2 Information Services Provided by Lifespan to NEMC. Between the Effective Date and the Closing Date, the parties shall negotiate in good faith the terms of a Service Agreement for the provision of information applications and services ("Information Services") by Lifespan to NEMC (the "IS Agreement"). Execution of an IS Agreement consistent with the terms of this Section 2.11 shall be a condition to the Closing as set forth in Section 6.7. It is the intent of Lifespan to provide as part of the IS Agreement (i) the services and applications currently in place or scheduled to be in place as of November 4, 2002 at NEMC, and (ii) any other services or applications included in Lifespan's long-term information services plan dated February 6, 2002, as amended from time to time by Lifespan, which plan was developed by Lifespan with input from Lifespan Affiliates and NEMC (the "Long Term Plan"), to the extent, in the case of this clause (ii), that Lifespan actually funds, implements and installs such services or applications at one or more of the Lifespan Affiliates, provided, however, Lifespan does

not implement any amendment to the Long Term Plan in the form it existed on February 6, 2002 which would impact the services or applications that NEMC was scheduled to receive pursuant to the Long Term Plan without giving NEMC ninety (90) days prior written notice of such amendment; and further subject in the case of each of clauses (i) and (ii), to the negotiation and execution of an IS Agreement incorporating mutually acceptable terms and conditions. NEMC acknowledges that it participated in the development of the Long Term Plan and is fully aware of its contents and limitations.

If the parties agree to waive this condition and agree to proceed with the Closing without an IS Agreement, Lifespan (1) shall provide transitional Information Services to NEMC of a scope and subject to the conditions set forth below ("Transitional Services") until such time as NEMC provides such Transitional Services itself and/or secures them from a third party, and (2) shall grant a license to NEMC on the terms and conditions set forth in Section 2.11.5. As a first step in the transition process, the parties will cooperate in good faith to promptly negotiate a transition plan providing for the orderly transition of responsibility for providing information services from Lifespan to NEMC or its designee. Any Transitional Services shall be provided to NEMC by Lifespan at a cost determined in the same manner as when NEMC was a Lifespan affiliate based on the Lifespan fiscal year budget for the year in which the Transitional Services are provided, plus an administrative add-on of ten percent (10%). In the event that the transition plan calls for an incremental reduction in the scope of Transitional Services being provided to NEMC, any actual reductions in the direct costs incurred by Lifespan in providing the Transitional Services shall be deducted from the amounts payable by NEMC, and the 10% administrative add-on shall apply to the reduced amount. The scope and nature of the Transitional Services to be initially provided by Lifespan shall be substantially the same as the information services provided by Lifespan to NEMC immediately prior to the Closing, except to the extent required to be limited as set forth in Section 2.11.3, and shall include the functionality to enable Lifelinks to be used consistent with this Section 2.11.2 for so long as Lifespan is providing Transitional Services to NEMC of a type requiring the use of Lifelinks, but shall not include the POM System. NEMC shall use its best efforts to provide such Transitional Services itself or secure them from a third party as soon as possible following the Closing, and in no event shall Lifespan be obligated to provide such Transitional Services for longer than twenty-four (24) months after the Closing Date. If NEMC wishes to obtain from Lifespan any information applications or services in addition to those defined as Transitional Services, Lifespan agrees to negotiate in good faith following the Closing the terms and conditions on which such additional services may be obtained from Lifespan as part of the arrangement for Transitional Services; <u>provided</u>, that in no event shall Lifespan be obligated to provide the POM System as part of any such additional services or applications.

Under the Long Term Plan, if NEMC were to remain a Lifespan affiliate, installation of the POM System would begin during the first calendar quarter of 2003. The parties acknowledge that the POM System, in the form envisioned by the Long Term Plan and as installed at certain Lifespan Affiliates, can become functional at NEMC only if a certain level of customization, work flow process improvement and other specialized services, software and hardware ("Customizations and Special Services") are first implemented and installed at NEMC, and that the inclusion of the POM System as part of

the IS Agreement will require that NEMC agree to pay the full cost of all Customizations and Special Services that Lifespan determines to be necessary to make the POM System work in the NEMC environment, as well as any other reasonable charges Lifespan may impose in connection therewith, and that the parties otherwise agree on the terms and conditions of the IS Agreement prior to the Closing. NEMC specifically agrees that any customizations and special services other than those related to the POM System provided by Lifespan at NEMC's request in conjunction with applications covered by the IS Agreement shall be separately paid for by NEMC in accordance with the terms and conditions of the IS Agreement.

Recognizing that Lifespan is not an information technology vendor and that following the Closing Lifespan and NEMC will be competitors, Lifespan shall not be required to enter into any IS Agreement or arrangement for Transitional Services that would require Lifespan to provide applications or services to NEMC other than at NEMCH as it today exists as a licensed facility (irrespective of additions or deletions of programs conducted therein) (the "NEMCH Facility"), or that would permit NEMC to use any applications or services that are proprietary to Lifespan, except to the extent permitted by the License (as defined in Section 2.11.5), or to use any applications or services in a manner that is directly competitive with Lifespan or any Lifespan Affiliate; provided, that nothing in this Section 2.11 shall restrict the ability of a physician employed (i.e. a "W-2" relationship) on a substantially full time basis by one of the medical groups listed on Schedule 2.11.2 (a "NEMC Physician") to gain secure access to clinical data arising from patient encounters at the NEMCH Facility. Any information services or applications Lifespan provides following the Closing shall be provided to NEMC as a user and not as a system participant.

2.11.3 Separately Enforceable. The parties acknowledge and agree that neither party will be required to provide services or applications under any Services Agreements to the extent that the provision of such services or applications is limited by the rights of or obligations to third party vendors under agreements in effect as of the Effective Date, or under modifications to those agreements that may be necessary to obtain the consent of such vendors to the transactions contemplated by Section 2.11. The parties acknowledge and agree that the Service Agreements shall be separate, independently enforceable agreements between the parties.

2.11.4 Other Affiliations. The parties have identified certain affiliations that currently exist and that are mutually beneficial on Schedule 2.11.4 hereto. The parties agree to enter into good faith negotiations to determine terms and conditions for the continuation of such affiliations on mutually agreeable terms and conditions.

2.11.5 License to Applications and Modifications. If the parties agree to waive the condition set forth in Sections 2.11.2 and 6.7 and agree to proceed with the Closing without an IS Agreement, Lifespan shall grant to NEMC, for use solely at the NEMCH Facility, a non-exclusive, perpetual, non-terminable, fully paid-up, royalty-free license to use and modify, but not to market, all applications and modifications owned by or licensed for the exclusive use of Lifespan, including, without limitation, integration software, such as on-line interfaces, batch interfaces, transport software, data extracts and

modifications to third party applications, but excluding any applications or software comprising the POM System (collectively, the "Lifespan Code") that is installed or in use or scheduled for installation at or for use by NEMC as of November 4, 2002 (the "License"). Notwithstanding anything else to the contrary contained herein, the License (1) shall specifically exclude the physician order management system ("the POM System"); (2) shall not encompass program connectivity software to the extent that it relates exclusively to the POM System; (3) shall not be sublicensable or otherwise permit NEMC to sell, license or transfer, or otherwise use on behalf of any third party any Lifespan Code, without the prior written consent of Lifespan, and (4) shall allow the NEMC Physicians to gain secure access to clinical data arising from patient encounters at the NEMCH Facility. The License, notwithstanding anything to the contrary contained herein, shall include those elements of the so-called Remote Computing Option Project ("RCO") that are Lifespan Code. RCO consists of the following elements:

- Applications
  - Enterprise MPI
  - Patient Management
  - Resource Scheduling
  - Patient Accounting
  - Integration Engine
  - Inpatient Pharmacy
  - Siemens LCR
  - Siemens COR
- Any interfaces between those applications or between any of those applications and other NEMC applications
- Any data extracts, or databases related to those applications
- Any file transfers related to those applications
- Any customized reports or queries related to those applications.

