# EXHIBIT 2

**Lifespan**

**Personal & Confidential**

**MEMORANDUM**

To: George Vecchione
President & CEO, Lifespan

From: Thomas Igoe
Director, Internal Audit Services & Compliance Officer

Subject: Morgan Stanley COI Investigation

Date: December 5, 2002

---

I have completed my investigation of an allegation that Mr. David Lantto, CFO and SVP of Lifespan had an undisclosed conflict of interest with Mr. Jeff Seubel, a broker with Morgan Stanley, who recently completed an engagement at New England Medical Center, a Lifespan affiliate. The allegation was that Messrs. Lantto and Seubel had a business relationship involving the purchase and resale of wine. The allegation was made by an unidentified third party and repeated by Mr. Benson (Ben) T. Caswell, Executive Director of Massachusetts Health and Educational Facilities Authority, to several parties. Mr. Caswell's statements were made known to Lifespan officials.

I interviewed Messrs. Lantto, Seubel, and Caswell, and Ms. Stephanie Gibson, a PFM representative. Outlined below are the conclusions reached from the information obtained and my recommendations.

- The allegation that Lantto and Seubel have a business relationship relating to the purchase and resale of wine cannot be substantiated, is denied by both parties, and based upon the information available should not be considered credible. In a meeting with several Executive Directors of state bonding authorities Mr. Caswell restated the allegation, which he had heard from a third party. Caswell told me that he believes the allegation lacks credibility and he should have never repeated it. Ms. Gibson, who reported the allegation to Morgan Stanley, also stated that she only heard of this rumor from a third party and had no direct knowledge of the allegation or its source. Lantto and Seubel categorically deny that they have ever been in a business relationship. Lantto provided copies of his 1997 through 2001 federal tax returns (some unsigned), and has agreed, if necessary, to submit a signed statement denying the allegation.

- Neither the Massachusetts Health and Educational Facilities Authority (HEFA), or Morgan Stanley is investigating this allegation because it lacks credible support. Caswell stated that this allegation does not merit any sort of HEFA investigation. He attributes this rumor to be the result of envy from other brokers who did not participate in the NEMC financing engagement, which has been given credence by the Lifespan/NEMC separation. Seubel reported this allegation to his superior at Morgan Stanley. They did not believe it to be worthy of an investigation; both Seubel and Morgan Stanley are trying to avoid a public spectacle. However, according to Seubel if such allegations resurface Morgan Stanley will investigate, determine the source of the allegation, and take legal action against the source of the allegation. It should be noted that this allegation was brought to Lifespan's attention by Seubel who called Lantto, who in turn relayed the information to Lifespan's President & CEO, and the Sr. Vice President and General Counsel. The allegation has never been formally brought to Lifespan's attention by a third party.

- In recent weeks the allegation has not resurfaced. Caswell and Gibson stated that they have not heard any rumor in weeks.

- The source of the allegation has not been identified. Neither Caswell nor Gibson would or could identify, or surmise, the source. Both Lantto and Seubel believe that Mr. Mark Scott, CFO of NEMC, is the source. They state that he was against the financing engagement from the start, wanted and eventually replaced Morgan Stanley with Ponders & Company, was upset that the financing engagement did not achieve the projected target and, since the beginning failed to fully understand the risk and rewards of the engagement. Caswell was formerly with Ponders & Company, and reportedly Scott made the allegation to Caswell over dinner. Gibson reportedly told this to Lantto, but when I questioned her she denied the Scott/Caswell connection. As such, at this time the source of the allegation, like the allegation itself is based entirely upon rumor and conjecture.

- Both Seubel and Lantto are concerned about the potential impact this allegation may have on their reputations. Seubel is not aggressively pursuing the source of the allegation; however, if the allegation reappears he will take legal action against Scott. Lantto would like the source of the allegation to be identified, and if it is Scott, he be sanctioned or terminated. Additionally, Lantto would like a letter of apology from Caswell and letters sent, retracting the statement he made, to the various Executive Directors.

- On January 8, 2002, Lifespan approved the Morgan Stanley proposed NEMC financing, including the use of a swap. According to Lantto, at that time Mal Sherman, NEMC Chair, declined to competitively bid the bond swap, instead he wanted Morgan Stanley to complete the project.

- While no evidence exists that Lantto and Seubel have a business relationship they do have a close friendship that should have been fully disclosed to the CEO and others and better managed during this financial engagement. Specifically, Lantto and Seubel developed a friendship, essentially starting in 1995, which revolves around the appreciation of wine. This has resulted in several social interactions that are most probably extremely innocent, but could be interpreted by a third party as to impact the independence of both parties. Because of their positions, Seubel as a Morgan Stanley broker who proposed the bond swap and Lantto as the CFO who brought it forward to the Lifespan Finance and NEMC Finance Committees, both parties needed to maintain a relationship beyond reproach; they have not. The frequency and degree of their social interaction gives the appearance of conflict via preferential access, places Lifespan in an awkward position, and should be fully disclosed and better managed in the future.

During interviews Lantto and Seubel disclosed the following, which to a third party may represent an impermissible appearance of conflict.

1. In the past year Seubel stated that he has come to Providence on Lifespan business four times. On each of these trips he is treated to dinner and stays as an overnight guest at the Lantto's residence. Seubel believes such arrangements are common in his industry and points out that Lifespan is spared his meal and hotel expenses. Lantto explains that these dinners are designed to reciprocate Seubel for past dinners he has sponsored, often involve business matters, and represent nothing more than their friendship.

2. Within the last two years the Seubel's and Lantto's have planned and booked three trips, with other couples. Specifically, within the last year a trip was planned to Las Vegas, but the Lantto's had to cancel at the last minute; within the last 18 months a trip to Italy occurred and the cost of an Italian Villa was to be shared, Seubel had to cancel at the last minute; and within the last year they attended the "International Wine Tasting Conference" in New York. The cost of these trips was not paid for by Morgan Stanley; everyone paid their own way. At the "Conference" Morgan Stanley paid for a dinner and brunch.

- Lifespan has competitive bidding policies that apply to the acquisition of goods and services. According to MS 102 – certain professional services, because of the unique level of professional expertise required, are exempt from competitive bidding. The services of a bond underwriter such as Morgan Stanley would fall into this category, as such, no competitive bid or documented decision has to be prepared justifying the selection of Morgan Stanley to issue bonds or conduct a bond swap. However, such selection decisions are based upon the understanding that the applicable Lifespan Executive who decides which professional service organization obtains the contract, performs an assessment that is independent and beyond reproach. In this case the applicable Executive would have been Lantto, because of his personal relationship with Seubel he should have recused himself from the process or more fully disclosed his friendship; it raises questions about his independence.

Based upon the information obtained and conclusions made I make the following recommendations to the Lifespan President & CEO.

- Brief the Chairman on the extent of the investigation, and it's findings and recommendations.

- Terminate the investigation at this point unless additional information surfaces.

- Instruct, after the NEMC closing, that the SVP and General Counsel call the NEMC President and CEO about the allegations and state that while no NEMC Executives have been identified, if these rumors resurface implicated individuals may take legal action.

- Counsel the SVP and CFO on those ethical standards that should be applied relating to close personal friends who may do business with Lifespan.