# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LIFESPAN CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>NEW ENGLAND MEDICAL CENTER, INC., and NEW ENGLAND MEDICAL CENTER HOSPITALS, INC.<br><br>Defendants. | ) | C. A. No. 06-421T |

**PLAINTIFF LIFESPAN CORPORATION'S ANSWERS AND OBJECTIONS TO DEFENDANT NEW ENGLAND MEDICAL CENTER, INC.'S FIRST SET OF INTERROGATORIES**

Pursuant to Fed. R. Civ. P. 33, plaintiff Lifespan Corporation ("Lifespan") hereby submits its objections and answers to Defendant New England Medical Center, Inc.'s ("Defendant") First Set of Interrogatories.

**GENERAL OBJECTIONS**

1. Lifespan objects in whole or in part to each and every interrogatory to the extent that it calls for disclosure of information from persons or entities other than Lifespan.

2. Lifespan objects in whole or in part to each and every interrogatory to the extent that it is vague, ambiguous or of uncertain meaning. Lifespan further objects in whole or in part to each and every interrogatory to the extent that it does not identify documents, subjects and time-frames with sufficient particularity to permit a reasonable response.

affiliation with Lifespan, NEMC was able to obtain an agreement with HPHC. Additionally, NEMC was perceived as failing, and on the verge of dissolving. By affiliating with Lifespan, which affiliation was perceived by many as good for the institution and the community, NEMC was able to negotiate a sale of its assets to a for-profit hospital company, which helped to preserve its charitable purpose and status. The affiliation with Lifespan had a positive impact in terms of stabilizing staff and allowing NEMC to focus on its clinical programs. It also opened doors with medical groups in Southeastern Massachusetts, who were concerned about NEMC's stability. NEMC senior management was aware of this intangible benefit by often including Lifespan senior management and staff in meetings and presentations, as a demonstration of their strength and affiliation. As a result of the Lifespan affiliation with NEMC, an independent fair market value opinion was obtained which indicated that the net book value of NEMC's long-lived assets was greater than the appraised market value by $138, 500,000. This amount reduced the carrying value of the net fixed assets and was a charge in the FY97 Statement of Operations. In all subsequent years, operating performance improved by approximately $17 million due to reduced depreciation. The impairment was also recorded in the FY97 Medicare cost report, the value of the depreciation recapture was estimated at $21 million.

**INTERROGATORY NO. 5.** Please describe any procedures that Lifespan and/or LOM had in place during the Affiliation Period to attempt to ensure that NEMC's commercial payor contracts were promptly renegotiated upon expiration and on the most favorable terms possible for NEMC.

**ANSWER:** Objection. This interrogatory attempts to place the burden of proof upon Lifespan. Without waiving this objection, at the time of the affiliation with Lifespan,

the parties were focused upon ensuring that NEMC's commercial payor contracts were promptly renegotiated upon expiration and on the most favorable terms possible. For example, in February 1998, as part of the Lifespan COMPASS project, Ernst and Young performed a review of all major payor contracts in Rhode Island and Massachusetts, with a particular focus on contract terms and language. This report was discussed in detail with NEMC management.

Also, from the beginning of the affiliation with Lifespan, the Contracting and Payor Relations staff based at NEMC, along with their supervisor, William Beyer, met on a regular basis, generally every one to two weeks, with NEMC finance and other individuals, generally including the CFO. During the initial years of the NEMC/Lifespan affiliation, Joel M. Kaufman, M.D., the Executive Director & CEO of the Lifespan PSO, would participate in meetings at NEMC, which included the CEO, CFO and other senior management, such as Douglas Gregory. After a period of time, the meetings continued without the NEMC CEO and Dr. Kaufman. Moreover, the NEMC CEO and Dr. Kaufman would continue to discuss contracting strategy and other contracting issues in connection with the continuing meetings or needs of NEMC as they arose. While Mitch Creem was CFO at NEMC and John Schibler CFO for Lifespan, Mr. Creem and Dr. Kaufman conducted regularly scheduled contacts, until the successor CFOs both at Lifespan and NEMC, assumed the day-to-day discussions.

The purpose of the meetings and discussions was to review current contracts and current negotiations, in order to develop strategy and desired outcome. Contracts were negotiated to achieve the most favorable terms, as determined by this group. Financial objectives were determined by NEMC finance personnel. With respect to physician contracting, Lifespan abided by antitrust and other statutory and regulatory requirements, and

therefore, restricted some of its activities. Thomas F. O'Donnell, the NEMC CEO, or his designee, signed contracts. During the final year of the affiliation, the NEMC CFO assumed sole responsibility for payor contracting.

