# EXHIBIT 2

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

LIFESPAN CORPORATION :
Plaintiff :
vs. :C.A. No. 06-421T
NEW ENGLAND MEDICAL :
CENTER, INC., and NEW ENGLAND :
MEDICAL CENTER HOSPITALS, INC. :
Defendants :

DEPOSITION OF DAVID LANTTO

Wednesday, January 9, 2008

9:30 a.m.

Adler, Pollock & Sheehan, P.C.

One Citizens Plaza

Providence, Rhode Island

---------- Ellen Zappia, RPR ----------

Capitol Court Reporting, Inc.

931 Jefferson Boulevard

Warwick, Rhode Island 02886

(401) 739-3600



b46a73fa-e043-4d05-aec4-06c61fe3ed48

A. Well, define "close personal relationship."
Q. I'll define it as you have defined it today.
A. Well, I wouldn't define that as a close personal relationship.
Q. However we characterize it, that relationship --
A. It was a relationship, and I don't think that's important for the reasons I already stated. I had disclosed it to my superior that we were friends. I had -- there was an outside entity who was actively involved assisting NEMC in negotiating the terms of the agreement. I wasn't involved in those negotiations. I was merely the person who brought them in to offer a proposal that potentially could save money.
Q. That's how you characterize your involvement?
A. Yes. And Mark Scott made some of the key decisions in that process. I did not.
Q. So when the -- so when the NEMC minutes mention you as stating what this proposal would do, what the swap would do and nothing about Mark



Scott, you're saying it was really all Mark Scott.
MR. SHERMAN: Objection.
A. I don't understand what your question is.
MR. WOLLIN: Let me mark this as the next exhibit.
(Lantto Exhibit 14, was marked for identification)
Q. I'm showing you what's been marked as Exhibit 14. This is the policy regarding entertainment, gifts and vendor promotional training. It's dated December 1999, and I will represent to you that based on the documents that Lifespan has produced to us that this one was in effect in 2001.
Is this familiar to you?
A. Yes.
Q. And if I could turn your attention to section 3.2, and specifically page three.
A. Yes.
Q. At the top it starts out by saying, "In order to avoid creating the appearance of being improperly influenced by individuals or entities which have or seek business with Lifespan, invitations to attend or participate in social



events received from such persons may be accepted provided the value does not exceed $100." Are you with me?
A. Yes.
Q. The next sentence says, "Lifespan Employees may not accept offers of travel costs (other than in a vehicle owned privately by the host) or overnight lodging." Right?
A. Right.
Q. But you did accept overnight lodging, correct?
MR. SHERMAN: Objection.
A. Yes.
Q. So that would be -- that would violate this policy, would it not?
A. In that regard I guess it would.
Q. And when we looked back at the conflict of interest policy, isn't it true that your acceptance of wine and acceptance of overnight travel also violated that policy?
A. Well, I didn't accept wine. We jointly consumed the wine, along with wine that I was providing myself at my cost. And I did stay at Jeff's house one time, but I reciprocated by



providing him lodging that saved Lifespan money when he came to town on Lifespan business.
Q. But would you agree --
A. And from my point of view I felt that was appropriate.
Q. But would you agree with me that your accepting lodging from Jeff Seubel was in violation of the conflict of interest policy that Lifespan had in effect in 2001?
A. Technically it did.
Q. Am I correct that Debra Benik, a Lifespan board trustee, has expressed concern about your relationship with Jeff Seubel?
A. No.
Q. Let me go back.
A. I believe what she did, ask George Vecchione about on a conference call was how did we know we're getting a good quote from Morgan Stanley, since they're being brought in by somebody, and the ultimate response turned out to be that the negotiation of Morgan Stanley's fee was done through the Rhode Island authority.
Q. Well --
A. And she wasn't really familiar with the





b46a73fa-e043-4d05-aec4-06c61fe3ed48