10/20/97

FILED
JUL 1 8 2008
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

# AMENDED AND RESTATED

# MASTER AFFILIATION AGREEMENT

# BETWEEN

# NEW ENGLAND MEDICAL CENTER, INC.

# AND

# LIFESPAN CORPORATION

1142044.28

AMENDED AND RESTATED
MASTER AFFILIATION AGREEMENT
BETWEEN
NEW ENGLAND MEDICAL CENTER, INC.
AND
LIFESPAN CORPORATION

TABLE OF CONTENTS


1. Definitions . . . . . 5
   - 1.1. "Act" . . . . . 5
   - 1.2. "Affiliate" . . . . . 5
   - 1.3. "Affiliation" . . . . . 5
   - 1.4. "Agreement" . . . . . 5
   - 1.5. "Closing or "Closing Date" . . . . . 5
   - 1.6. "Code" . . . . . 6
   - 1.7. "Effective Date" . . . . . 6
   - 1.8. "Initial Period" . . . . . 6
   - 1.9. "Managed Care Contract" . . . . . 6
   - 1.10. "MOU" . . . . . 6
   - 1.11. "Organizational Documents" . . . . . 6
   - 1.12. "Quaternary Care Program or Service" . . . . . 7
   - 1.13. "Steering Committee" . . . . . 7
   - 1.14. "System" . . . . . 7
   - 1.15. "Triggering Event" . . . . . 7

2. Affiliation and System Development. . . . . . 7
   - 2.1. Revision of LIFESPAN Organizational Documents . . . . . 7
   - 2.2. Lifespan of Massachusetts, Inc. . . . . . 8
   - 2.3. Merger of NEMCH into Lifespan/NEMC. . . . . . 9
   - 2.4. NEW NEMCH Powers . . . . . 9
   - 2.5. Reserved Powers . . . . . 10
   - 2.6. Governance . . . . . 10
   - 2.7. NEMC Representatives on LIFESPAN Board . . . . . 12
   - 2.8. NEMC Representation on LIFESPAN and Lifespan/MA Committees 14
   - 2.9. NEW NEMCH Management . . . . . 15

3. Operational Aspects of Affiliation . . . . . 15
   - 3.1. NEW NEMCH Assets . . . . . 16
   - 3.2. Donor-Restricted Funds; Other Funds . . . . . 16
   - 3.3. Investment in Operations. . . . . . 17
   - 3.4. Centers of Excellence. . . . . . 20

3.5. Academic Collaboration. . . . . 21
3.6. Community Network; Tertiary and Quaternary Services . . . . . 21
3.7. Significant Clinical Programs. . . . . 22
3.8. Restriction on Sale . . . . . 22
3.9. Teaching and Research . . . . . 22
3.10. Other Boston Tertiary Hospitals . . . . . 23
3.11. Physician Groups . . . . . 23
3.12. Corporate Overhead Allocation . . . . . 24
3.13. Academic Chairs/Hospital Chiefs . . . . . 24
3.14. No Assumption of Liabilities . . . . . 24
3.15. Maintenance of Insurance Coverages and Indemnification . . . . . 24
3.16. Community Benefit Programs . . . . . 25

4. Closing Date. . . . . 25

5. Massachusetts Attorney General Notification . . . . . 25

5A. Rhode Island Attorney General Notification. . . . . 26

6. Representations and Warranties . . . . . 26
6.1. Authority to Enter into Agreement; Enforceability. . . . . 26
6.2. Organization and Standing. . . . . 26
6.3. Financial Statements. . . . . 27
6.4. Litigation. . . . . 27
6.5. Compliance with Laws and Other Instruments. . . . . 27
6.6. Insurance. . . . . 28
6.7. Tax Status . . . . . 29

7. Covenants of the Parties. . . . . 29
7.1. Interim Conduct of Business. . . . . 29
7.2. Accuracy of Representations and Warranties. . . . . 30
7.3. Access to Information. . . . . 31
7.4. Books and Accounting Practices. . . . . 32
7.5. Reserved. . . . . 32
7.6. Confidentiality . . . . . 32

8. List of Conditions Precedent to Closing . . . . . 32
8.1. Representations True . . . . . 33
8.2. Covenants Performed . . . . . 33
8.3. Material Adverse Change . . . . . 33
8.4. Closing Certificate . . . . . 33
8.5. No Contest of Consolidation . . . . . 34
8.6. No Material Change in Laws . . . . . 34

8.7. Opinion of Counsel Delivered . . . . . . . . 34
8.8. Organizational Documents . . . . . . . . 34
8.9. Management Agreement . . . . . . . . 34
8.10. Governmental Approvals . . . . . . . . 34
8.11. Other Obligations . . . . . . . . 35

9. Failure to Fulfill Conditions Precedent . . . . . . . . 35

10. Indemnification . . . . . . . . 35

11. Amendments . . . . . . . . 38

12. Reserved . . . . . . . . 38

13. Remedies . . . . . . . . 38

14. Miscellaneous . . . . . . . . 39
14.1. Strict Compliance . . . . . . . . 39
14.2. Notices . . . . . . . . 39
14.3. Captions . . . . . . . . 39
14.4. Assignment . . . . . . . . 40
14.5. Reserved. . . . . . . . . 40
14.6. Severability . . . . . . . . 40
14.7. Successors and Assigns . . . . . . . . 40
14.8. Expenses . . . . . . . . 40
14.9. Entire Agreement . . . . . . . . 40
14.10. Cross References . . . . . . . . 41
14.11. Execution in Counterparts . . . . . . . . 41

EXHIBIT 1.2 Present LIFESPAN and NEMC Affiliates

EXHIBIT 2.1(a) Revised Bylaws of LIFESPAN

EXHIBIT 2.1(b) Articles of Amendment of the Articles of Incorporation of Rhode Island Hospital

EXHIBIT 2.1(c) Articles of Amendment of the Articles of Incorporation of The Miriam Hospital

EXHIBIT 2.2 Articles of Organization and Bylaws of Lifespan/MA

EXHIBIT 2.2(a) Reserved Powers of LIFESPAN With Respect to NEMC and NEW NEMCH Upon a Triggering Event

| | |
|---|---|
| EXHIBIT 2.3(a) | Articles of Merger |
| EXHIBIT 2.3(b) | Agreement of Merger |
| EXHIBIT 2.3(c) | NEW NEMCH Bylaws |
| EXHIBIT 2.3(d) | Revised NEMC Bylaws |
| EXHIBIT 2.3(e) | Articles of Amendment to NEMC Articles of Organization |
| EXHIBIT 2.4 | NEW NEMCH Board Functions |
| EXHIBIT 2.5 | Lifespan/MA Reserved Powers |
| EXHIBIT 2.7 | NEMC-Nominated Directors to Serve on LIFESPAN Board |
| EXHIBIT 3.1 | Deed of Gift from NEMC to NEMCH |
| EXHIBIT 3.10 | University-Affiliated Teaching Hospitals in Downtown Boston |
| EXHIBIT 14.2 | Notices |

# AMENDED AND RESTATED
# MASTER AFFILIATION AGREEMENT
# BETWEEN
# NEW ENGLAND MEDICAL CENTER, INC.
# AND
# LIFESPAN CORPORATION

THIS AMENDED AND RESTATED MASTER AFFILIATION AGREEMENT, made as of the 20th day of October, 1997, between NEW ENGLAND MEDICAL CENTER, INC., a Massachusetts not-for-profit corporation ("NEMC"), and LIFESPAN CORPORATION, a Rhode Island not-for-profit corporation ("LIFESPAN"), amends and restates in their entirety the Master Affiliation Agreement between NEMC and LIFESPAN, dated as of June 19, 1997, the First Amendment to Master Affiliation Agreement, dated as of September 26, 1997, and the Second Amendment to Master Affiliation Agreement, dated as of October 16, 1997.

