In the Matter of:

# Lifespan Corporation v. New England Medical Center, Inc.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

George Vecchione

October 5, 2007

CAPITOL COURT REPORTING

931 Jefferson Blvd., Suite 2003
Warwick, Rhode Island 02886
401.739.3600 - phone 401.739.3665 - fax
www.capitolcourtreporting.com

telephone conversations?
A. I frequently do that.
Q. And what do you do with the notes once you're done with them; do you typically put them in a file?
A. No. Typically discard them.
Q. Discard them. And why do you do that?
A. Either there was something that I thought needed a follow-up and it was followed up, and therefore the discard was appropriate. That would be the reason.
Q. Okay. You indicated earlier that your computer had been stripped. What did you mean by that?
A. I don't maintain files.
Q. You don't maintain files on your computer?
A. That's correct.
Q. Okay. Can you explain that? I mean, obviously you have files on your computer today, correct?
A. I delete virtually everything within a week.
Q. You do that automatically, or is that something that you do -- you have to do manually?
A. Manually.
Q. Why do you do that?
A. Anything that -- I'm still a little bit of the old school. I -- if there's something of importance, I'll print it and use the hard copy. And that could be



something that you might find in a file as well. I do believe, I do recall, frankly, Ken's paralegal...
MR. SHERMAN: Yeah, Joanne.
A. Joanne going through it so, I presume everything that was appropriate to be produced has been produced.
Q. Okay. Was anything destroyed or discarded since the time of the litigation, that you're aware of, that might relate to the affiliation period?
A. No.
Q. Does Lifespan have a document retention policy?
A. We do, yes.
Q. Do you know if anything was done to -- under that policy to make sure the documents were preserved for this litigation?
A. Again, everything that -- I believe everything that I had, Ken had. And Ken would make sure that we're fully compliant.
Q. You indicated earlier that you had been deposed three times. Can you just tell us when the last time you were deposed?
A. It was quite a while ago. It was about 12 or 13 years ago.
Q. Okay. Can you tell me what kind of case it was?
A. I was on a bank board and there was a, an issue during a



takeover attempt and, as a board member I was deposed.
Q. And how about the time before that, do you remember what the issue was? What the case was about?
A. Actually, I don't.
Q. How about the time before that?
A. I don't. It was well before.
Q. Okay. Let me briefly ask you about what you did before you were at Lifespan. You were -- were you in Pittsburgh at some point?
A. No, I came from New York.
Q. New York. Okay, what did you do in New York?
A. Immediately prior to coming.
Q. Yes.
A. I was at New York Presbyterian Health System. I was the director of New York Hospital, which is the Cornell affiliate, and headed up their health care system.
Q. What were your responsibilities there?
A. The hospital -- a director's responsibility were operating responsibilities, and from the system perspective, developing a network of related institutions that we could coordinate care and also create the benefits of a number of hospitals working together, either from a cost perspective or from a quality of care perspective.



Q. How long were you there?
A. I was there for ten years.
Q. And why did you leave?
A. Well, the opportunity arose up in Providence which I found of interest. There were also -- I mentioned the merger between the New York Hospital and Presbyterian Hospital. That occurred late during that ten-year period. I, I was the number two at New York Hospital. The head of Columbia Presbyterian joined and we had an office of the president -- a three-person office. A physician, Dr. Speck his name is, he was designated as the heir apparent when Dr. Skinner was to retire. So it was, it was time.
Q. Okay. What did you do prior to that position?
A. Prior to that position, from 1976 to 1988, I was president -- from 1977 to 1988, I was president and CEO of New Rochelle Hospital. From the summer of '96 through early '97, I was the CFO of the same, New Rochelle Hospital.
Q. Did either of these hospital organizations operate like Lifespan does, as an umbrella organization over affiliated hospitals?
A. The, the New York Hospital health care network was similar. Similar but different.

Q. How was it similar?
A. It was similar in that the apparent[sic] had the opportunity and the right and authority to, to vote in or approve the board of the affiliate. Different -- well, I shouldn't assume.
Q. Go ahead, that was my next question. What -- what were the differences?
A. There the CEOs did not have a direct reporting line to, to the CEO of the parent.
Q. And were you part of the parent?
A. Yes.
Q. And would you agree that the parent owed fiduciary duties to the affiliated hospitals?
A. Could you please explain that.
Q. Do you understand what a fiduciary duty is?
A. I think I do.
Q. What do you understand it to be?
A. To act appropriately to ensure the viability of the organization.
Q. And with that definition, did you -- would you agree that the parent organization owed that fiduciary duty to the affiliated hospitals?
A. Yes.
Q. Would you agree that that includes a duty of care as



well as a duty of loyalty?
A. Yes.
Q. Would you agree it also includes a duty of trust and confidence?
A. Yes.
Q. And I take it you would agree that the same thing would apply to Lifespan during the affiliation period?
A. Yes.
Q. And obviously it still applies today?
A. Yes.
Q. When you were at -- in New York, did you have discussions with the affiliated hospitals about that -- those duties? Would that be a topic of discussion between the parent and the affiliates?
A. Mostly at the time of affiliation, yes.
Q. What would you -- what would you or what would the parent tell the affiliate about those duties?
A. There were two levels. Again, there was less of an operating line between the affiliate boards and affiliate management and the system management. So there, there was a very clear responsibility of the trustees and the management to ensure that they're operating, A, efficiently; that the quality of care is maintained in that accreditation, and compliance, full



compliance with all regulatory responsibilities are met. What -- question?
Q. No, go ahead. Had you finished your answer?
MR. SHERMAN: Had you finished the answer?
A. Well...
MR. SHERMAN: You can finish. Go ahead. If you finished your answer then stop.
A. All right, why don't I stop because I was gonna go off.
MR. SHERMAN: Just answer the question.
A. I thought it related but different.
Q. Go ahead, what were you going to say? It's probably my follow-up question anyway.
A. May not be. The Lifespan operating model, which was clearly understood by all the affiliates -- in fact, different from New York where, as I mentioned, most of these responsibilities are discussed principally around the time of affiliation, the Lifespan operating model was something that was discussed on an ongoing basis. And, and there it was very clear. When, when I was recruited to Lifespan, I asked the governance committee to suspend an action that they were considering. They were considering creating a single board that would make all operating decisions at all sites. I thought that was a mistake. I think the role of the local hospital



boards is critical. I think the input from the medical staffs, from the volunteers, the philanthropic supporters, the community in general, employees, is critical, and if we took that away and moved all authority to Providence, that would be a huge mistake. The board thankfully agreed and it did not go in that direction, and in fact strengthened the role and responsibility of the local boards of trustees of the hospitals, the delegation of operating decisions to local management, and that was very clearly done at Lifespan over a period of time.
Q. But the responsibilities that you just described a few minutes ago owed by the parent to the affiliates that you've discussed in New York, are the same kinds of things that were relevant to Lifespan and its affiliates during the affiliation period, correct?
A. Yes, but there's, there's an issue of nuance and emphasis. Here it was very clear that from a financial and qualitative perspective, targets would be agreed upon and set by the parent. How those targets were achieved was up to the local management and boards.
Q. But during the affiliation period, it's fair to say that Lifespan owed the affiliates these fiduciary duties and this was a subject of discussion throughout the