The License shall provide that Lifespan shall deliver (at the times specified in the next sentence) to NEMC copies of the then-current versions of all Lifespan Code subject to the License, in source code and object code format, together with any relevant documentation that is reasonably required for NEMC to use or modify for a permitted use the Lifespan Code, provided that Lifespan shall not be obligated by the License to create any new documentation for NEMC's use. The parties intend that the timing of the transfer of the Lifespan Code will be linked to the transfer to NEMC pursuant to the transition plan of responsibility for the operation of the systems to which the Lifespan Code relates. At the times specified in the transition plan agreed to by the parties, Lifespan shall provide to NEMC the source code, the object code and use its best efforts to provide any related documentation for the Lifespan Code; to the extent that Lifespan later discovers additional relevant documentation, it will furnish such documentation to NEMC. The transition plan will assure that any updates to source code that, in the period between the initial delivery of source code pursuant to the immediately preceding sentence and the transfer to NEMC of production responsibilities, are developed and put into effect in NEMC's production environment, will be provided to NEMC in a manner agreed to by the parties in the transition plan. All such source code, object code and

documentation will be provided as is, without any warranty; and upon the release of any Lifespan Code in source code format to NEMC and the termination of the portion of the Transitional Services to which such Lifespan Code relates, Lifespan shall have no further responsibility of any kind for the operation of the software and applications transferred. Upon conclusion of the Transitional Services arrangement, Lifespan shall transfer to NEMC any remaining Lifespan Code subject to the License that has not previously been transferred. The License shall contain such other terms and conditions as are customary and agreed to by the parties, and shall be entered into as of the Closing Date.

2.11.6 Hardware, Peripherals, Etc. As between Lifespan and the Lifespan Affiliates, on the one hand, and NEMC and the NEMC Affiliates, on the other hand, the parties agree that:

1) Lifespan owns the hardware and peripherals located in the legal department offices at NEMC and in the Lifespan Physician's PSO located at NEMC;

2) NEMC owns all other assets located on the premises of NEMC, subject to the rights of third parties, if any; and

3) Lifespan and the Lifespan Affiliates own all assets located in Rhode Island, subject to the rights of third parties, if any.

2.12 The Closing. The Closing (the "Closing") shall take place at the offices of Ropes & Gray at One International Place, Boston, MA on October 31, 2002 or at such other place and on such other date as Lifespan and NEMC may agree in writing, in each case, subject to the satisfaction of the conditions set forth in Article VI. The parties agree that if the parties' respective obligations under Article VI have been met, each party shall be obligated to consummate the Contemplated Transactions. Except as otherwise provided in Article IX, the failure to consummate the Contemplated Transactions provided for in this Agreement on the date and time and at the place specified herein will not relieve any party to this Agreement of any obligation under this Agreement.

2.13 Closing Deliveries. At the Closing:

2.13.1 NEMC shall deliver, as applicable, the various certificates, documents and instruments referred to in Article VI; and

2.13.2 Lifespan shall deliver, as applicable, the various certificates, documents and instruments referred to in Article VI.

## III. REPRESENTATIONS AND WARRANTIES OF NEMC AND THE NEMC AFFILIATES.

NEMCH and NEMCI, jointly and severally, hereby represent and warrant, to Lifespan as follows:

3.1 Organization and Corporate Power. Each of NEMCH, NEMCI and the NEMC Affiliates is a legal entity that (a) is duly organized, validly existing and in good standing under the laws of Massachusetts, except as set forth on Schedule 3.1, and (b) is duly qualified to do business as a foreign corporation and in good standing in each jurisdiction in which such qualification is legally required, unless the failure to so qualify has not had, and would not be reasonably likely to have, a Material Effect. NEMC and each of the NEMC Affiliates has full corporate power and authority and all Permits required (x) to own and use its assets, (y) to carry on the business and operations presently conducted by it and (z) to carry out the Contemplated Transactions.

3.2 Authorization and Enforceability. Assuming that LOM, as sole corporate member of each of NEMCH and NEMCI, exercises its reserved powers as contemplated in Section 2.1 hereof, the execution, delivery and performance by NEMC of this Agreement and the consummation of the Contemplated Transactions are within each such entity's corporate power and authority and have been, or with respect to the adoption of necessary amendments to the articles and bylaws of LOM, NEMCI, NEMCH and other NEMC Affiliates, will have been as of the Closing, duly authorized by all necessary action on the part of NEMC. This Agreement has been duly executed and delivered by NEMC, and is the legal, valid and binding obligation of the parties executing the same and enforceable against each such party in accordance with its terms.

3.3 Compliance; Authorization of Governmental Authorities. By entering into this Agreement, neither NEMCH, NEMCI nor the NEMC Affiliates will have violated any state or federal laws or any other Legal Requirement or any preemptive or other similar rights of any Person. Except as disclosed on Schedule 3.3 and except for filings required by the HSR Act, if any, no action by (including any authorization, consent or approval) or in respect of, or filing with, any Governmental Authority is required for, or in connection with, the valid and lawful (a) authorization, execution, delivery and performance of this Agreement by NEMCH, NEMCI or any NEMC Affiliate or (b) consummation of the Contemplated Transactions.

3.4 Effect of the Contemplated Transactions. Except as disclosed on Schedule 3.4, neither the execution, delivery and performance of this Agreement in accordance with its terms by NEMC or a NEMC Affiliate, nor the consummation of the Contemplated Transactions will, with or without the passage of time or the giving of notice or both: (a) assuming the termination of any waiting period under the HSR Act and assuming the taking of any action by (including any authorization, consent or approval), or in respect of, or any filing with any Governmental Authority, in each case, as disclosed on Schedule 3.3, violate any provision of any Legal Requirement or Government Order applicable to NEMC or to a NEMC Affiliate; (b) conflict with, or result in a Breach of any of the terms, conditions or provisions of any Contractual Obligation of NEMC or of a NEMC Affiliate, including the NEMCH Bonds, (c) give rise to any right of amendment, termination, cancellation or acceleration of any right or Liability of NEMC or a NEMC Affiliate, or to a loss of any benefit to which NEMC or a NEMC Affiliate is entitled under any provision of any Contractual Obligation, including the NEMCH Bonds, (d) require any action by (including any authorization, consent or approval) or in respect of (including notice to), any Person under any Contractual Obligation, including the NEMCH Bonds, (e) result in the creation or imposition of an Encumbrance upon, or the forfeiture of, any asset of NEMC or a NEMC Affiliate or (f) result in a Breach of any of the terms, conditions or provisions of the respective Articles or By-laws of NEMC or any NEMC Affiliate.

3.5 Quarterly Reports. NEMC has provided to Lifespan a quarterly report consisting of financial statements for the quarter and the quarter year-to-date for both the current fiscal year and the prior fiscal year, prepared on a basis consistent with the most recent audited financial statements; a quarterly checklist with all required attachments; and a letter of representation (together, the "Quarterly Report") for each of NEMC and the NEMC Affiliates.

3.6 Absence of Other Offers. Neither NEMC nor any NEMC Affiliate nor any Representative thereof is negotiating with, or has entered into any transaction or Contractual Obligation with, any Person concerning any merger, change of control, joint venture or partnership, consolidation or other business combination, reorganization, affiliation, acquisition or disposition or, sale of any substantial portion of its business or assets (other than sales of assets in the Ordinary Course of Business), management agreement or similar transaction, involving NEMC or any NEMC Affiliate.