One of the first contracting items addressed when NEMC joined with Lifespan was to negotiate the NEMC and HPHC contract. A model of broad involvement of internal stakeholders was used then, and continued throughout the affiliation.

**INTERROGATORY NO. 6.** Please describe the supposed justification for the Interest Rate Swap Transaction described in the Counterclaim in this case.

**ANSWER:** On January 15, 2002, NEMCH entered into an interest swap arrangement (the Swap Contract) as part of an anticipated refunding of its 1992 Series F Bonds. Under the Swap Contract, NEMCH paid interest at a fixed rate (4.77%) and received interest at a variable rate equal to the BMA Municipal Swap Index announced by Municipal Market Data and based on the weekly interest rate resets of tax-exempt variable rate issues. The amount owed under the contract was $13,471,000 as of September 30, 2002, which was reflected as an unrealized loss in the consolidated statement of operations and changes in net assets.

Typically, forward starting swaps can be used to hedge against rising interest rates and to reduce borrowing costs. Swaps provide the ability to lock in an attractive interest rate in advance of a future debt issue. A hospital that plans to issue fixed rate debt at a future date can use a forward-starting swap to hedge the future issuance rate, essentially locking the future bond transaction in at today's interest rate. Forward-starting swaps allow the hospital to take advantage of favorable rates when the market offers them - not just when coming to market. Locking in the forward financing costs

similar transactions."

Moreover, there were numerous meetings; memoranda, emails and presentations to members of senior management at NEMCH, primarily with Mark Scott and attendees and/or members of the Lifespan Finance Committee including George Carmany, Tom O'Donnell, Mark Scott, and Malcolm Sherman. Updates were provided to the Lifespan Finance Committee on February 21, 2002, April 1, 2002, April 25, 2002 and May 30, 2002, and an internal memorandum from David Lantto on June 28, 2002 documented a conversation with Malcolm Sherman on the transaction.

Morgan Stanley advised NEMCH in its June 24, 2002 presentation that the recovery of the swap termination would cost $4,880,000. However, NEMCH delayed the swap termination. During the summer and fall of 2002, NEMCH and Lifespan were engaged in negotiations to end their affiliation and management communications were limited. Therefore, Lifespan is unaware of the reasons for the delays by NEMCH.

In November 2002 (FY03), NEMCH recorded a loss on bond refinancing and termination of swap contract of $14,638,000 in its income statement. Applicable tax rules precluded the refunding of the Series F Bonds before July 1, 2002, and the 6-month delay in refunding the Series F Bonds created a risk that interest rate increases would reduce or eliminate the savings available from immediate refunding of the Series F Bonds. It was believed that entering into the above Swap Contract could have reduced the risk of interest rate increases between January and July 1, 2002.

**INTERROGATORY NO. 7.** Please describe any and all disclosures of any actual or potential conflicts of interest that Lifespan and/or LOM made to NEMC prior to the closing of the Interest Rate Swap Transaction described in the Counterclaim in this case.

**ANSWER:** Objection. This interrogatory attempts to place the burden of proof upon Lifespan. Without waiving its objections, Lifespan states that Lifespan's Internal Audit Services and Compliance Officer investigated an alleged potential conflict of interest between David Lantto, the Lifespan CFO, and Jeff Seubel, a broker with Morgan Stanley, concerning a personal business relationship. The allegations were determined to be unsubstantiated.

**JURAT**

On behalf of Lifespan Corporation, I have read the foregoing responses to interrogatories. Said responses were prepared by or with the assistance of agents, employees, and/or representatives of Lifespan Corporate Services ("LCS") and/or others believed to have relevant information, and with the assistance and advice of counsel, upon which I have relied. The responses set forth herein, subject to inadvertent or undiscovered errors and omissions, are based on and therefore necessarily limited by the records and information still in existence, presently recollected, thus far discovered in the course of preparation of these responses, and currently available to LCS and/or LCM. Consequently, Lifespan reserves the right to make any changes in or additions to any of these responses if it appears at any time that errors or omissions have been made therein or that more accurate or complete information has become available. Subject to the limitations set forth herein, the said responses are true to the best of my present knowledge, information and belief. I certify under penalty of perjury on behalf of Lifespan that the foregoing is true and correct.

Mary A. Wakefield
Mary A. Wakefield
Senior Vice President & Chief Financial Officer
Lifespan Corporate Services

STATE OF RHODE ISLAND
PROVIDENCE, Sc.

Subscribed and sworn to before me this 1st day of May, 2007.

Notary Public
My Commission Expires: July 31, 2009