## RECITALS

WHEREAS:

(a) Academic medical centers have experienced significant growth in expenses, reductions in payments for graduate medical education and health care services by most governmental and many private payors, increases in federal and state governmental regulation, rapid technological developments, substantial reductions in demand for inpatient services and an increased need for capital to adjust facilities and programs to current needs, all of which have encouraged them to pursue affiliations in order to share resources and to provide more efficient and cost-effective services and facilities to the communities they serve, while pursuing their educational and research missions as well.

(b) Each of NEMC and LIFESPAN believes that the future of its affiliated academic medical centers, medical school affiliates, community hospitals, non-acute provider affiliates, and allied physician practice groups will require a regionalization of health care providers and a closer integration of the various components of the health care industry and the health professions in order to enable them to participate effectively and competitively in managed care contracting environments, to contract for the rendering of more efficient health care while assuring high standards of quality, to educate health care professionals, to conduct basic and applied medical research, and to reduce medical educational and health care costs generally.

(c) Pursuant to these developments, the parties have entered into that certain Memorandum of Understanding dated January 15, 1997 (the "MOU"), whereby they agreed, subject to certain contingencies, to effect a commonality of control between them which will permit an affiliation of their respective organizations into a single health care delivery system as further described herein.

(d) The parties believe that the Affiliation will provide greater coordination of the provision of patient care services and health professional education, thereby increasing efficiencies and decreasing costs to health care consumers; provide greater patient access to specialized services and technological and medical advances; enhance access to capital markets at lower costs; promote the education of physicians and other health care professionals; enhance the collaboration between their respective affiliated medical schools; improve strategic planning of health care services within the parties' augmented service area; make available more sophisticated clinical and management

services and expertise; permit greater and more effective public health education and preventive health measures; advance science through research regarding the cure and treatment of human disease; encourage private philanthropy; preserve and create opportunities for community service; and provide continued and appropriate health care services to all within the parties' service areas.

(e) The parties believe it to be in the best interests of their communities and constituencies for them to build together a health care delivery system to serve New England and to serve as a national and international referral center, while preserving the parties' historic roles wherever possible.

(f) A collaborative relationship is being developed between the Tufts University School of Medicine ("Tufts") and the Brown University School of Medicine ("Brown").

(g) The parties intend to develop a health care delivery system with the capability of competing successfully in managed care contracting with medical centers and other health care providers in Massachusetts as well as in Rhode Island and elsewhere in New England.

(h) The parties intend to create an affiliation structure that will (i) facilitate the development of a strong Massachusetts network as a component of the System, and (ii) in particular, provide incentives and opportunities for other Massachusetts-based health care providers to join and fully participate in the System.

(i) The parties believe that the Affiliation will enhance the ability of the System to continue to provide substantial uncompensated care to the public at a time of shrinking resources and increased pressure on operating results.

(j) The parties intend that LIFESPAN will conduct and support community health education and preventive care activities, will plan and direct the evolution of the System's necessarily growing emphasis on primary and ambulatory care, and will serve as the corporate parent and focal point of the System, with the leadership responsibilities and reserved powers with respect to the System as are set forth in this Agreement.

(k) The parties desire to develop relationships with local health care and/or human service agencies and providers in Massachusetts.

(l) The terms of the Affiliation and the structure of the System will allow the health care providers in the System, including NEMCH, to a significant extent, to retain their separate historical identities, unique traditions, constituencies, philanthropic support, and donor-restricted endowments.

(m) The Boards of Directors of the parties have approved the Affiliation. Each party considers it to be in its best interests and in the interests of the public it serves to enter into the Affiliation on the terms, conditions and contingencies set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and of the mutual agreements and covenants hereinafter set forth and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Definitions. In addition to the words and terms defined elsewhere in this Agreement, the following words and terms shall have the following meanings:

1.1. "Act" shall mean, with respect to LIFESPAN, the Rhode Island Nonprofit Corporation Act, as amended, R.I. Gen. Laws §§ 7-6-1 et seq. (1992 & Supp. 1995), or successor provisions, and with respect to NEMC, Mass. Gen. Laws Chapter 180, §§ 1 et seq. (1987 & Supp. 1996), or successor provisions.

1.2. "Affiliate" shall mean, with respect to a party, any corporation, association, partnership, joint venture, trust or other entity which is listed on the attached **EXHIBIT 1.2**, together with any other entities that after the date hereof become majority owned or controlled by a party, directly or indirectly.

1.3. "Affiliation" shall mean the various corporate transactions contemplated under this Agreement by which the parties and their Affiliates become one group of organizations, all commonly-owned or controlled as provided herein.

1.4. "Agreement" shall mean this Amended and Restated Master Affiliation Agreement.

1.5. "Closing or "Closing Date" shall be the date selected by agreement of the chief executive officers of the parties, at a place and time also to be agreed, for the delivery of all executed agreements, documents, certificates, opinions, and the performance or waiver of all other conditions precedent to the effectiveness of the Affiliation transaction under this Agreement.

1.6. "Code" shall mean the Internal Revenue Code of 1986, as amended, and any corresponding provisions of any future United States Internal Revenue law.

1.7. "Effective Date" shall mean the date selected by the chief executive officer of each party and approved by the chair of the board of each party when the merger, changes of membership, effectiveness of articles of merger and amendments of articles of organization and bylaws, installation in office necessary to effect the Affiliation, and all of the contingencies described in this Agreement, shall have been resolved in favor of the Affiliation described herein.

1.8. "Initial Period" shall mean a period commencing as of August 9, 1994, and as described more fully in the LIFESPAN Corporation Bylaws.

1.9. "Managed Care Contract" shall mean any agreement between a health care provider within the System and any payor or intermediary organization acting on behalf of either itself or another payor to pay for covered health care services under an arrangement in which such health care provider has incentives for appropriate utilization of health care services.

1.10. "MOU" shall mean the Memorandum of Understanding dated January 15, 1997 between the parties, pursuant to which this Agreement has been negotiated and executed.

1.11. "Organizational Documents" shall mean, as the context requires, the articles of incorporation or organization, articles of agreement, corporate bylaws,

general or limited partnership agreements, or articles of association of an organization described herein.

1.12. "Quaternary Care Program or Service" shall mean such services as the transplantation of hearts, livers, lungs, combinations thereof, bone marrow and xenotransplants; and other services generally recognized throughout the health care industry as unusually sophisticated or "quaternary care" procedures.

1.13. "Steering Committee" shall mean the Joint Steering Committee established by the parties to formulate and design the Affiliation and upon whose report and recommendations to the parties' boards the principal provisions of this Agreement and its exhibits are based.

1.14. "System" shall mean, collectively, the parties and their Affiliates after the Effective Date.

1.15. "Triggering Event" shall mean (1) the expiration of the Initial Period or (2) at the option of LIFESPAN, the reduction of the number of trustees nominated by LIFESPAN for election to the Board of Lifespan of Massachusetts, Inc. ("Lifespan/MA") below sixty percent (60%) of the total trustees (including ex officio trustees) of such Board.