3.7 Compliance with Articles, By-Laws, Legal Requirements and Government Orders. Neither NEMC nor any of the NEMC Affiliates is in default under, or in violation of: (a) its respective Articles or By-laws or (b) any Legal Requirement or Government Order applicable to it or its business. To the knowledge of NEMC and the NEMC Affiliates, there does not exist any Basis which could constitute a default under, or violation of, any of the foregoing. To the knowledge of NEMC and the NEMC Affiliates, all future expenditures with respect to the operation of the business of NEMC and the NEMC Affiliates, as presently conducted, that are required for NEMC and the NEMC Affiliates to comply with the provisions of all Legal Requirements currently in effect (or, to the knowledge of NEMC and the NEMC Affiliates, enacted but to take effect in the future) have been accounted for except for those expenditures that have not had, and would not reasonably be likely to have, a Material Effect.

3.8 Disclosure. The representations and warranties contained in this Article III (including the Schedules hereto) and in the documents, instruments and certificates furnished by NEMC, NEMC's Representatives or a NEMC Affiliate to Lifespan pursuant to this Agreement, including NEMC's Quarterly Reports, do not contain on the Effective Date and will not contain as of Closing any untrue statement of fact or omit to state any material fact necessary in order to make the statements and information contained in this Article III not misleading.

3.9 Employee Benefit Plans. For purposes of this Agreement, "Employee Plan" means any plan, program, agreement, policy or arrangement, whether or not reduced to writing, and whether covering a single individual or a group of individuals, that is (a) a welfare plan within the meaning of section 3(1) of ERISA, (b) a pension benefit plan within the meaning of Section 3(2) of ERISA, (c) a stock bonus, stock purchase, stock option, restricted stock, stock appreciation right or similar equity-based plan or (d) any other deferred-compensation, retirement, welfare-benefit, bonus, incentive or fringe-benefit plan, program or arrangement, but not including the dental benefits plan.

Schedule 3.9 lists all Employee Plans as to which NEMC or a NEMC Affiliate sponsors, maintains, contributes or is obligated to contribute, or under which NEMC or a NEMC Affiliate has or may have any Liability, or which benefits any current or former employee, director, consultant or independent contractor of NEMC or a NEMC Affiliate or the beneficiaries or

dependents of any such Person (each a "NEMC Plan"). NEMC has delivered to Lifespan true, accurate and complete copies of each NEMC Plan.

Each NEMC Plan, including any associated trust or fund, has been administered in accordance with its terms and with applicable Legal Requirements and all required contributions to, and premium payments on account of, each NEMC Plan have been made on a timely basis. There is no pending or, to the knowledge of NEMC or any NEMC Affiliates, threatened Action relating to a NEMC Plan.

3.10 Tax Status, Standing and Bond Compliance.

3.10.1 Each of NEMCH, NEMCI and the NEMC Affiliates, with the exception of those NEMC Affiliates organized as business corporations, business trusts, partnerships, or limited liability partnerships, has received a letter from the Internal Revenue Service ("IRS") stating that it is an organization described in Section 501(c)(3) of the Code and that it is not a private foundation as described in Section 509(a) of the Code. Neither NEMCH, NEMCI nor any NEMC Affiliate has knowledge of any challenge, investigation or inquiry that the IRS has made regarding its tax exempt status. Neither NEMCH, NEMCI nor any NEMC Affiliate has done or omitted to do anything that could lead to or result in a question being raised regarding, or a challenge being made by the IRS to, its Section 501(c)(3) or its non-private foundation status; and

3.10.2 To the knowledge of NEMC and the NEMC Affiliates, neither NEMCH, NEMCI nor any of the NEMC Affiliates has done or omitted to do anything that would cause interest on the NEMCH Bonds to become includable in the gross income of the holders of the NEMCH Bonds for federal income tax purposes, and each of NEMCH, NEMCI and the NEMC Affiliates has taken all action necessary to comply with those provisions of the Code, noncompliance with which would adversely affect the exclusion of interest from the gross income of the holders of such bonds for Federal income tax purposes.

IV. REPRESENTATIONS AND WARRANTIES OF LIFESPAN.

Lifespan represents and warrants to NEMC that:

4.1 Organization and Corporate Power. Lifespan is a legal entity that (a) is duly organized, validly existing and in good standing under the laws of Rhode Island and (b) is duly qualified to do business as a foreign corporation and in good standing in each jurisdiction in which such qualification is legally required, unless the failure to so qualify has not had, and would not be reasonably likely to have, a Material Effect.

4.2 Authorization and Enforceability. The execution, delivery and performance by Lifespan of this Agreement and the consummation of the Contemplated Transactions are within Lifespan's corporate power and authority and have been or, with respect to the adoption of necessary amendments to the articles and bylaws of LOM, NEMCH, NEMCI, will have been as of the Closing, duly authorized by all necessary action on the part of Lifespan. This Agreement

has been duly executed and delivered by Lifespan and is the legal, valid and binding obligation of Lifespan and is enforceable against Lifespan in accordance with its terms.

4.3 Compliance; Authorization of Governmental Authorities. By entering into this Agreement, Lifespan will not have violated any state or federal laws or any other Legal Requirement or any preemptive or other similar rights of any Person. Except as disclosed on Schedule 4.3 and except for filings required by the HSR Act, if any, no action by (including any authorization, consent or approval) or in respect of, or filing with, any Governmental Authority is required for, or in connection with, the valid and lawful (a) authorization, execution, delivery and performance by Lifespan of this Agreement or (b) consummation of the Contemplated Transactions.

4.4 Effect of the Contemplated Transactions. Except as disclosed on Schedule 4.4, neither the execution, delivery and performance by Lifespan of this Agreement in accordance with its terms, nor the consummation of the Contemplated Transactions by Lifespan will, with or without the passage of time or the giving of notice or both: (a) assuming the termination of any waiting period under the HSR Act and assuming the taking of any action by (including any authorization, consent or approval), or in respect of, or any filing with any Governmental Authority, in each case, as disclosed on Schedule 4.3, violate any provision of any Legal Requirement or Government Order applicable to Lifespan; (b) conflict with, or result in a Breach of any of the terms, conditions or provisions of any Contractual Obligation of Lifespan, (c) give rise to any right of amendment, termination, cancellation or acceleration of any right or Liability of Lifespan, or to a loss of any benefit to which Lifespan is entitled under any provision of any Contractual Obligation, (d) require any action by (including any authorization, consent or approval) or in respect of (including notice to), any Person under any Contractual Obligation, or (e) result in the creation or imposition of an Encumbrance upon, or the forfeiture of, any asset of Lifespan or (f) result in a Breach of any of the terms, conditions or provisions of the Articles or By-laws of Lifespan.

4.5 Disclosure. The representations and warranties contained in this Article IV (including the Schedules hereto) and in the documents, instruments and certificates furnished by Lifespan, Lifespan's Representatives and/or a Lifespan Affiliate to NEMC pursuant to this Agreement do not contain on the Effective Date and will not contain as of Closing any untrue statement of fact or omit to state any material fact necessary in order to make the statements and information contained in this Article IV not misleading.

V. COVENANTS.

5.1 General. Subject to the terms and conditions of this Agreement, each of the parties shall use its best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper, or advisable in order to consummate and make effective the Contemplated Transactions, including satisfaction, but not waiver, of the Closing conditions set forth in Article VI.

5.2 Notices and Consents.

5.2.1 NEMC. NEMC shall procure all actions by (including any authorization, consent or approval), perform all actions in respect of (including notice to), and make all filings with, any Massachusetts Governmental Authority that are required to consummate the Contemplated Transactions, including those disclosed on Schedule 3.3 and Schedule 3.4, or as otherwise reasonably requested by Lifespan. NEMC shall deliver copies of any such authorizations, consents, approvals, notices or filings to Lifespan on or before the Closing.