2. Affiliation and System Development. The Affiliation to be effected under this Agreement shall be accomplished as follows:

2.1. Revision of LIFESPAN Organizational Documents. LIFESPAN shall amend, effective as of the Effective Date, its Organizational Documents to implement

each term of this Agreement which is intended to be memorialized in the Organizational Documents including but not limited to amendments to allow NEMC and New England Medical Center Hospitals, Inc. ("NEMCH") to join the System by designating Lifespan/MA, an Affiliate of LIFESPAN, as the sole voting member of NEMC and of a Massachusetts not-for-profit corporation into which NEMCH shall merge effective as of the Effective Date, as set forth on the attached **EXHIBIT 2.1(a)**, and described more fully herein. In addition, the Articles of Incorporation of Rhode Island Hospital and The Miriam Hospital shall be amended as set forth in **EXHIBIT 2.1(b)** and **EXHIBIT 2.1(c)**.

2.2. Lifespan of Massachusetts, Inc. Prior to the Effective Date, LIFESPAN shall have created Lifespan/MA, a Massachusetts not-for-profit corporation that shall serve as a holding company for the development of LIFESPAN's Massachusetts network. Until the occurrence of a Triggering Event, the persons serving from time to time as members of the LIFESPAN Board of Directors shall serve as the members of Lifespan/MA, and shall have such powers and rights as are vested in them by law, the Articles of Organization and bylaws of Lifespan/MA including the power to authorize: (i) the amendment and restatement of Lifespan/MA's Articles of Organization and bylaws; (ii) the merger or consolidation of Lifespan/MA with any other entity; (iii) the sale, lease, exchange, mortgage, pledge or other disposition of all or substantially all the property and assets of Lifespan/MA; and (iv) the voluntary dissolution, the plan of distribution of assets upon dissolution, and revocation of voluntary dissolution proceedings of Lifespan/MA. The Organizational Documents of

Lifespan/MA shall be as set forth in **EXHIBIT 2.2**. Upon the occurrence of a Triggering Event, LIFESPAN shall become the sole corporate member of Lifespan/MA and shall have not only the powers described above in this Section 2.2 but also the powers described in **EXHIBIT 2.2(a)**.

2.3. Merger of NEMCH into Lifespan/NEMC. Prior to the Effective Date, LIFESPAN shall have created Lifespan/New England Medical Center, Inc. ("Lifespan/NEMC"), a Massachusetts not-for-profit corporation of which Lifespan/MA shall be the sole member. Effective as of the Effective Date, NEMCH shall execute Articles of Merger and an Agreement of Merger with Lifespan/NEMC, which documents shall be substantially in the form of **EXHIBITS 2.3(a)** and **2.3(b)**, to effect a merger of NEMCH into Lifespan/NEMC. The Lifespan/NEMC Organizational Documents shall be amended, effective as of the Effective Date, substantially as set forth in **EXHIBIT 2.3(c)**, and Lifespan/NEMC shall be renamed "New England Medical Center Hospitals, Inc." ("NEW NEMCH"). Effective as of the Effective Date, the NEMC Organizational Documents shall be amended substantially as set forth in **EXHIBIT 2.3(d)** and **EXHIBIT 2.3(e)**.

2.4. NEW NEMCH Powers. Subject to the other provisions of this Agreement, including the reserved powers of Lifespan/MA described in Section 2.5, after the Effective Date the NEW NEMCH Board of Trustees will at all times continue to be responsible for managing the affairs of NEW NEMCH and the affairs of each of its Affiliates according to applicable law, its articles of organization and its bylaws. By

way of example, and not of limitation, the NEW NEMCH Board of Trustees shall be responsible after the Effective Date for the functions described in **EXHIBIT 2.4** attached.

2.5. Reserved Powers. After the Effective Date, Lifespan/MA shall be the sole member of NEMC and NEW NEMCH. In addition to the powers conferred upon Lifespan/MA as sole member under Massachusetts law, the bylaws of NEMC and NEW NEMCH will grant Lifespan/MA reserved powers substantially in the form attached as **EXHIBIT 2.5**, subject to other provisions of this Agreement.

2.6. Governance.

(a) Lifespan/MA. Immediately after the Effective Date, the Lifespan/MA Board of Trustees shall consist of fifteen (15) persons, of whom three (3) shall be persons who were governors of NEMCH or trustees of NEMC immediately prior to the Effective Date and twelve (12) shall be persons who were not trustees of NEMC or governors of NEMCH immediately prior to the Effective Date. The Chair of the LIFESPAN Board of Directors and the LIFESPAN President/Chief Executive Officer (the "Lifespan CEO"), or their designees, and the President/Chief Executive Officer of Lifespan/MA (the "Lifespan/MA CEO") shall each become members, *ex officio* with vote, of the Lifespan/MA Board of Trustees and shall be counted within the fifteen (15) person limit. Following the initial appointment of the Board of Trustees of Lifespan/MA, the members of Lifespan/MA shall at each annual meeting of Lifespan/MA elect individuals to serve as trustees of Lifespan/MA from among a slate of candidates nominated by the Lifespan/MA Nominating Committee. The members of

Lifespan/MA also shall elect replacement trustees to fill any vacancies that may arise on the Board of Trustees of Lifespan/MA from among individuals nominated by the Lifespan/MA Nominating Committee. The LIFESPAN board Chair and the Lifespan CEO, or their designees, and the Lifespan/MA CEO, shall also be appointed to the Lifespan/MA executive committee (if such a committee exists), *ex officio* with vote. In no event shall more than twenty percent (20%) of the Board of Lifespan/MA ever be persons who were voting trustees of NEMC or governors of NEMCH immediately prior to the Effective Date; provided that this restriction shall no longer apply in the event the Board of NEMCH determines that reimbursement from Medicare for a loss on sale relating to the Affiliation is not available or otherwise will not be pursued. After the Effective Date, Trustees of Lifespan/MA may be removed by the members of Lifespan/MA.

(b) NEW NEMCH. Immediately after the Effective Date, the NEW NEMCH Board of Trustees shall consist of twenty (20) persons, of whom four (4) shall be persons who were trustees of NEMC or governors of NEMCH immediately prior to the Effective Date and sixteen (16) shall be persons who were not trustees of NEMC or governors of NEMCH immediately prior to the Effective Date. The Chair of the Lifespan/MA Board of Trustees and the Lifespan/MA CEO or their designees shall each become members, *ex officio* with vote, of the NEW NEMCH Board of Trustees and shall be counted within the twenty (20) person limit. Following the initial appointment of the Board of Trustees of NEW NEMCH, Lifespan/MA in its capacity as the sole member of NEW NEMCH shall at each annual meeting of NEW NEMCH

elect individuals to serve as trustees of NEW NEMCH from among a slate of candidates nominated by the NEW NEMCH Nominating Committee. Lifespan/MA also shall elect replacement trustees to fill any vacancies that may arise on the Board of Trustees of NEW NEMCH from among individuals nominated by the NEW NEMCH Nominating Committee. At least one person who was a trustee of NEMC or governor of NEMCH immediately prior to the Effective Date shall serve on any NEW NEMCH executive committee during the Initial Period. The Lifespan/MA board chair and the Lifespan/MA CEO shall also be appointed to the NEW NEMCH executive committee (if such a committee exists), *ex officio* with vote. In no event shall more than twenty percent (20%) of the Board or any executive committee of NEW NEMCH ever be persons who were voting trustees of NEMC or governors of NEMCH immediately prior to the Effective Date; provided that this restriction shall not apply in the event the Board of NEMCH determines that reimbursement from Medicare for a loss on sale relating to the Affiliation is not available or otherwise will not be pursued. After the Effective Date, Trustees of NEW NEMCH may be removed by Lifespan/MA in its capacity as the sole member of NEW NEMCH.