5.2.2 Lifespan. Lifespan shall procure all actions by (including any authorization, consent or approval), perform all actions in respect of (including notice to), and make all filings with, any Rhode Island Governmental Authority that are required to consummate the Contemplated Transactions, including those disclosed on Schedule 4.3 and Schedule 4.4 or as otherwise reasonably requested by NEMC. Lifespan shall deliver copies of any such authorizations, consents, approvals, notices or filings to NEMC on or before the Closing.

5.2.3 The parties agree to cooperate with respect to all filings and contacts related to the Contemplated Transactions with any Governmental Authority and in communicating with any Governmental Authority. The parties further agree that until the Closing, reasonable advance notice, to the extent feasible, or if not feasible, as soon as possible thereafter, of any meeting between a party and, or of any information being provided by a party to, a Governmental Authority related to the Contemplated Transactions will be given to the other party, whether formal, informal, written, oral, or otherwise. Provision of information to a Governmental Authority related to the Contemplated Transactions shall be limited to such information as the parties mutually deem to be reasonably necessary or advisable for the purpose of responding to issues raised by the Governmental Authority. Until the Closing, each party agrees to provide prompt notice to the other party of any communications received from a Governmental Authority related to the Contemplated Transactions, whether formal, informal, written, oral or otherwise.

5.2.4 Third Party Contracts. Lifespan shall take the lead in discussions with third party vendors that supply services, licenses or otherwise provide access to applications or computer systems to Lifespan that also benefit NEMC or any NEMC Affiliate and that are proposed for inclusion in a Service Agreement or a Transitional Services arrangement ("Vendors"). Immediately after the Effective Date, Lifespan will commence the process of identifying those Vendors whose consent may be necessary for Lifespan to perform under such proposed Service Agreements or Transitional Services arrangement and shall use its commercially reasonable efforts to seek the consent of those Vendors, as applicable, in a timely manner. NEMC shall cooperate fully in any negotiations that Lifespan commences with Vendors, provided that the final decision regarding any resulting modification to an agreement with any Vendor shall rest solely with Lifespan. For services not addressed in a Service Agreement and except for services provided to NEMC as Transitional Services, NEMC acknowledges that it shall be responsible for obtaining its own services contracts for NEMC and the NEMC Affiliates after the Closing.

5.2.5 If the Contemplated Transactions require a filing under the HSR Act, then each of the parties shall, as promptly as practicable (i) file with the Federal Trade Commission ("FTC") and the Antitrust Division of the United States Department of Justice (the "Antitrust Division") the notification and report form and related material required for the Contemplated Transactions pursuant to the HSR Act and (ii) file any similar notifications and reports required under all other applicable Legal Requirements regarding similar subject matter. The parties shall furnish to each other such necessary information and reasonable assistance as may be requested in connection with the preparation of any filing required to be made in accordance with the preceding sentence. The parties shall use their best efforts to respond as promptly as practicable to all inquiries received from the FTC, the Antitrust Division or any other Governmental Authority with similar subject matter jurisdiction for additional information or documentation and to obtain any clearance required under the HSR Act or any other applicable Legal Requirement regarding similar subject matter. Each of the parties shall be responsible for its own costs incurred in preparing and filing under the HSR Act and in responding to any inquiries received from Governmental Authorities as a result of such filing, provided that any filing fee required under the HSR Act shall be borne on a 50/50 basis by NEMC and Lifespan.

5.2.6 Notwithstanding any other provision in this Agreement to the contrary, this Agreement shall not require Lifespan to dispose of, or make any material changes in, any portion of its business or to incur any other burden to obtain a favorable Government Order under the HSR Act or to obtain any authorization, consent or approval of a Governmental Authority.

5.3 Operation of Business. From the Effective Date until the Closing Date and except with the prior written consent of Lifespan, NEMC shall (and shall cause the NEMC Affiliates and its Subsidiaries to) conduct its business only in the Ordinary Course of Business.

5.3.1 Without limiting the generality of the foregoing, without the written consent of Lifespan, NEMC shall (and shall cause its Subsidiaries and the NEMC Affiliates to):

(a) not take or commit to take any action that would cause the representations and warranties in Article III to be untrue at, or as of any time prior to, the Closing Date;

(b) preserve intact its business organization and relationships with vendors and third parties (including lessors, licensors, suppliers, distributors and customers) and employees; and

(c) consult with and obtain the prior written consent of Lifespan, prior to taking any action or entering into any transaction that may be of strategic importance.

5.3.2 Managed Care Contracts. As of the Effective Date and until the Closing, the CFO of NEMCH shall be responsible for conducting managed care contracting negotiations with those third party payors who pay for or arrange for payment for the clinical services of NEMC and NEMC Affiliates, and said CFO and the Lifespan CFO or

his designee shall notify such third party payors of the NEMCH CFO's responsibility hereunder.

5.3.3 Ongoing Payment Obligations. NEMC shall continue to pay its share of capital expenditure allocations through the Closing for capital expenditures that are consistent with an approved Lifespan corporate office capital budget or budgets ("Approved Capital Expenditures"), with NEMC's share to be based on the formulae in use at Lifespan as of the Effective Date and applicable to all Lifespan Affiliates that are hospitals, including for this purpose NEMCH, but in no event to exceed 35% of the expenditures; provided, however, that for the period beginning October 1, 2002, and ending with the Closing (the "FY 2003 Period"), NEMC's contribution toward Lifespan's Approved Capital Expenditures will be in an amount equal to NEMC's Net Patient Service Revenue Percentage multiplied by Expended Capital Costs. NEMC's Net Patient Service Revenue Percentage is the proportion of NEMC's unaudited FY 2002 net patient service revenue to the aggregate FY 2002 unaudited net patient service revenue of all Lifespan Affiliates that are hospitals, including for this purpose NEMCH, and "Expended Capital Costs" means the amount of Approved Capital Expenditures actually paid by Lifespan during the FY 2003 Period in the form of cash disbursed or checks written.

5.4 Tax Matters. From the Effective Date hereof until the Closing Date, without the written consent of the other party, neither party shall make, change or revoke any material Tax election, elect or change any method of accounting for Tax purposes, settle any claim or assessment in respect of Taxes or enter into any Contractual Obligation in respect of Taxes with any Governmental Authority.

5.5 Notice of Developments. From the Effective Date hereof until the Closing Date, each party shall give the other party prompt written notice upon becoming aware of any material development affecting the assets, Liabilities, business, financial condition, operations or prospects of such notifying party, or any event or circumstance that could reasonably be expected to cause a Breach of any of such notifying party's representations and warranties; provided, however, that no such notice shall be deemed to amend or supplement any Schedule hereto, or to prevent or cure any Breach or otherwise disclose any exception to, any of the representations and warranties set forth in this Agreement.

5.6 Expenses. Except as otherwise specifically provided in this Agreement, whether or not the Contemplated Transactions are consummated, each party shall pay its own financial advisory, legal, accounting and other expenses incurred by it or for its benefit in connection with the preparation and execution of this Agreement, the compliance herewith and the Contemplated Transactions.

5.7 Release from MAA

5.7.1 NEMC and the NEMC Affiliates. Effective as of the Closing, NEMC and each of the NEMC Affiliates hereby releases, remises and forever discharges any and all rights and claims that each has had, now has, might now have or might in the future have against Lifespan, or any of the Lifespan Affiliates, or their officers, directors, employees

and agents arising from or in connection with the MAA, except with regard to those provisions of the MAA that, by their terms, survive the termination of the MAA.

5.7.2 Lifespan. Effective as of the Closing, Lifespan and each of the Lifespan Affiliates hereby releases, remises and forever discharges any and all rights and claims that each has had, now has, might now have or might in the future have against NEMC or any of the NEMC Affiliates or their officers, directors, employees and agents arising from or in connection with the MAA, except with regard to those provisions of the MAA that, by their terms, survive the termination of the MAA.