2.7. NEMC Representatives on LIFESPAN Board. Immediately prior to the Effective Date, the NEMC Trustees will have the right to nominate to serve as voting members of the LIFESPAN Board of Directors as of the Effective Date the number of persons determined in accordance with EXHIBIT 2.7 (the LIFESPAN Directors nominated by NEMC, together with any representatives of NEMC or NEW NEMCH or an NEMC Affiliate appointed to the LIFESPAN Board pursuant to an

increase in the size of the LIFESPAN Board as described below, are hereinafter defined as the "NEMC-nominated Directors"). The number of NEMC-nominated Directors shall be adjusted in the event of an increase or a decrease in the size of the LIFESPAN Board of Directors during the Initial Period, so that the number of NEMC-nominated Directors shall equal the lesser of: (i) eight persons (or such other number as may be equal to the number to be nominated by RIH's Board of Trustees) or (ii) a number of persons that is closest to, but is not equal to or greater than, twenty percent (20%) of the total number of voting directors serving on the LIFESPAN Board of Directors.

Until the expiration of the Initial Period, any vacancy in positions originally filled by NEMC-nominated Directors shall be filled by nominations from the remaining NEMC-nominated Directors on the LIFESPAN Board. If each nominee is acceptable to LIFESPAN, LIFESPAN will elect the nominee to the LIFESPAN Board. If any NEMC nominee to the LIFESPAN Board is not acceptable to LIFESPAN, the NEMC-nominated Directors will continue to make nominations until an acceptable nominee is found. LIFESPAN and NEMC agree to encourage physician participation in the governance of LIFESPAN, and LIFESPAN and NEW NEMCH will give appropriate consideration to nominating and electing some NEW NEMCH physicians to the LIFESPAN Board. An NEMC-nominated trustee serving on the LIFESPAN Board of Directors, upon nomination by NEMC, will be elected as a Vice Chairman of the Board of LIFESPAN; provided, however, that the rights of the representative directors of Rhode Island Hospital and The Miriam Hospital to nominate the Chair of

LIFESPAN during the Initial Period shall not be diluted. After the Initial Period, the composition of the LIFESPAN Board will fairly and equitably reflect, among other things, the geographical diversity of the providers in the System. In addition, persons who were trustees of NEMC or governors of NEMCH immediately prior to the Effective Date shall have the same participation as Rhode Island Hospital on any governance committee or task force reviewing the composition of the LIFESPAN Board.

In addition to the foregoing, governors, directors, officers, trustees, physicians and executives of NEMC and its Affiliates as of the Effective Date and/or other NEMCH-area leaders may be asked to serve and/or nominate others to serve on the board or board committees of LIFESPAN or other System entities.

2.8. <u>NEMC Representation on LIFESPAN and Lifespan/MA Committees</u>. After the Effective Date, at least one (1) person who was a trustee of NEMC or a governor of NEMCH immediately prior to the Effective Date shall be appointed to serve on each LIFESPAN and Lifespan/MA standing committee during the Initial Period. At least one LIFESPAN Director who was nominated by NEMC shall serve on any LIFESPAN and Lifespan/MA executive committee during the Initial Period; provided, however, that less than twenty percent (20%) of the members of each such committee shall be persons who were voting trustees of NEMC or voting governors of NEMCH immediately prior to the Effective Date.

2.9. NEW NEMCH Management.

(a) Chief Executive Officer. As of the Effective Date, the President and Chief Executive Officer formerly of NEMC and NEMCH shall continue in office as President and Chief Executive Officer of NEW NEMCH, all terms of his severance agreement shall continue to be honored, and he will report to the Lifespan CEO or, at the option of the Lifespan CEO, the Lifespan/MA CEO. From and after the Effective Date, subject to the terms of any applicable employment or severance agreement, the Lifespan CEO, or at the option of the Lifespan CEO, the Lifespan/MA CEO, shall have the authority to appoint and remove the President and Chief Executive Officer of NEW NEMCH.

(b) Other NEMC and Affiliates Management. Prior to and after the Effective Date, LIFESPAN agrees to honor in full all employment agreements and severance arrangements in effect for members of the management of NEMC or its Affiliates immediately prior to the Effective Date; provided that the arrangements in force on January 15, 1997 may not be amended or modified prior to and through the Closing Date and Effective Date without LIFESPAN's prior written consent, which shall not be unreasonably withheld.

3. Operational Aspects of Affiliation. In addition to the foregoing provisions governing the organizational elements of the Affiliation, the parties are agreed upon the following operational covenants:

3.1. NEW NEMCH Assets. NEW NEMCH will own all of the assets owned by NEMCH immediately prior to the Effective Date, including funds donated to NEMCH by NEMC (prior to the merger of NEMCH into Lifespan/NEMC) as a donor-restricted gift of assets substantially in the form set forth in **EXHIBIT 3.1**; and the NEW NEMCH Affiliates will each continue to own all of the assets each owned immediately prior to the Effective Date.

3.2. Donor-Restricted Funds; Other Funds. Subject to the other provisions of this Agreement, the donor-restricted assets (subject to donor restrictions) and all other existing funds and existing assets as of the Effective Date of NEMC and its Affiliates, including without limitation NEMCH, shall be used only for the development of a hospital and physician network in Massachusetts, for programmatic and physician initiatives at or in support of NEMCH (e.g., Centers of Excellence), for costs of administration of such funds, and with respect to existing non-fund assets for provision of health care services and related support services. The parties agree that all donor-restricted funds will be used solely in accordance with the restrictions imposed by the applicable gift instruments. NEW NEMCH shall account for and maintain appropriate records permitting the appropriate monitoring of the uses of all donor-restricted funds. The parties further agree that, in the event the surviving corporation proposes to discontinue use of the facility known as New England Medical Center Hospitals as an acute care hospital, it will consult with the office of the Public Charities Division, Office of the Attorney General of the Commonwealth of Massachusetts with respect to such proposed change in operations prior to effecting any such conversion

from acute care licensure status. The parties further agree that NEW NEMCH will provide notice to the Division of Public Charities, Office of the Massachusetts Attorney General no less than 30 days prior to any proposed change in the use of its pre-affiliation assets inconsistent with the uses set forth in the first sentence of this section or discontinuance of use of the facility known as New England Medical Center as an acute care hospital. Should NEW NEMCH propose such a change of use of its pre-affiliation assets or discontinuance of use of the facility known as New England Medical Center as an acute care hospital, the parties agree that such change or discontinuance will be subject to the requirements of Massachusetts law, including without limitation the requirement that any matters requiring judicial review or determination be presented to and be addressed by a Massachusetts court applying Massachusetts law. The parties acknowledge NEW NEMCH's obligation as a Massachusetts public charity to enforce these obligations.

3.3. Investment in Operations. LIFESPAN shall make the following legally binding commitment to NEW NEMCH:

(a) Amount of Annual Investment. Consistent with LIFESPAN's strategic interest in developing a Massachusetts network that will strengthen LIFESPAN and its related activities in Rhode Island, LIFESPAN shall transfer eight million seven hundred thousand dollars ($8,700,000) per year to NEW NEMCH during the term set forth below in paragraph (d); provided, however, that in fulfilling its obligations to transfer such funds, LIFESPAN shall not be required to and shall not under any circumstances cause any transfer or transfers (a "Prohibited Transfer") of any assets

from any "hospital" (as defined below) which, singly or in the aggregate, would result in a change of ownership or control or possession of twenty percent (20%) or greater of the assets held by such hospital from time to time, so as to result in a "conversion" (as defined below) of such hospital. For purposes of this Section 3.3(a), the terms "hospital" and "conversion" shall have the meanings ascribed to such terms in the Rhode Island Hospital Conversions Act (R.I. Gen. Laws §23-17.14-3).