5.8 Confidentiality. Each party acknowledges that the success of the other party after the Closing depends upon the continued preservation of the confidentiality of certain information possessed or disclosed by such other party (a "Disclosing Party") prior to the Closing, that the preservation of the confidentiality of such information by a party receiving such information (a "Recipient") prior to the Closing is an essential premise of the bargain between NEMC and Lifespan, and that each party would be unwilling to enter into this Agreement in the absence of this Section 5.8. Accordingly, each of NEMC and Lifespan agree that it shall not, at any time on or after the Closing Date, directly or indirectly, without the prior written consent of the Disclosing Party, disclose or use, in any way harmful to the Disclosing Party, or otherwise contrary to the interests of the Disclosing Party, any confidential or proprietary information involving or relating to the Disclosing Party that the Recipient received from the Disclosing Party prior to the Closing; provided, however, that the information subject to the foregoing provisions of this sentence shall be deemed not to include any information generally available to, or known by, the public (other than as a result of disclosure in violation hereof) or any information otherwise known on a non-confidential basis by Recipient; and provided, further, that the provisions of this Section 5.8 shall not prohibit any retention of records or disclosure (i) required by any applicable Legal Requirement so long as reasonable prior notice is given to the other party of such disclosure and a reasonable opportunity is afforded to the other party to contest the same or (ii) made in connection with the enforcement of any right or remedy relating to this Agreement or the Contemplated Transactions. The parties agree that they shall be responsible for any Breach of the provisions of this Section 5.8 by any of their respective employees, agents or Representatives.

5.9 Quarterly Reports. NEMC shall provide to Lifespan a Quarterly Report for each of NEMC and the NEMC Affiliates for each quarter, or any partial quarter up to and including the Closing.

5.10 Publicity. No public announcement or disclosure shall be made by any party with respect to the subject matter of this Agreement or the Contemplated Transactions without the prior written consent of the other party hereto; provided, however, that the provisions of this Section 5.10 shall not prohibit any disclosure required by any applicable Legal Requirements, which disclosure will be governed by Section 5.2.3 above, or any disclosure made in connection with the enforcement of any right or remedy relating to this Agreement or the Contemplated Transactions. The parties shall use best efforts to discuss and review all such disclosures required under this Section 5.10 with the other party prior to such disclosures being made. Further, nothing in this Section 5.10 shall prohibit a party from making any disclosure that it reasonably believes needs to be made to rating agencies, credit enhancers, bond insurers or bond

trustees, provided that the CFO of NEMC shall provide advance notice to the CFO of Lifespan of any such anticipated disclosures and shall involve the Lifespan CFO in any communications with such parties.

5.11 Use of Marks. Except and only to the extent specifically set forth in this Agreement, no party nor any employee, officer, director, agent, contractor, parent, Subsidiary, NEMC Affiliate, Lifespan Affiliate, joint venturer or partner of such party, shall acquire any right under this Agreement to use, nor shall use, nor allow or assist a party to use the other party's name or any of its trademarks (i) in any advertising, publicity or promotion or other disclosure, (ii) to express or imply any endorsement of any service, or (iii) in any other manner or for any purpose whatsoever (whether or not similar to any of the foregoing) without the prior written consent of the other party; provided, however, that following the Closing NEMC and the NEMC Affiliates shall be entitled to continue to use existing stocks of signage and stationery with the Lifespan name, in accordance with current use of the Lifespan name by NEMC or such NEMC Affiliate, until such current stocks are used up or 120 days following the Closing, whichever first occurs, (or, in the case of signage, for a period of six (6) months following the Closing); provided, further that NEMC and the NEMC Affiliates shall indemnify Lifespan, LOM and the Lifespan Affiliates for any Losses incurred by virtue of the use of the Lifespan name by NEMC or NEMC Affiliates following the Closing, and provided NEMC shall use best efforts to replace such signage as soon as possible after the Effective Date.

5.12 Insurance. (a) Subject to the terms of this Section 5.12, Lifespan will maintain in full force and effect with the carrier that provides directors and officers coverage to Lifespan as of the Closing ("D & O Carrier") insurance for the trustees and officers of NEMC and the NEMC Affiliates with respect to acts or omissions during the Affiliation Period, provided that the D & O Carrier agrees to provide such "tail coverage" at no additional expense to Lifespan. Lifespan shall be required to provide such "tail coverage" only until the earlier of such time that (i) the D & O Carrier refuses to provide such "tail coverage," or (ii) the D & O Carrier requires any payment for such "tail coverage," or (iii) NEMC obtains a "nose policy" as described herein.

(b) Notwithstanding the foregoing NEMC shall use best efforts to obtain a "nose policy" to insure the trustees and officers of NEMC and the NEMC Affiliates with respect to acts or omissions during the Affiliation Period, and, in any event, NEMC shall obtain and maintain such coverage effective at such time Lifespan's obligations to maintain "tail coverage" hereunder end.

(c) It is the intent of the parties to cooperate in good faith to seek to avoid any gap in directors and officers liability coverage for the trustees and officers of NEMC and the NEMC Affiliates relating to acts or omissions during the Affiliation Period; provided, however, that nothing in this subsection (c) shall enlarge the obligations of either party beyond those expressly stated in subsection (a) with respect to Lifespan and in subsection (b) with respect to NEMC.

5.13 Further Assurances. From and after the Closing Date, upon the request of either party, each of the parties hereto shall do, execute, acknowledge and deliver all such further acts, assurances, deeds, assignments, transfers, conveyances and other instruments and papers as may be reasonably required or appropriate to carry out the Contemplated Transactions.

## VI. CONDITIONS TO THE CLOSING.

The obligation of each party to consummate the Closing is subject to the fulfillment of each of the following conditions (unless waived by the other party in accordance with Section 9.3):

6.1 Representations and Warranties. The representations and warranties of each party contained in this Agreement (including in Articles III and IV) and in any document, instrument or certificate delivered hereunder, shall be true and correct in all respects on and as of the Closing as if made on and as of the Closing Date.

6.2 Performance. Each party shall have performed and complied with all agreements, obligations and covenants contained in this Agreement that are required to be performed or complied with by them at or prior to the Closing.

6.3 Qualifications. Any applicable waiting periods (and any extensions thereof) under the HSR Act shall have expired or otherwise been terminated. No provision of any applicable Legal Requirement and no Government Order shall prohibit the consummation of any of the Contemplated Transactions.

6.4 Absence of Government Orders. No Action shall be pending or threatened wherein an unfavorable Government Order would (i) prevent consummation of any of the Contemplated Transactions, or (ii) cause any of the Contemplated Transactions to be rescinded following consummation.

6.5 Consents, etc. All actions by (including any authorization, consent or approval) or in respect of (including notice to), or filings with, any Governmental Authority or other Person that are required to consummate the Contemplated Transactions or the Service Agreements shall have been obtained or made, in a manner reasonably satisfactory in form and substance to the other party, and no such authorization, consent or approval shall have been revoked.

6.6 Proceedings and Documents. All corporate and other proceedings in connection with the Contemplated Transactions and all documents incident thereto shall be reasonably satisfactory in form and substance to each party and its respective counsel, and they shall have received all such counterpart original and certified or other copies of such documents as they may reasonably request.

6.6.1 At the Closing, NEMC shall deliver to Lifespan a duly executed and acknowledged Certificate of Amendment, in triplicate, of each of NEMC and, as applicable in accordance with the terms of Section 2.1.1(a), the NEMC Affiliates' amended and restated Articles as filed with the Office of the Secretary of State of the Commonwealth of Massachusetts and effective as of the Closing Date.

6.6.2 At the Closing, NEMC shall deliver to Lifespan a copy of each of NEMC and, the NEMC Affiliates' amended and restated Bylaws, certified by the Secretary of each such entity.