(b) Use of Investment. NEW NEMCH may use such funds for general operating expenses and/or programmatic investments or initiatives at NEW NEMCH in accordance with approved strategic plans of LIFESPAN and NEW NEMCH and approved budgets of NEW NEMCH in effect from time to time.

(c) Schedule of Payments. LIFESPAN shall disburse the annual investment amount to NEW NEMCH in equal monthly installments on or before the first day of each calendar month each year during the period commencing on the first day of the first calendar month after the Effective Date or on the Effective Date if the Effective Date falls on the first day of the month and ending as provided in paragraph (d) below. If for any reason LIFESPAN does not make payments in accordance with the foregoing schedule, any overdue payments shall accrue interest compounded daily at the prime rate published in the Wall Street Journal on the date such payment was due.

(d) Term. The obligation of LIFESPAN to make such annual investments shall terminate on the earlier of the date when either:

i. LIFESPAN through the members from time to time of the Lifespan Obligated Group under the Master Trust Indenture dated as of September 1, 1991 (i) has, in the opinion of nationally recognized bond counsel selected by LIFESPAN, guaranteed or otherwise become liable for, (ii) has guaranteed or otherwise expressly assumed liability for or (iii) has been determined by final adjudication of a court of competent jurisdiction to be primarily or secondarily liable for the payment obligations of NEW NEMCH with respect to the outstanding amount of the Massachusetts Health and Educational Facilities Authority's Revenue Bonds, New England Medical Center Hospitals Issues, Series F and Series G (the "Series F and G Revenue Bonds" and, collectively with indebtedness incurred directly or indirectly (e.g. in a "synthetic refunding") to repay such Series F and G Revenue Bonds, the "Bonds"); or

ii. All the Bonds have been paid; or

iii. LIFESPAN has made ten $8,700,000 investments in NEW NEMCH under Section 3.3(a) and has paid any interest accrued under Section 3.3(c).

(e) Beneficiaries of the Investment Commitment. NEW NEMCH is the sole intended beneficiary of the annual investment and only NEW NEMCH (or, during the Initial Period, a majority of the Directors on the LIFESPAN Board who were nominated by NEMC or by the NEMC-nominated Directors) shall be entitled to enforce the obligations of LIFESPAN with respect to the annual investment. The rights of NEW NEMCH with respect to the annual investment shall not be assignable or transferable. In no event shall LIFESPAN be a guarantor or surety of NEW

NEMCH or any entity controlling, controlled by or under common control with NEW NEMCH or of the obligations, debts or liabilities of any of them by reason of the annual investment.

(f) Sources of Funds. LIFESPAN shall not use any donor-restricted funds of LIFESPAN or the LIFESPAN Affiliates to pay the annual investment that, by their terms, may not lawfully be so used. In the event LIFESPAN alone does not have sufficient resources to pay the annual investment, to the extent permitted by law, LIFESPAN shall cause its Affiliates (not including the NEMC Affiliates listed in EXHIBIT 1.2(B)) to provide unrestricted funds sufficient to pay the annual investment; provided, however, that in fulfilling its obligations under Section 3.3(a), LIFESPAN shall not be required to and shall not under any circumstances cause any Prohibited Transfer.

3.4. Centers of Excellence. LIFESPAN shall assure that not less than $25 million of the Board-designated funds of NEW NEMCH and its Affiliates will be committed to capital expenditures and/or new program support over the five-year period following the Closing to develop or continue to develop the following programs as Centers of Excellence at NEW NEMCH: oncology, cardiovascular care, primary care, transplantation services, pediatrics, maternal and fetal medicine, neonatology, pain management, fertility services, neuromuscular services and other programs designated by the NEW NEMCH Board that are consistent with strategic plans approved by LIFESPAN.

3.5. Academic Collaboration. LIFESPAN acknowledges that NEMCH is the principal teaching hospital for Tufts, and LIFESPAN shall continue to preserve and promote that relationship under NEW NEMCH. NEMC acknowledges that Rhode Island Hospital and The Miriam Hospital are the principal teaching hospitals for Brown, and LIFESPAN shall continue to preserve and promote these relationships. LIFESPAN shall honor the existing affiliation agreement between NEMCH and Tufts, and LIFESPAN represents and warrants that it has no intention to change such agreement. The parties agree that this transaction shall not dilute the commitments made by either LIFESPAN or NEMC to Brown or Tufts or their respective programs. The parties further agree to facilitate the development of an academic collaboration between Brown and Tufts. The goal of the collaboration will be to enhance academic cooperation and improve the quality of each school and its affiliated principal teaching hospitals. LIFESPAN agrees that Tufts medical students shall have access for their clerkships to all LIFESPAN facilities where teaching is conducted in Rhode Island, subject to the recommendation of the appropriate department chairs with respect to details such as particular educational programs, numbers of students, and scheduling.

3.6. Community Network; Tertiary and Quaternary Services.

(a) LIFESPAN shall use its best efforts to (i) enhance the existing national and international distinction and preeminence of NEMCH, consistent with LIFESPAN's efforts to promote the System generally; and (ii) develop a network of community-based providers, including but not limited to hospitals and physicians, in Massachusetts. Subject to LIFESPAN's overall System goal, among others, to deliver

health care services to patients at locations that are geographically appropriate and convenient for such patients, LIFESPAN shall encourage community-based providers to refer patients requiring quaternary, tertiary and other specialized services not available in the community to NEW NEMCH and its physicians.

(b) LIFESPAN acknowledges and agrees that NEW NEMCH shall be the principal quaternary level facility for the entire System. LIFESPAN shall not approve the establishment or significant expansion of any Quaternary Care Program or Service at any hospital or any facility in Massachusetts, Maine or New Hampshire that is owned, leased, managed by or receives consulting services from LIFESPAN or any Affiliate without the prior approval of NEW NEMCH.

3.7. Significant Clinical Programs. During the Initial Period, neither LIFESPAN nor Lifespan/MA may discontinue, relocate or substantially reduce a significant clinical program of NEW NEMCH without the approval of a majority of the NEMC-nominated Directors on the LIFESPAN Board.

3.8. Restriction on Sale. LIFESPAN agrees that for seven (7) years from the Effective Date it shall not (i) sell or otherwise dispose of all or substantially all of the assets of NEW NEMCH to a person not under the control of LIFESPAN or (ii) cease to operate the facility known as New England Medical Center Hospitals as an acute care hospital.

3.9. Teaching and Research. LIFESPAN affirms its commitment to maintain and enhance the teaching and research programs of NEW NEMCH as an integral part of NEW NEMCH's mission. To this end, LIFESPAN agrees to maintain

support for teaching and research at NEW NEMCH at the maximum levels consistent with economically responsible management of the hospital. Consistent with current practice, adjustments in such support shall be made only after significant consultation with, and due consideration of input from, the NEW NEMCH physician practice groups and Tufts.

3.10. Other Boston Tertiary Hospitals. LIFESPAN agrees that for five (5) years from the Effective Date it shall not acquire, lease, manage or establish a significant relationship with any of the university-affiliated teaching hospitals in downtown Boston identified in attached **EXHIBIT 3.10** without the prior approval (a) during the Initial Period, of the Directors on the LIFESPAN Board who were nominated by NEMC or by the NEMC-nominated directors and (b) for the remainder of the five (5) years, of NEW NEMCH. Thereafter, LIFESPAN may enter into such arrangements only in consultation with NEW NEMCH.