6.6.3 At the Closing, NEMCI shall deliver to Lifespan a written acceptance of its status, as of the Closing Date, as sole member of NEMCH and each of the NEMC Affiliates of which NEMCI serves as sole member, together with a certification by an officer of each of NEMCI and NEMCH, and each of the NEMC Affiliates of which NEMCI serves as sole member, respectively that such acceptance has been approved by the applicable Board of Directors for each such entity.

6.6.4 The parties shall have obtained the resignations, effective as of the Closing, of each of the directors and officers listed on Schedule 2.1.2(a) and Schedule 2.1.2(b) hereto.

6.6.5 Lifespan shall deliver to NEMC a certificate executed on its behalf by an authorized officer to the effect that, as of the Closing, all representations and warranties of Lifespan in this Agreement are true and correct in all respects on and as of the Closing Date as though such representations and warranties were made on and as of such time. Each of NEMCI and NEMCH shall deliver to Lifespan a certificate executed on its behalf by an authorized officer to the effect that, as of the Closing, all representations and warranties of NEMCI and NEMCH respectively in this Agreement are true and correct in all respects on and as of the Closing Date as though such representations and warranties were made on and as of such time.

6.6.6 NEMCH shall deliver to Lifespan, in a form satisfactory to Lifespan, a guaranty agreement relating to the payment obligation of NEMCI as described in Section 2.2.3.

6.6.7 The parties shall deliver such other schedules or documents as are required by this Agreement.

6.7 IS Agreement. The parties shall have executed and delivered to the other party an IS Agreement as described in Section 2.11.2.

6.8 Agreements to be Terminated, etc. The parties shall have caused to be terminated or amended, as the case may be, without further obligation to either party, each of the Contractual Obligations listed as agreements to be terminated or amended on Schedule 6.8 including, but not limited, to the MAA (except for those provisions of the MAA that by their terms survive the termination of the MAA), and shall have caused to be executed and delivered such other documents and instruments as may be reasonably requested by the other party to evidence and confirm the termination or amendment of such Contractual Obligations.

6.9 Opinions of Counsel.

6.9.1 NEMC shall have delivered to Lifespan a legal opinion dated as of the Closing Date of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., counsel to NEMC, with respect to the Contemplated Transactions, which opinion shall be in form and substance reasonably satisfactory to Lifespan and cover such matters with respect to the Contemplated Transactions as Lifespan or its counsel may reasonably request.

6.9.2 Lifespan shall have delivered to NEMC a legal opinion dated as of the Closing Date of Ropes & Gray, counsel to Lifespan, with respect to the Contemplated Transactions, which opinion shall be in form and substance reasonably satisfactory to NEMC and cover such matters with respect to the Contemplated Transactions as NEMC or its counsel may reasonably request.

6.10 Absence of Other Negotiation. Neither NEMC nor any NEMC Affiliate nor any Representative thereof shall have entered into any negotiations, transaction or Contractual Obligation with any Person other than Lifespan concerning any merger, change of control, joint venture or partnership, consolidation or other business combination, reorganization, affiliation, acquisition or disposition of, sale of any substantial portion of its business or assets (other than sales of assets in the Ordinary Course of Business), management agreement or similar transaction, involving NEMC or any NEMC Affiliate.

VII. INDEMNIFICATION.

7.1 Indemnification by NEMC. Subject to the limitations set forth in this Article VII, each of NEMCH and NEMCI (each in its capacity as indemnifying party, an "Indemnifying Party") shall indemnify and hold harmless Lifespan and LOM (each in its capacity as an indemnified party, an "Indemnified Party"), from, against and in respect of any and all Actions, Liabilities, Governmental Orders, Encumbrances, losses, damages, bonds, dues, assessments, fines, penalties, Taxes, fees, costs (including costs of investigation, defense and enforcement of this Agreement), expenses or amounts paid in settlement (in each case, including reasonable attorneys' fees and expenses), whether or not involving a Third Party Claim (collectively, "Losses"), incurred or suffered by an Indemnified Party or any of them as a result of, arising out of or directly or indirectly relating to:

(a) Any knowing or intentional omission, or any misrepresentation made by or on behalf of NEMC or a NEMC Affiliate, or any breach or failure of any covenant of NEMC or a NEMC Affiliate, or any breach or inaccuracy in any representation or warranty made by or on behalf of NEMC or any NEMC Affiliate in this Agreement, including in any Schedule or Exhibit (as any such representation or warranty would read if all qualifications as to knowledge and materiality were deleted therefrom);

(b) All Debts, Liabilities and Contractual Obligations of NEMC or the NEMC Affiliates or Subsidiaries;

(c) Any and all contractual settlements associated with the Closing and/or the Contemplated Transactions;

(d) Any and all assessments, fines, penalties, judgments, awards, charges, repayments, and the like, imposed by a Governmental Authority (or any agent thereof) or any court of competent jurisdiction for any acts or omissions of NEMC or any NEMC Affiliate or Subsidiary or any of its or their Representatives occurring at any time before, after or during the Affiliation Period: (i) on Lifespan or any Lifespan Affiliate, or (ii) on any of the directors, trustees, members,

owners, officers, employees, agents or Representatives of Lifespan or any Lifespan Affiliate to the extent of any amounts paid by Lifespan or a Lifespan Affiliate to indemnify or defend any such Persons; or

(e) The transactions covered by this Agreement, or otherwise incurred by Lifespan or LOM in respect of any of NEMC's or the NEMC Affiliates' or NEMC Subsidiaries' operations before, during or after the Affiliation Period.

7.2 Indemnification by Lifespan. Subject to the limitations set forth in this Article VII, Lifespan (in its capacity as indemnifying party, an "Indemnifying Party") shall indemnify and hold harmless NEMC (in its capacity as an indemnified party, an "Indemnified Party"), from, against and in respect of any and all Losses, incurred or suffered by an Indemnified Party as a result of, arising out of or directly or indirectly relating to:

(a) Any misrepresentation by Lifespan, or any breach or failure of any covenant, or any breach or inaccuracy in any representation or warranty made by or on behalf of Lifespan in this Agreement, including in any Schedule or Exhibit (as each such representation or warranty would read if all qualifications as to knowledge and materiality were deleted therefrom); and

(b) Any Liabilities incurred by Lifespan solely on behalf of the Lifespan Affiliates, not including LOM, with respect to matters before the Closing.

In addition, subject to the limitations set forth in this Article VII, Lifespan will indemnify NEMC for any losses it incurs that result directly and solely (x) from Lifespan's willful misconduct or gross negligence in the provision of services to NEMC by Lifespan employees working under the supervision and direction of Lifespan employees during the Affiliation Period or (y) from a material obligation that was approved by the Board of Directors of LOM, acting as sole member of NEMCI or NEMCH, as the case may be, but not otherwise, where such action was taken without the knowledge, consent, ratification or approval of the chief executive officer, chief financial officer or any trustee of NEMCI or NEMCH or any of the NEMC Affiliates.

7.3 Failure of Indemnification. If and to the extent that any undertaking in Sections 7.1 and 7.2 above is unenforceable against any party to this Agreement for any reason, such party shall make the maximum contribution to the payment and satisfaction of each of the Losses described in Section 7.1 or Section 7.2, as applicable, that is permissible under applicable Legal Requirements.

7.4 Third Party Claims.

7.4.1 If any third party shall notify an Indemnified Party with respect to any matter (a "Third Party Claim") which may give rise to an Indemnified Claim against an Indemnifying Party under this Article VII, then the Indemnified Party shall promptly give written notice to the Indemnifying Party; provided, however, that no delay on the part of the Indemnified Party in notifying the Indemnifying Party shall relieve the Indemnifying

Party from any obligation under this Article VII, except to the extent such delay actually and materially prejudices the Indemnifying Party.