3.11. Physician Groups. LIFESPAN shall continue the successful and productive relationship that currently exists among NEMCH, New England Health Care Foundation, Inc., and the NEMC physician practice groups to enhance the ability of all of these organizations to achieve their mission and promote their economic viability. LIFESPAN acknowledges that there are significant financial and operational arrangements currently in place among NEMCH, New England Health Care Foundation, Inc. and the NEMCH physician practice groups and shall move forward with these arrangements with due recognition of the importance they play in supporting the academic, teaching and other missions of all the entities. Consistent with this

understanding and with current practice, adjustments in such arrangements shall be made only after significant consultation and meaningful input from the physician groups affected and Tufts.

3.12. Corporate Overhead Allocation. LIFESPAN agrees that its corporate overhead expenses shall be allocated to NEW NEMCH and its Affiliates on a budget neutral basis to NEMCH and its Affiliates.

3.13. Academic Chairs/Hospital Chiefs. Academic Chairs of the departments at Tufts shall be the clinical chiefs of the corresponding departments at NEW NEMCH to the extent agreeable to Tufts.

3.14. No Assumption of Liabilities. Neither party shall by virtue of the MOU or of this Agreement be deemed to have assumed any of the liabilities of the other, to have employed any of the employees of the other, or to have obligated itself to transfer any asset to any party except as expressly agreed in writing.

3.15. Maintenance of Insurance Coverages and Indemnification. LIFESPAN agrees that as of and after the Closing Date, NEMC, NEW NEMCH and its Affiliates shall maintain policies of tail insurance or other insurance to cover any liability of NEMC's or its Affiliates' directors, trustees, governors, overseers or officers arising from actions taken prior to or on the Closing Date, or any liability arising under Section 10, in amounts at least equal to the level of coverage NEMC and its Affiliates maintained for such liabilities under their insurance policies in effect immediately prior to the Closing Date. LIFESPAN further agrees that as of and after the Closing Date, NEMC, NEW NEMCH and its Affiliates shall maintain the

indemnification arrangements (as set forth in their bylaws) that existed immediately prior to the Closing Date to cover any liability of NEMC's, NEW NEMCH's or their Affiliates' directors, trustees, overseers or officers arising from actions taken prior to or on the Closing Date.

3.16. Community Benefit Programs. LIFESPAN is committed to carrying on the tradition of community service at NEMCH, including continuing to fund and carry out community benefits programs and providing to the Massachusetts Attorney General, on the same basis as other Massachusetts hospitals, an annual statement of community benefits by NEMCH.

4. Closing Date. The parties intend to close the Affiliation as quickly as possible and not later than October 31, 1997.

5. Massachusetts Attorney General Notification. It is the intention of LIFESPAN to operate NEW NEMCH as a community-based not-for-profit medical center. After the Effective Date, if any change in the membership or charitable status of LIFESPAN or NEW NEMCH, or any material change in control of LIFESPAN or NEW NEMCH occurs, the parties will notify the Division of Public Charities, Office of the Massachusetts Attorney General, no less than 30 days in advance of the proposed change. The parties further agree that such change will be subject to all requirements of Massachusetts law, including without limitation the requirement that any matters requiring judicial review or determination be presented to and be addressed by a Massachusetts court applying Massachusetts law. The parties acknowledge NEW NEMCH's obligation as a Massachusetts public charity to enforce these obligations.

5A. Rhode Island Attorney General Notification. LIFESPAN shall promptly notify the Rhode Island Attorney General in writing in the event that there occurs any Prohibited Transfer or any other change which constitutes a "conversion" as defined by R.I. Gen. Laws § 23-17.14-3.

6. Representations and Warranties. Each party represents and warrants to the other party that the statements set forth in this Section 6 are true and correct as of the date hereof as to itself and as to each of its Affiliates.

6.1. Authority to Enter into Agreement; Enforceability. Each party has full corporate power and authority to enter into and to carry out the terms and provisions of this Agreement and the transactions contemplated hereby, without obtaining the approval or consent of any other party or authority that has not been obtained except as specified in Section 8 below, and all corporate proceedings have been taken, and all corporate authorizations have been obtained by such party, which are necessary to authorize the execution and delivery of this Agreement; this Agreement is and is intended to be a legal, valid, and binding obligation of such party, enforceable in accordance with its terms.

6.2. Organization and Standing. Each party and each of its Affiliates is duly organized, validly existing, and in good standing under the laws of each state as may be identified in attached EXHIBIT 1.2. Each such corporation has all requisite corporate power and authority to own, lease, and operate its properties and to carry on its business as it is now being conducted.

6.3. Financial Statements. Each party has provided the other party with the audited balance sheets and income statements of such party and its Affiliates for the most recent three (3) fiscal years for which audited statements are available, together with the most recent unaudited balance sheets and income statements of such party and its Affiliates. The foregoing financial statements (a) are in accordance with the books and records of such party and its Affiliates, and (b) fairly present the financial condition and results of operations for such party and its Affiliates as of the dates and for the periods indicated in accordance with generally accepted accounting principles applied on a consistent basis, except as may be noted therein. Each party and its Affiliates has no material liabilities or obligations, whether contingent or absolute, direct or indirect, or matured or unmatured, which are not shown or provided for in the most recent of such financial statements or which have not otherwise been disclosed to the other party.

6.4. Litigation. Except as has otherwise been disclosed in writing to the other party during due diligence, each party represents and warrants that there are no suits, actions, or legal, administrative, arbitration or other proceedings or governmental investigations pending, filed, or initiated by, or to the best of its knowledge, threatened against or directly involving the party or any of its Affiliates that may materially and adversely affect the operations or financial status of such party or its Affiliates or its or their ability to perform hereunder.

6.5. Compliance with Laws and Other Instruments. To the best of its knowledge, the business and operations of each party and its Affiliates have been and

are being conducted in accordance with all applicable laws, ordinances, and rules and regulations of all authorities, the violation of which, individually or in the aggregate, would materially and adversely affect the business or operations of such party or its Affiliates. Except for federal and state laws and regulations that apply commonly to all hospitals in Massachusetts, Rhode Island or such other states in which the party or an Affiliate is located or doing business, and except for those matters, if any, expressly reflected in the financial statements referred to in Section 6.3, each party and its Affiliates are not subject to any restriction of any kind or character, which may materially and adversely affect its or their business or operations. Neither the execution and delivery of this Agreement, nor the consummation of the Affiliation contemplated hereby, will conflict with, result in a violation or breach of any term or provision of, or constitute a default under, the Organizational Documents of each party or its Affiliates, or any statute, order, judgment, writ, injunction, decree, license, permit, rule, or regulation of any court or any governmental or regulatory body, or any indenture, mortgage, lease, contract, agreement, instrument, commitment or other arrangement to which any party or any of its Affiliates is a party or by which it is or may be bound, which conflict, violation, breach or default would materially and adversely affect the operations of the party or any of its Affiliates.

6.6. Insurance. Each party and its Affiliates have continuously maintained and currently maintain fire, casualty, liability, professional liability and all other insurance (including self-insurance) coverage necessary in its and their respective business and operations. Such insurance policies or programs cover the property,

business, and operations of such party and its Affiliates in amounts and against losses and risks such as are generally maintained for comparably situated businesses.

6.7. Tax Status. With respect to each Affiliate identified in **EXHIBIT 1.2**, except as otherwise indicated in **EXHIBIT 1.2**, the Affiliate is an organization described in Section 501(c)(3) of the Code, or corresponding provisions of prior law, as set forth in a determination letter issued by the Internal Revenue Service. Said letter has not been modified, limited or revoked as to the Affiliate. The Affiliate is in compliance with the terms, conditions and limitations in said letter, and the facts and circumstances that form the basis of such letter, as represented to the Internal Revenue Service, continue substantially to exist. No proceedings are pending with respect to which the Affiliate has been served or threatened in any way contesting or affecting the Affiliate's status as an organization described in Section 501(c)(3) of the Code, or which would subject any income of the Affiliate to federal income taxation to such extent as would result in loss of such status.