7.4.2 The Indemnifying Party shall be entitled to participate in the defense of any Third Party Claim that is the subject of a notice given by the Indemnified Party pursuant to Section 7.4.1. In addition, the Indemnifying Party shall have the right to defend the Indemnified Party against the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party so long as (a) the Indemnifying Party gives written notice to the Indemnified Party within fifteen (15) days after the Indemnified Party has given notice of the Third Party Claim that the Indemnifying Party shall indemnify the Indemnified Party from and against the entirety of any and all Losses the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim, (b) the Indemnifying Party provides the Indemnified Party with evidence reasonably acceptable to the Indemnified Party that the Indemnifying Party will have adequate financial resources to defend against the Third Party Claim and fulfill its indemnification obligations hereunder, (c) the Third Party Claim involves only money damages and does not seek an injunction or other equitable relief, (d) the Indemnified Party has not been advised by counsel that an actual or potential conflict exists between the Indemnified Party and the Indemnifying Party in connection with the defense of the Third Party Claim, (e) the Third Party Claim does not relate to or otherwise arise in connection with Taxes or any criminal or regulatory enforcement Action, (f) settlement of, an adverse judgment with respect to or the Indemnifying Party's conduct of the defense of the Third Party Claim is not, in the good faith judgment of the Indemnified Party, likely to be adverse to the Indemnified Party's reputation or continuing business interests (including its relationships with current or potential customers, suppliers or other parties material to the conduct of its business) and (g) the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently.

7.4.3 So long as the Indemnifying Party is conducting the defense of the Third Party Claim in accordance with Section 7.4.2, (a) the Indemnifying Party shall not consent to the entry of any judgment or enter into any compromise or settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party unless such judgment, compromise or settlement (i) provides the payment of money as sole relief for the claimant that is paid by the Indemnifying Party, (ii) results in the full and general release the Indemnified Party from all liabilities arising or relating to, or in connection with, the Third Party Claim and (iii) involves no finding or admission of any violation of Legal Requirements or the rights of any Person or any effect on any other claims that may be made against the Indemnified Party; and (b) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim; <u>provided</u>, <u>however</u>, that the Indemnifying Party shall pay the fees and expenses of separate co-counsel retained by the Indemnified Party that are incurred prior to Indemnifying Party's assumption of control of the defense of the Third Party Claim.

7.4.4 If the Indemnifying Party does not deliver the notice contemplated by clause (a), or the evidence contemplated by clause (b), of Section 7.4.2 within fifteen (15)

days after the Indemnified Party has given notice of the Third Party Claim, or otherwise at any time fails to conduct the defense of the Third Party Claim actively and diligently, the Indemnified Party may defend, and may consent to the entry of any judgment or enter into any compromise or settlement with respect to, the Third Party Claim in any manner it may deem appropriate (and the Indemnified Party need not consult with, or obtain any consent from, the Indemnifying Party in connection therewith). If such notice is given on a timely basis, the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently but any of the other conditions in Section 7.4.2 is or becomes unsatisfied, the Indemnified Party may defend, and may consent to the entry of any judgment or enter into any compromise or settlement with respect to, the Third Party Claim; provided, however, that the Indemnifying Party shall not be bound by the entry of any such judgment consented to, or any such compromise or settlement effected, without its prior written consent (which consent shall not be unreasonably withheld or delayed). In the event that the Indemnified Party conducts the defense of the Third Party Claim pursuant to this Section 7.4.4, the Indemnifying Party shall (a) advance the Indemnified Party promptly and periodically the costs of defending against the Third Party Claim (including reasonable attorneys' fees and expenses) and (b) remain responsible for any and all other Losses that the Indemnified Party may incur or suffer resulting from, arising out of, relating to, in the nature of or caused by the Third Party Claim to the fullest extent provided in this Article VII.

7.4.5 Any Indemnifying Party hereunder hereby consents to the non-exclusive jurisdiction of any court in which any Third Party Claim may be brought against any Indemnified Party for purposes of any claim which such Indemnified Party may have against such Indemnifying Party pursuant to this Agreement in connection with such Third Party Claim.

7.5 No Circular Recovery. Except with respect to its indemnification rights as provided in the last paragraph of Section 7.2, NEMC hereby agrees that it shall not make any claim against Lifespan by reason of the fact that Lifespan was a controlling person or Representative of NEMC or a NEMC Affiliate or was serving as such at the request of NEMC or a NEMC Affiliate (whether such claim is for Losses of any kind or otherwise and whether such claim is pursuant to any statute, Articles or By-Laws, Contractual Obligation or otherwise) with respect to any claim brought by an Indemnified Party against NEMC or a NEMC Affiliate relating to this Agreement or any of the Contemplated Transactions. With respect to any claim brought by an Indemnified Party against NEMC or a NEMC Affiliate relating to this Agreement and any of the Contemplated Transactions, NEMC and each NEMC Affiliate expressly waives any right of subrogation, contribution, advancement, indemnification or other claim against Lifespan with respect to any amounts owed by NEMC pursuant to this Article VII, except with respect to NEMC's indemnification rights provided for in the last paragraph of Section 7.2.

7.6 Knowledge and Investigation. The right of any Indemnified Party to indemnification pursuant to this Article VII shall not be affected by any investigation conducted or knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing, with respect to the accuracy of any representation or warranty, or performance of or compliance with any covenant or agreement, referred to in Sections 7.1 and 7.2. The waiver of any condition contained in this Agreement

based on the accuracy of any such representation or warranty, or on the performance of or compliance with any such covenant or agreement, shall not affect the right of any Indemnified Party to indemnification pursuant to this Article VII based on such representation, warranty, covenant or agreement.

7.7 Remedies Cumulative. The rights of each Indemnified Party under this Article VII are cumulative, and each Indemnified Party, as the case may be, shall have the right in any particular circumstance, in its sole discretion, to enforce any provision of this Article VII without regard to the availability of a remedy under any other provision of this Article VII.

VIII. TAX MATTERS.

8.1 Tax Indemnification. Each party will indemnify, defend and hold harmless the other party from and against any Losses attributable to (a) all Taxes (or the non-payment thereof) applicable to such Indemnifying Party for all Taxable periods ending on or before the Closing Date and the portion through the end of the Closing Date for any Taxable period that includes (but does not end on) the Closing Date ("Pre-Closing Tax Period"), and (b) any and all Taxes of any person imposed on an Indemnifying Party as a transferee or successor, by contract, or otherwise.

8.2 Certain Taxes and Fees. All transfer, documentary, sales, use stamp, registration and other such Taxes, and any conveyance fees or recording charges incurred in connection with the Contemplated Transactions, will be paid by NEMC when due. NEMC will, at their own expense, file all Tax Returns necessary to consummate the Contemplated Transactions and other documentation with respect to all such Taxes, fees and charges and, if required by applicable law, Lifespan will (and will cause its Affiliates to) join in the execution of any such Tax Returns and other documentation.

IX. TERMINATION.

9.1 Termination of Agreement. This Agreement may be terminated only as provided below:

(a) The parties may terminate this Agreement by mutual written consent; or

(b) By Lifespan or NEMC if: (i) the Closing has not occurred by November 30, 2002 (the "Final Termination Date"); provided, however, that the right to terminate this Agreement under this Section 9.1(b) shall not be available to any party whose action or failure to act has been a principal cause of or resulted in the failure of the Closing to occur on or before such date and such action or failure to act constitutes a breach of this Agreement; (ii) there shall be a final nonappealable order of a federal or state court in effect preventing the Closing; or (iii) there shall be any statute, rule, regulation or order enacted, promulgated or issued or deemed applicable to the transactions contemplated by this Agreement by any Governmental Authority that would make consummation of the transactions contemplated by this Agreement illegal.