7. Covenants of the Parties. From and after the date hereof and through the Closing Date and the Effective Date, each party hereby agrees to keep, perform, and fully discharge the following covenants and agreements:

7.1. Interim Conduct of Business. Each party shall use its best efforts and shall cause its Affiliates to use their best efforts to (a) preserve, protect and maintain the businesses, properties and assets of the party and its Affiliates; (b) operate the businesses of the party and its Affiliates as a going concern consistent with prior practices and in the ordinary course of business; (c) preserve the good will of all

individuals and entities having business or other relations with it or them, including physicians, employees, patients, customers, payors and suppliers; and (d) prepare all documents called for by this Agreement and required to facilitate the consummation of the Affiliation contemplated herein. Each party shall provide the other party promptly with interim financial statements and any material management reports of the party and its Affiliates as and when they become available, except for sensitive pricing information and privileged documents concerning each party. Without the consent of the other party, each party shall not, and shall not permit its Affiliates, to (i) make any material changes in its or their Organizational Documents inconsistent with the undertakings hereunder, except for changes expressly authorized or required by this Agreement; (ii) enter into any new affiliation with any university, medical school, or degree-granting institution (but not including a new affiliation agreement between LIFESPAN and Brown) or (iii) enter, into any transaction materially and adversely affecting the business of either party or its Affiliates. NEMC shall not, and shall not permit its Affiliates to, commence or participate in discussions relating to an affiliation, merger, acquisition or other such transaction with any other party without the prior approval of LIFESPAN. LIFESPAN shall not, and shall not permit its Affiliates to, commence or participate in discussions relating to an affiliation, merger, acquisition or other such transaction with any entity listed on **EXHIBIT 3.10** without the prior approval of NEMC.

7.2. Accuracy of Representations and Warranties. Each party shall not take, and shall cause its Affiliates not to take, any action which would render any

representation and/or warranty contained in Section 6 of this Agreement materially inaccurate as of the Effective Date. Each party shall promptly notify the other party of any lawsuits, claims, administrative actions, or other proceedings asserted or commenced against the party or any of its Affiliates, or its or their officers, directors/trustees, or members involving in any material way the businesses, properties or assets of the party or its Affiliates. Each party shall promptly notify the other party in writing of any facts or circumstances which come to the party's attention and which the party reasonably believes to cause, or through the passage of time may cause, any of the representations and warranties contained in Section 6 to be false or inaccurate.

7.3. Access to Information. Each party shall give, and shall cause its Affiliates to give, to the other party and to appropriate representatives of each (defined for purposes of this Section 7.3 as a party's directors/trustees, officers, employees, agents, or advisors) access, during normal business hours, to such properties, books, records, contracts and other documents pertaining to the businesses, properties and assets of the party and its Affiliates (except sensitive pricing information or privileged documents as described above), as may be reasonably requested and appropriate in order for each party to perform its obligations hereunder. Officers and employees of a party and its Affiliates shall be available on a regular and frequent basis to confer with appropriate representatives of the other party to report material operational matters and the general status of ongoing operations. Each party shall cooperate in keeping the other party fully informed and shall promptly provide notice to the other party of any

unexpected emergency or other unanticipated adverse change in the normal course of business or prospects of the business of the notifying party and its Affiliates.

7.4. Books and Accounting Practices. Except as may be necessary to comply with changes in FASB accounting principles, each party shall maintain, and cause its Affiliates to maintain, its and their books of account and in the usual, regular, and ordinary manner in accordance with generally accepted accounting principles consistently applied, and shall make no change in any of its and their accounting methods or practices without the prior written approval of the other party.

7.5. Reserved.

7.6. Confidentiality. The parties agree that all documents and information received by them from each other pursuant hereto or to the MOU shall remain strictly confidential (unless ascertainable from person(s) not associated with the other party without violation of its rights or from information in the public domain), shall not be utilized for any purpose other than evaluating the Affiliation, and shall be returned immediately to the other party in the event the transaction is not closed as contemplated hereunder. The parties' obligations pursuant to this Section 7.6 shall survive by one (1) year any determination not to close. The parties agree to coordinate between themselves all public statements and press releases about the Affiliation.

8. List of Conditions Precedent to Closing. The obligations of the parties to close the Affiliation are subject to the satisfaction of the following conditions, compliance with which by a party, as applicable, may be waived in whole or in part by the other party for which the condition or obligation is being performed in that other party's sole discretion:

8.1. Representations True. Each and every representation and warranty by a party contained in this Agreement or in any certificate, exhibit or required closing document furnished to the other party under this Agreement shall be true in all material respects on and as of the Closing Date as though made on such date.

8.2. Covenants Performed. Each party shall have performed and complied with all covenants and conditions required by this Agreement to be performed or complied with prior to or on the Closing Date.

8.3. Material Adverse Change. Between the date of the MOU and the Closing Date, no material adverse change shall have occurred in either party's business, prospects, operations or conditions. For purposes of this Section 8.3, the term "material adverse change" means any change or effect or any prospective change or effect that, individually or when taken together with other changes or effects, is or is reasonably likely to be materially adverse to a party or to the party's ability to consummate the transactions contemplated herein.

8.4. Closing Certificate. Each party shall have received a certificate of a duly authorized officer of the party, dated as of the Closing Date, certifying (a) that there have been no material changes in its respective businesses and operations not in the ordinary course of business prior to the Closing Date which have not been made known to the other party, and (b) that the representations and warranties of the party and its Affiliates contained in Section 6 are true and correct on and as of the Closing Date in all material respects as if made on and as of such date, except as otherwise described.

8.5. No Contest of Consolidation. No suit or action by any party or any investigation, inquiry or proceeding by any governmental authority, or any legal or administrative proceedings shall have been instituted or threatened on or before the Closing Date which: (a) questions the validity or legality of this Agreement or any transaction contemplated hereby, or (b) seeks to enjoin any transaction contemplated hereby, or (c) seeks material damages on account of the consummation of any transaction contemplated hereby.

8.6. No Material Change in Laws. No change shall have been announced or proposed prior to the Closing Date in the laws, rules, regulations, or policies of any governmental authority which might reasonably be expected to materially and adversely affect the consummation of the Affiliation.

8.7. Opinion of Counsel Delivered. The opinion of Ropes & Gray shall have been delivered to each party in a form and substance satisfactory to each party.

8.8. Organizational Documents. Each party shall have received certified resolutions of the board of directors/trustees/governors/overseers of the other party, dated as of or prior to the Closing Date, evidencing authorization to adopt all the changes to the parties' Organizational Documents required hereunder.

8.9. Management Agreement. LIFESPAN and Lifespan/MA shall have entered into a mutually agreeable management agreement.

8.10. Governmental Approvals. Each party shall have received, prior to the Closing, all governmental permits, licenses or other approvals necessary to implement

the transactions contemplated in this Agreement which shall not be subject to any conditions, limitations or other terms not reasonably acceptable to the other party.

8.11. Other Obligations. The parties shall have performed all of their obligations under this Agreement.

9. Failure to Fulfill Conditions Precedent. In the event that any of the conditions set forth in Section 8 or elsewhere in this Agreement has not been fulfilled as of December 31, 1997 for reasons beyond either parties' control (which date may be extended by agreement of the chair of the board of each party), either party may, at its option, by written notice to the other party, render its obligations hereunder null and void, and thereupon this Agreement shall be of no further force or effect. By proceeding on the Closing Date, each party shall be conclusively deemed to have accepted or waived fulfillment of all such conditions, unless otherwise agreed in writing prior to or at such time.