9.2 Effect of Termination. In the event of the termination of this Agreement pursuant to Section 9.1, (a) all rights and obligations of the parties hereunder shall terminate without any liability of any party to any other party and, (b) the provisions of the MAA shall not terminate and Lifespan's obligation to make monthly payments under Section 3.3 of the MAA shall be reinstated as of September 1, 2002, provided, however, that each party shall remain liable for any Breaches of this Agreement, prior to its termination and the terminating party's right to pursue all legal remedies will survive such termination unimpaired; and provided, further, that, Sections 5.6 and 5.10 shall survive termination and continue in full force and effect.

9.3 Extension; Waiver. At any time prior to the Closing, Lifespan, on the one hand, and NEMC, on the other hand, may, to the extent legally allowed, (i) extend the time for the performance of any of the obligations of the other parties, (ii) waive any inaccuracies in the representations and warranties made to such party contained in this Agreement or in any document delivered pursuant to this Agreement, and (iii) waive compliance with any of the agreements or conditions for the benefit of such party contained in this Agreement. Any agreement on the part of a party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

X. MISCELLANEOUS.

10.1 Notices. All notices, requests, demands, claims or other communications required or permitted to be delivered, given or otherwise provided under this Agreement must be in writing and may be delivered, given or otherwise provided:

(a) by hand, which will be effective upon delivery;

(b) by nationally recognized overnight courier, which will be effective on the following business day;

(c) by certified mail, return receipt requested, which will be effective on the fifth business day; and

(d) to the address listed below either:

If to NEMC, to it at:

New England Medical Center Hospitals, Inc.
750 Washington Street
Boston, Massachusetts 02110
Attention: Thomas F. O'Donnell, M.D., CEO

with a copy to:
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo P.C.
One Financial Center
Boston, Massachusetts 02111
Attention: Stephen M. Weiner, Esq.

If to Lifespan, to it at:

Lifespan Corporation
167 Point St.
Providence, RI 02903
Attention: George Vecchione, CEO

with a copy to:
Lifespan Corporation
General Counsel's Office
167 Point St.
Providence, RI 02903
Attention: Kenneth Arnold, Esq.

Each of the parties to this Agreement may specify different address by giving notice in accordance with this Section 10.1 to each of the other parties hereto.

10.2 Succession and Assignment; No Third-Party Beneficiary. Subject to the immediately following sentence, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, each of which such successors and permitted assigns shall be deemed to be a party hereto for all purposes hereof. No party may assign, delegate or otherwise transfer either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other parties; provided, however, that Lifespan may (i) assign any or all of its rights and interests hereunder to one or more of the Lifespan Affiliates so long as Lifespan is not relieved of any liability hereunder and (ii) designate one or more of the Lifespan Affiliates to perform its obligations hereunder so long as Lifespan is not relieved of any of its obligations hereunder. Except as expressly provided herein, this Agreement is for the sole benefit of the parties and their permitted successors and assignees and nothing herein expressed or implied shall give or be construed to give any Person, other than the parties and such permitted successors and assignees, any legal or equitable rights hereunder.

10.3 Amendments and Waivers. No amendment or waiver of any provision of this Agreement shall be valid and binding unless the same shall be in writing and signed, in the case of an amendment, by Lifespan and NEMC, or in the case of a waiver, by the party against whom the waiver is to be effective. No waiver by any party of any Breach of any representation, warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent Breach of any such representation, warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence. No delay or omission on the part of any party in exercising any right, power or remedy under this Agreement shall operate as a waiver thereof.

10.4 Entire Agreement. This Agreement, which includes the Service Agreements and any documents, instruments and certificates explicitly referred to herein, constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, with respect thereto.

10.5 Schedules; Listed Documents, etc. Neither the listing nor description of any item, matter or document in any Schedule hereto nor the furnishing or availability for review of any document shall be construed to modify, qualify or disclose an exception to any representation or warranty of any party made herein or in connection herewith, except to the extent that such representation or warranty specifically refers to such Schedule and such modification, qualification or exception is clearly described in such Schedule.

10.6 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument. This Agreement shall become effective when each party hereto shall have received counterparts hereof signed by the other parties hereto.

10.7 Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. In the event that any provision hereof would, under applicable law, be invalid or unenforceable in any respect, each party hereto intends that such provision shall be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.

10.8 Headings. The headings contained in this Agreement are for convenience purposes only and shall not in any way affect the meaning or interpretation hereof.

10.9 Construction. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. The parties intend that each representation, warranty and covenant contained herein shall have independent significance. If any party has Breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the party has not Breached shall not detract from or mitigate the fact that the party is in Breach of the first representation, warranty or covenant.

10.10 Specific Performance. Each of the parties acknowledges and agrees that the other parties would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are Breached. Accordingly, each of the parties agrees that, without posting bond or other undertaking, the other parties shall be entitled to an injunction or injunctions to prevent Breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any Action instituted in any court of the United States or any state thereof having jurisdiction over the parties and the matter in addition to any other remedy to which it may be entitled, at law or in equity. Each party further agrees that, in the event of any action for specific performance in respect of such Breach, it shall not assert the defense that a remedy at law would be adequate.

10.11 Obligations and Liability Joint and Several. All the obligations and Liabilities under this Agreement of NEMCI, NEMCH and the NEMC Affiliates, on the one hand, and of Lifespan and the Lifespan Affiliates, not including LOM, on the other, shall be joint and several, except with respect to the obligation of NEMCI under Section 2.2.3(a), which shall be exclusive to NEMCI (but such obligation shall be the subject of the guaranty of NEMCH provided for in Section 2.2.3(b)).

10.12 Waiver of Jury Trial. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, THE PARTIES HEREBY WAIVE, AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT,

TORT OR OTHERWISE. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE ITS RIGHT TO TRIAL BY JURY IN ANY PROCEEDING WHATSOEVER BETWEEN THEM RELATING TO THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

10.13 Survival. Except as expressly set forth in this Agreement, all obligations, representations and warranties and covenants of the parties under this Agreement shall survive the Closing.

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as an agreement under seal as of the date first above written.

NEW ENGLAND MEDICAL CENTER, INC.

By:____________________
Name: Malcolm Sherman
Title: Chairman

By:____________________
Name: Thomas O'Donnell, Jr. M.D.
Title: President & CEO

LIFESPAN CORPORATION

By:____________________
Name: Alfred Verrecchia
Title: Chairman

By:____________________
Name: George Vecchione
Title: President & CEO

NEW ENGLAND MEDICAL CENTER HOSPITALS, INC.

By:____________________
Name: Malcolm Sherman
Title: Chairman

By:____________________
Name: Thomas O'Donnell, Jr. M.D.
Title: President & CEO

For the sole purpose of accomplishing the obligations of Section 2.1 hereof:

LIFESPAN OF MASSACHUSETTS, INC.

By:____________________
Name: Hon. Bruce M. Selya
Title: Chairman

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as an agreement under seal as of the date first above written.

NEW ENGLAND MEDICAL CENTER, INC.

By:____________________
Name: Malcolm Sherman
Title: Chairman

By:____________________
Name: Thomas O'Donnell, Jr., M.D.
Title: President & CEO

LIFESPAN CORPORATION

By: [signature]
Name: Alfred Verrecchia
Title: Chairman

By: [signature]
Name: George Vecchione
Title: President & CEO

NEW ENGLAND MEDICAL CENTER HOSPITALS, INC.

By:____________________
Name: Malcolm Sherman
Title: Chairman

By:____________________
Name: Thomas O'Donnell, Jr., M.D.
Title: President & CEO

For the sole purpose of accomplishing the obligations of Section 2.1 hereof:

LIFESPAN OF MASSACHUSETTS, INC.

By: [signature]
Name: Hon. Bruce M. Selya
Title: Chairman