10. Indemnification.

Except to the extent otherwise covered by insurance policies, the parties agree to the following indemnification provisions:

(a) If for any reason the Affiliation is not consummated by reason of nonperformance of any condition precedent set forth in Section 8 of this Agreement, each party (an "indemnifying party") agrees to indemnify and hold the other party, and the respective directors/trustees, employees and agents of each (collectively, an "indemnified party") forever harmless to the full extent permitted under law as the same currently exist or may hereafter be amended from and against any and all liabilities, demands, claims, actions, or causes of action, assessments, judgments,

losses, costs, damages or expenses, including reasonable attorneys' fees, sustained or incurred by an indemnified party and not otherwise reimbursed by insurance (other than self-insurance) resulting from or arising out of or by virtue of:

i. Any false representation or warranty made herein by such indemnifying party or any of its Affiliates or non-compliance with or breach by such indemnifying party or any of its Affiliates of any of the covenants, commitments or obligations of the Affiliation Agreement to be performed by such indemnifying party or any of its Affiliates; or

ii. The performance of any services rendered by such indemnifying party, its Affiliates, or its employees, directors/trustees, officers, or agents which results in any bodily injury, sickness, disease, death or physical injury which is caused in whole or in party by the negligent or willful act of such party, its Affiliates, or its employees, directors/trustees, officers, or agents.

The obligations set forth in this Section 10(a) shall survive the contested withdrawal by a party from the System or the contested termination of this Agreement. Except as specifically set forth in Section 10(b) below, no indemnification is provided hereunder in the event of a consummation of the Affiliation because the indemnifying party will be empowered to so protect the indemnified party if it desires.

(b) To the extent not otherwise covered by insurance, LIFESPAN shall indemnify each individual who served as a director/trustee, governor, overseer or officer of NEMC, NEMCH or any of their Affiliates (collectively, "Officials") at any

time prior to the Effective Date from and against any and all liabilities, demands, claims, actions, or causes of action, assessments, judgments, losses, costs, damages or expenses, including reasonable attorneys' fees (collectively, "Adverse Actions"), resulting from or arising out of the entering into or implementation of the terms and conditions of this Agreement, including Lifespan/MA's exercise of a reserved power as provided in Section 2.5 or LIFESPAN's exercise of a reserved power as provided in Section 2.2. The obligations set forth in this Section 10(b) shall survive the termination or expiration of this Agreement or the consummation of the Affiliation. LIFESPAN shall not use any donor-restricted funds to pay any indemnification claim hereunder which by their terms may not lawfully be so used. In the event LIFESPAN alone does not have sufficient resources to fulfill any indemnification obligations arising under this Section 10(b), to the extent permitted by law LIFESPAN shall cause its Affiliates (not including the NEMC Affiliates listed in **EXHIBIT 1.2(B)**) to provide funds sufficient to pay such obligations.

(c) In the event that any claim is asserted by a third party other than an Affiliate against an indemnified party as to which such indemnified party is entitled to indemnification hereunder, such party shall promptly after learning of such claim notify the indemnifying party thereof in writing; provided, however, that the failure of the indemnified party to give prompt notice of such claim shall not relieve the obligation of the indemnifying party with respect to such claim. Except to the extent otherwise provided by the terms of applicable insurance policies (other than self-insurance or by law), the indemnifying party shall have the right, upon written notice to the

indemnified party within thirty (30) days after receipt from the indemnified party of notice of such claim, to conduct at its expense the defense against such claim in its own name, or, if the indemnifying party shall fail to give such notice, it shall be deemed to have elected not to conduct the defense of the subject claim, and in such event the indemnified party shall have the right to conduct such defense and to compromise and settle the claim without prior consent of the indemnifying party. In the event that the indemnifying party elects to conduct the defense of the subject claim, the indemnified party will cooperate with and make available to the indemnifying party, such assistance and materials as may be reasonably requested by it, all at the expense of the indemnifying party and the indemnified party shall have the right at its expense to participate in the defense, provided that the indemnified party shall have the right to compromise and settle the claim only with the prior written consent of the indemnifying party, unless otherwise provided by the terms of applicable insurance policies (other than self-insurance).

11. Amendments. This Agreement may not be amended or terminated without the written agreement of both parties.

12. Reserved.

13. Remedies. The parties agree that if either party breaches any provision of this Agreement, the other party will suffer irreparable harm that cannot be adequately compensated by money damages and for which there is no adequate remedy at law; and that any such breach of the terms of this Agreement may be enjoined by a court of competent jurisdiction

pursuant to a petition for temporary, preliminary or permanent injunctive relief, without any requirement that the moving party post any bond in conjunction therewith.

14. Miscellaneous. The following miscellaneous provisions shall apply to this Agreement in all respects:

14.1. Strict Compliance. No failure by any party to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement, shall constitute a waiver of any such breach of such covenant, agreement, term or condition. No waiver of any breach shall affect or alter this Agreement, but each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect.

14.2. Notices. All notices, requests, approvals, demands and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given and to be effective when delivered personally (including delivery by express or courier services), or if mailed, four (4) business days after being deposited in the United States mail as registered or certified matter, postage prepaid, return receipt requested, addressed to parties at the addresses set forth in the attached **EXHIBIT 14.2** or to such other address as either party may designate by notice to the other party.

14.3. Captions. The captions of this Agreement are for convenience of reference only and in no way define, limit or describe the scope or intent of this Agreement or any part hereby, nor in any way affect this Agreement or any part hereof.

14.4. Assignment. This Agreement shall be assignable by a party only upon the prior written consent of the other party.

14.5. Reserved.

14.6. Severability. If any provisions of this Agreement shall for any reason be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid or unenforceable provision were omitted.

14.7. Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon the parties hereof, and their respective corporate or business successors and permitted assigns.

14.8. Expenses. Unless otherwise agreed to in writing, each party agrees to pay its own expenses incurred in evaluating, negotiating and consummating the Affiliation and the transactions contemplated hereby, except as modified by the MOU.

14.9. Entire Agreement. This Agreement, including any exhibits, constitutes the entire agreement between the parties hereto with respect to the subject matter hereof. Each exhibit referred to herein is hereby incorporated by reference. This Agreement supersedes the Master Affiliation Agreement between NEMC and LIFESPAN, dated as of June 19, 1997, the First Amendment to Master Affiliation Agreement, dated as of September 26, 1997, the Second Amendment to Master Affiliation Agreement, dated as of October 16, 1997 and the MOU, except as may be specifically provided herein.

14.10. <u>Cross References</u>. Unless otherwise stated, all references to sections and exhibits in the text of this Agreement are to other sections and exhibits of this Agreement.

14.11. <u>Execution in Counterparts</u>. This Agreement may be executed in two (2) or more counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and the year first above written.

Witness:

Thomas F. O'Donnell, M.D.
President & Chief Executive Officer

NEW ENGLAND MEDICAL CENTER, INC.

By:
George W. Carmany, III
Its Chairman

Witness:

William Kreykes
President & Chief Executive Officer

LIFESPAN CORPORATION

By:
Bruce Selya
Its Chairman

1142044.28

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and the year first above written.

Witness:

Thomas F. O'Donnell, M.D.
President & Chief Executive Officer

NEW ENGLAND MEDICAL CENTER, INC.

By:__________________________
George W. Carmany, III
Its Chairman

Witness:

William Kreykes
President & Chief Executive Officer

LIFESPAN CORPORATION

By:
Bruce Selya
Its Chairman

1142044.28