UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

<u>Lifespan Corporation</u>

     v.

Civil No. 06-cv-421-JNL
Opinion No. 2010 DNH 117

<u>New England Medical Center, Inc.,
now known as Tufts Medical Center
Parent, Inc., and New England
Medical Center Hospitals, Inc.,
now known as Tufts Medical Center,
Inc.</u>

     and

<u>Martha Coakley, Attorney General
for the Commonwealth of
Massachusetts, Intervenor</u>

## OPINION & ORDER

This case, transferred to this court from the District of
Rhode Island, arises out of a dispute between a healthcare system
and one of its former hospitals over the terms of their
separation.  Lifespan Corporation, which runs a network of
hospitals in Rhode Island, sued New England Medical Center
("NEMC"), a Massachusetts hospital that had briefly joined
Lifespan's system, alleging that NEMC failed to make various
payments required by their disaffiliation agreement.  NEMC,
accusing Lifespan of gross misconduct during their affiliation,
brought counterclaims for contractual indemnification, breach of
fiduciary duty, unjust enrichment, and unfair business practices.
NEMC also challenged the enforceability of one of the payment

1

provisions.  The Massachusetts Attorney General intervened on NEMC's side of the case and joined most of the counterclaims against Lifespan.  This court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) (diversity).

The parties have each moved for partial summary judgment. See Fed. R. Civ. P. 56.  Specifically, NEMC and the Attorney General moved for summary judgment on the issue of whether Lifespan owed a fiduciary duty to NEMC during their affiliation. Lifespan, in turn, moved for summary judgment on nearly all of the claims in the case.  After hearing oral argument, this court concludes that Lifespan had a fiduciary relationship with NEMC and therefore grants summary judgment to NEMC and the Attorney General on that issue.  This court also grants Lifespan's motion in part, concluding that NEMC released its tort counterclaims in the disaffiliation agreement and that there is no merit to the counterclaims challenging the enforceability of one of the payment provisions.  The rest of the parties' claims will need to be resolved at trial.

## I.  __Applicable legal standard__

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

2

Fed. R. Civ. P. 56(c)(2).  An issue is "genuine" if it could reasonably be resolved in either party's favor at trial, and "material" if it could sway the outcome under applicable law. Mulvihill v. Top-Flite Golf Co._, 335 F.3d 15, 19 (1st Cir.2003). In making this determination, the "court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor." Id.  On cross-motions for summary judgment, this standard is applied to each party's motion separately.  See, e.g., Am. Home Assurance Co. v. AGM Marine Contractors, Inc., 467 F.3d 810, 812 (1st Cir. 2006).

## II.  **Background**[1]

In 1997, Lifespan and NEMC entered into an Affiliation Agreement whereby NEMC, a non-profit hospital in Boston, agreed to join Lifespan's existing healthcare system.  The system already included a network of hospitals in Rhode Island, where Lifespan is located, but Lifespan wanted to make inroads into Massachusetts as well.  NEMC, whose financial position had weakened in recent years, hoped that Lifespan would be able to turn things around.  As an added benefit, the transaction gave

---

[1]This summary is based on undisputed facts in the record. To the extent that the summary judgment motions implicate disputed facts, this court will discuss them in the appropriate part of the analysis, drawing the required inferences in favor of the non-moving party.

NEMC an opportunity to seek reimbursement from the Centers for Medicare and Medicaid Services ("Medicare") for its loss on sale, i.e., the realization of asset depreciation attributable to services provided to Medicare patients.  See 42 C.F.R. § 413.134(f) (1997).

The parties structured their agreement so that a new holding company, Lifespan of Massachusetts ("LOM"), became NEMC's sole voting member, with the power to oversee NEMC's finances, strategic planning, policymaking, and key contractual negotiations, among other things.  Lifespan had majority control over LOM and, through it, significant control over NEMC.  In exchange for NEMC's agreement to join its healthcare system, Lifespan agreed to pay $87 million to NEMC over the next ten years and to use its best efforts to enhance NEMC's reputation. NEMC, in turn, agreed to pay Lifespan an annual fee for its corporate management services.  The fee started at $10.3 million for the first year, but then steadily increased to $43 million by the fifth year.

After five years together, with NEMC still struggling financially and with the Medicare reimbursement issue still unresolved,[2] the parties decided in 2002 to sever their relationship through a Restructuring Agreement and to operate

---

[2]Medicare initially denied NEMC's claim for reimbursement. The claim was pending on appeal at the time of the Restructuring Agreement, and the parties agree that its success was then uncertain.

independently once again.  The Restructuring Agreement required NEMC to make a series of payments to Lifespan totaling $30 million, plus half of "any recovery received from Medicare by NEMC ... for the loss on sale/depreciation recapture resulting from the Affiliation."

NEMC paid most of the $30 million.  In 2006, however, it refused to pay the final two installments, totaling $3.66 million, claiming that it had sustained losses far in excess of that amount due to Lifespan's alleged misconduct during their affiliation, including (1) its gross mismanagement of NEMC's contracts with health insurers and its accounts receivable; (2) Lifespan's excessive corporate management fees; (3) its deliberate depletion of NEMC's assets and reserves; and (4) Lifespan's insistence that NEMC enter into an ill-fated interest rate swap without disclosing that the swap was deemed too risky for Lifespan's other hospitals and that Lifespan's chief financial officer, who recommended the deal, had a conflict of interest.

Lifespan brought suit against NEMC in the District of Rhode Island in 2006, alleging breach of contract and seeking to recover the $3.66 million.  NEMC brought a counterclaim for recovery under the Restructuring Agreement's indemnification provision, which required Lifespan to indemnify NEMC for losses caused by Lifespan's misrepresentations, willful misconduct, or

gross negligence during their affiliation.  NEMC also brought counterclaims for breach of fiduciary duty, unjust enrichment, and unfair business practices.  Although NEMC admitted that it had not paid the $3.66 million as contractually required, the district court refused to grant summary judgment to Lifespan on its contract claim, deeming it so "closely related" to NEMC's counterclaim for indemnification that they must be resolved together.  See Lifespan Corp. v. New Eng. Med. Ctr., Inc., No. 06-421, 2008 WL 310967, at *2-3 (D.R.I. Feb. 1, 2008) (Torres, D.J.).

Shortly after that ruling, NEMC finally resolved its Medicare reimbursement claim and recovered about $20.5 million from Medicare for the asset depreciation that it had realized when the parties affiliated in 1997.  Upon learning of that recovery, Lifespan amended its complaint to add a contract claim for half of it.  NEMC responded with more counterclaims, asserting that the Medicare recovery provision in the Restructuring Agreement was inapplicable, unconscionable, contrary to public policy, lacking in consideration, a violation of the parties' original Affiliation Agreement, a breach of fiduciary duty, and an unjust enrichment.

This court was assigned to the case in 2009, after all of the judges in the District of Rhode Island recused themselves. Shortly thereafter, this court granted a motion for the

6

Massachusetts Attorney General to intervene in the case, <u>see</u> Fed. R. Civ. P. 24, pursuant to her supervisory authority over public charities in Massachusetts.  <u>See</u> Mass. Gen. Law ch. 13, §§ 8 and 8G.  The Attorney General had approved the parties' affiliation in 1997 and had been notified of their disaffiliation in 2002, but had never approved the Restructuring Agreement.  After intervening, the Attorney General joined in nearly all of NEMC's counterclaims against Lifespan (except for the indemnification claim and the unfair business practices claim).  She did not assert any new claims of her own.

The parties have now cross-moved for partial summary judgment.  <u>See</u> Fed. R. Civ. P. 56.  Specifically, NEMC and the Attorney General move for summary judgment on the issue of whether Lifespan owed a fiduciary duty to NEMC during their affiliation.  Lifespan, in turn, moves for summary judgment on its claim for half of the Medicare recovery and on nearly all of the counterclaims (except for NEMC's indemnification claim, which the parties agree presents trialworthy issues).  This court will analyze each of the parties' arguments in turn.


III.  <u>**Analysis**</u>

A.  *Choice of law*

The threshold issue, raised by both sides, is which state's law governs this case:  Rhode Island or Massachusetts.  As one

might expect, Lifespan favors the law of its home state (Rhode Island), whereas NEMC and the Attorney General favor the law of their home state (Massachusetts).  In resolving choice-of-law issues, a federal court sitting in diversity must apply the choice-of-law rules of the forum state.  <u>See</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 491 (1941); <u>Baker v. St. Paul Travelers Ins. Co.</u>, 595 F.3d 391, 392 (1st Cir. 2010). Here, the forum state is Rhode Island.  Like many states, Rhode Island has separate choice-of-law rules for contract claims and tort claims.  This court will analyze each type of claim separately.

### i.  **Contract claims**

The parties did not include a choice-of-law provision in their Restructuring Agreement.  "In the absence of a contractual stipulation about which law controls, Rhode Island's conflict-of-laws doctrine provides that the law of the state where the contract was executed governs" any contract claims.  <u>DeCesare v. Lincoln Benefit Life Ins. Co.</u>, 852 A.2d 474, 483-84 (R.I. 2004); <u>see also</u> <u>Emhart Indus., Inc. v. Century Indem. Co.</u>, 559 F.3d 57, 80 (1st Cir. 2009).  For purposes of this rule, "the place of contracting is the place in which the last act that forms the contract is performed."  <u>Crellin Techs., Inc. v. Equipmentlease Corp.</u>, 18 F.3d 1, 5 (1st Cir. 1994) (citing <u>Tim Hennigan Co. v.</u>

Anthony A. Nunes, Inc., 437 A.2d 1355, 1357 (R.I. 1981), and A.C. Beals Co. v. R.I. Hosp., 292 A.2d 865, 870-71 (R.I. 1972)).

In most cases, the "last act that forms the contract" is the acceptance of an offer, which generally occurs in the place from which the acceptance is sent.  See, e.g., DeCesare, 852 A.2d at 484; Crellin, 18 F.3d at 5.  In this case, however, the Restructuring Agreement expressly provides that it "shall become effective when each party hereto shall have received counterparts hereof signed by the other parties hereto."  (Emphasis added.) The record indicates that NEMC signed the agreement first in Massachusetts; Lifespan then counter-signed it in Rhode Island and faxed its signed copy back to NEMC in Massachusetts.  Thus, the contract became effective when NEMC received the fax in Massachusetts.  That was the "last act that form[ed] the contract."  Accordingly, Massachusetts law governs the parties' contract claims.

### ii.  Tort claims

For tort claims, Rhode Island courts use an "interest-weighing" approach that requires consideration of five factors: "(1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law."  Najarian v. Nat'l

Amusements, Inc., 768 A.2d 1253, 1255 (R.I. 2001).  In weighing these factors, Rhode Island courts also consider the specific facts of the case, including "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  Id.  The overarching objective is to determine which state "bears the most significant relationship to the event and the parties."  Id.

In this case, many of the relevant factors point in both directions.  The relationship between Lifespan, a Rhode Island entity, and NEMC, a Massachusetts entity, is centered in both states.  The injury to NEMC occurred primarily in Massachusetts, but much of Lifespan's conduct causing it occurred in Rhode Island.  Both states have very similar laws regarding the issues in this case, so it is hard to say that one state's laws are better than the other's.  And both states have significant interests in the outcome.

Two factors, though, tip the balance in favor of Massachusetts.  The first is predictability.  Although the Restructuring Agreement does not contain a choice-of-law provision, many related documents invoke Massachusetts law (including, for example, the opinion letters that both parties'

counsel issued on the Restructuring Agreement; NEMC's written guarantee of its payment obligation as required by the Restructuring Agreement; and the parties' original Affiliation Agreement).  Moreover, the holding company through which Lifespan oversaw NEMC was created as a Massachusetts entity.  Under the circumstances, application of Massachusetts law would be the most predictable result.  See Cribb v. Augustyn, 696 A.2d 285, 288 (R.I. 1997) (applying Rhode Island law where court "believe[d] that the parties would have expected Rhode Island law to apply in resolving their dispute").

The second factor that favors Massachusetts law is simplification of the judicial task.  As explained above, Massachusetts law governs the contract claims in this case. Additionally, both sides agree that the Massachusetts Attorney General's powers are defined by Massachusetts law.  Under the circumstances, it would be much simpler to apply Massachusetts law to all claims.  After weighing all of the relevant factors, this court concludes that is the best approach.[3]

B.   ***Fiduciary duty*** (counterclaim #2)

The next issue, also raised by both sides, is whether

---

[3]For the most part, Massachusetts and Rhode Island have very similar laws with respect to the issues in this case.  Most, if not all, of the parties' claims would be resolved the same way under either state's law.

Lifespan owed a fiduciary duty to NEMC during their affiliation. Under Massachusetts law, a fiduciary relationship generally "exists when one reposes faith, confidence, and trust in another's judgment and advice." Doe v. Harbor Schs., Inc., 843 N.E.2d 1058, 1064 (Mass. 2006). "The circumstances which may create a fiduciary relationship are so varied" that the Massachusetts courts have declined "to attempt the formulation of any comprehensive definition that could be uniformly applied in every case." Id. Rather, the analysis depends on the particular circumstances, making it a mixed question of law and fact. Id. But that "does not preclude determination on a motion for summary judgment record that a fiduciary relationship does nor does not exist" based on facts that neither party disputes. Id.[4] The party asserting the existence of such a relationship bears the burden of proof. Id.

In this case, the summary judgment record leaves no doubt that NEMC reposed faith, confidence, and trust in Lifespan's judgment and advice when it joined Lifespan's healthcare system. Lifespan had majority control over NEMC's sole voting member (the holding company LOM) and, through it, the power to oversee key

---

[4]Lifespan argues that the record contains too many factual disputes to resolve this issue in NEMC and the Attorney General's favor (though it apparently sees those disputes as no barrier to summary judgment in its own favor). With a few minor exceptions, however, Lifespan has not disputed any of the facts that NEMC and the Attorney General present in support of their claim. As explained infra, those undisputed facts conclusively establish the existence of a fiduciary relationship.

aspects of the hospital's operations, including its financial decisions, its strategic planning, its policymaking, and its contracts with health insurers, physicians, and academic institutions.  At the board level, Lifespan had the authority to appoint and remove NEMC's directors.  At the executive level, Lifespan had the authority to hire, fire, and set compensation for NEMC's chief executive and financial officers, both of whom reported directly to their counterparts at Lifespan.  In essence, Lifespan became NEMC's corporate parent, and NEMC became a controlled subsidiary.  Lifespan, in turn, agreed to use its best efforts to enhance NEMC's reputation.

In the for-profit context, "the weight of authority holds that a parent corporation does not owe a fiduciary duty to a wholly-owned subsidiary."  Gen. Elec. Co. v. Lines, 26 Mass. L. Rptr. 66, 2009 WL 2393935, at *6 (Mass. Super Ct. Aug. 3, 2009); see also 3 William Meade Fletcher et al., Fletcher Cyclopedia of Corporations § 844.30, at 209-10 (2002).  But that is because their interests are directly aligned.  See Lines, 2009 WL 2393935, at *6.  Where the parent owns only part of the subsidiary, the rule changes:  "a parent corporation generally owes a fiduciary duty to its majority-controlled subsidiary." 12B Fletcher, supra, § 5811.40, at 187.  This duty prevents the parent from using its majority control to advance its own interests at the expense of the subsidiary's minority

13

shareholders.  See Donahue v. Rodd Electrotype Co. of New Eng., Inc., 328 N.E.2d 505, 593 (Mass. 1975).

In the non-profit context, the analysis changes somewhat. The concern there is not with competing shareholder interests, but with competing charitable objectives between parent and subsidiary.  Even where the parent is the subsidiary's sole voting member, they may have different aims and different beneficiaries.  This is particularly true in the case of healthcare systems, where the interests of the system as a whole may diverge from those of a given hospital.  "In significant respects, the beneficiaries of the [hospital], namely its patients and community, stand in a position similar to the minority shareholders in a non-wholly-owned, for-profit subsidiary," in that they "are vulnerable to the power of the controlling entity."  Dana Brakman Reiser, Decision-Makers Without Duties: Defining the Duties of Parent Corporations Acting as Sole Corporate Members in Nonprofit Health Care Systems, 53 Rutgers L. Rev. 979, 1009 (2001).

In the most extensive scholarly analysis of this issue to date, Professor Reiser concluded that "it is appropriate to apply a fiduciary standard" to a healthcare system acting as the sole member of a non-profit hospital in order "to constrain the [system's] powers and protect the interests of subsidiaries' beneficiaries," just as courts (including those in Massachusetts)

14

have done with respect to controlling shareholders in for-profit
corporations.  Id. at 995.  As she noted, however, "current law
provides little guidance to courts, regulators, and [healthcare
systems] themselves" on this issue, despite the increasing
prevalence of such affiliations in the healthcare industry.  Id.

The only case on point that the parties have identified (or
this court has found) is Health Alliance of Greater Cincinnati v.
Christ Hosp., No. C-070426, 2008 WL 4394738 (Ohio App. Ct. Sept.
30, 2008).  There, as here, "the participating hospitals allowed
[the healthcare system] to manage their affairs," including their
financial decisions and third-party contracts.  Id. at *6.  On
those facts, the court concluded that the healthcare system's
"argument that it owed no fiduciary duty to its member hospitals
is untenable," because the "hospitals reposed special confidence
and trust in the [system], which resulted in a position of
superiority on the part of the [system], the very essence of a
fiduciary relationship."  Id.

Where, as here, a federal court is confronted with a novel
question of state law, it must make "an informed prophecy of what
the [state's highest court] would do in the same situation,
seeking guidance in analogous state court decisions, persuasive
adjudications by courts of sister states, learned treatises, and
public policy considerations."  Walton v. Nalco Chem. Co., 272
F.3d 13, 20 (1st Cir. 2001).  Based on these considerations, as

15

just discussed, this court is confident that the Massachusetts Supreme Judicial Court would agree with the reasoning set forth by Professor Reiser and the Health Alliance decision, at least as applied to the facts of this case, and conclude that Lifespan owed a fiduciary duty to NEMC during their affiliation.

Lifespan argues that even if a fiduciary duty exists, its scope should be limited to those obligations set forth in the parties' Affiliation Agreement. But under Massachusetts law, "the fact that [the parties] entered into an ... agreement ... does not relieve [Lifespan] of the high fiduciary duty" imposed by tort law. Blank v. Chelmsford Ob/Gyn, P.C., 649 N.E.2d 1102, 1106 (Mass. 1995); cf. also Wartski v. Bedford, 926 F.2d 11, 20 (1st Cir. 1991) (explaining that a fiduciary duty "cannot be negated by the words of the [parties'] agreement" under Massachusetts law).

Lifespan also argues that this claim is barred by the applicable statute of limitations. See Mass. Gen. L. ch. 260, § 2A ("actions of tort ... shall be commenced only within three years next after the cause of action accrues"); id. § 18 (stating that the limitations period "shall apply to actions brought by or for the Commonwealth"). But a claim for breach of fiduciary duty accrues only when the plaintiff has "actual knowledge of the fiduciary's breach." O'Connor v. Redstone, 896 N.E.2d 595, 607 (Mass. 2008). On the current record, there is a material dispute

16

as to when that happened, which precludes summary judgment on that issue. See Silvestris v. Tantasqua Reg'l Sch. Dist., 847 N.E.2d 328, 336 (Mass. 2006) ("In most instances, the question when a plaintiff knew ... of the existence of a cause of action is one of fact that will be decided by the trier of fact.").

In sum, this court concludes that Lifespan owed a fiduciary duty to NEMC during their affiliation and therefore grants summary judgment to NEMC and the Attorney General on that issue (which is the only one raised by their summary judgment motions). Lifespan's competing request for summary judgment on that issue is denied.  Whether Lifespan actually breached its fiduciary duty, and whether this claim is barred by the statute of limitations, will be resolved at trial.

## C.  *Liability release*

Turning now to the issues raised solely by Lifespan, the first one is whether NEMC released its tort claims against Lifespan when it entered into the Restructuring Agreement.  "The fact of a release is an affirmative defense, and the party seeking to have a release enforced usually bears the initial burden of pleading and proving [its] existence."  In re Mi-Lor Corp., 348 F.3d 294, 305 (1st Cir. 2003) (citing Sharon v. City of Newton, 769 N.E.2d 738, 744 (Mass. 2002)).  The interpretation of the release then becomes a question of law for the court to

decide, although it may depend to some extent on the factual
context.  See Leblanc v. Friedman, 781 N.E.2d 1283, 1287 (Mass.
2003).  If the court determines that the release covers the
claims at issue, then "the burden of proving or disproving its
enforceability may lie with either party, depending on the
context."  Mi-Lor, 348 F.3d at 305.  In this context, because the
parties had a fiduciary relationship, that burden falls to
Lifespan.  Id.

Lifespan has identified three releases in the Restructuring
Agreement that, in its view, should bar NEMC's tort claims.  This
court will focus on the broadest of the three, which provides:

> Effective as of the Closing, NEMC ... hereby releases,
> remises, and forever discharges any and all rights and
> claims that [it] has had, now has, might now have or
> might in the future have against Lifespan ... arising
> from or in connection with the MAA, except with regard
> to those provisions of the MAA that, by their terms,
> survive the termination of the MAA.

Lifespan executed an identical release of claims against NEMC.
Both releases were part of the same provision, entitled "Release
from MAA."[5]

---

[5]The other two releases provide (1) that upon terminating
the Affiliation Agreement, "the parties shall be fully released
from their respective obligations thereunder," and (2) that the
Restructuring Agreement is "in complete and full satisfaction of
all claims for amounts due or claimed to be due under the
Affiliation Agreement or otherwise that [NEMC] has or may have
against Lifespan ..., each of which is hereby ... forever
irrevocably released."  Both of those releases appear to be
directed toward contractual claims, not tort claims.

18

NEMC argues that this release extends only to contractual claims arising from the Affiliation Agreement. As Lifespan notes, however, the phrase "arising from or in connection with" is usually interpreted to mean that the parties intended for the release to extend beyond mere contract claims, to cover other types of claims closely connected to the contract. See, e.g., Cooper v. Meridian Yachts, Ltd., 575 F.3d 1151, 1162 (11th Cir. 2009) (stating that the phrase "arising out of or in connection with" an agreement "is clearly meant to be read broadly" and governs all disputes "having a connection to the agreement and not just the agreement itself"). Here, NEMC's tort claims are all very closely connected to the Affiliation Agreement. This court therefore concludes that they are encompassed by the plain meaning of the release.

The question, then, is whether such a release can be enforced. As a general matter, "Massachusetts law favors the enforcement of releases." Sharon, 769 N.E.2d at 744. But "a release executed in favor of one standing in a fiduciary relation to the one executing the release will be subjected to the closest scrutiny" and generally cannot "discharge a fiduciary's liability for breach of the trust imposed in him unless the person executing the release had knowledge of all relevant facts that the fiduciary knew or ought to have known." Allen v. Moushegian, 71 N.E.2d 393, 400 (Mass. 1947); see also Mi-Lor Corp., 348 F.3d

at 306.  Here, NEMC alleges that Lifespan failed to disclose all relevant facts before they executed the release.

The Massachusetts Supreme Judicial Court has not required full disclosure, though, in cases where the release is part of an agreement terminating the parties' fiduciary relationship and where each party is represented by its own outside counsel during the negotiations.  See Eck v. Godbout, 831 N.E.2d 296, 303 (Mass. 2005); Naukeag Inn, Inc. v. Rideout, 220 N.E.2d 916, 918 (Mass. 1966).  In those circumstances, the parties are relying on their counsel for judgment and advice on the terms of the release.  "As such, [they] cannot avoid the release by claiming that [they] relied on [each other's] advice in connection with the release." Eck, 831 N.E.2d at 303; see also Naukeag Inn, 220 N.E.2d at 918 (finding "no continuing confidence" between the parties at that stage of negotiations).

This case falls squarely in the Eck/Naukeag category.  Both parties had sophisticated outside law firms representing them during the contractual negotiations.  NEMC, while agreeing to the release, effectively hedged its risk by negotiating a broad indemnification provision to protect itself against losses caused by Lifespan's misrepresentations, willful misconduct, or gross negligence during their affiliation.  That provision belies any claim of "continuing confidence" between NEMC and Lifespan with respect to the release.  Id.  To the contrary, it indicates that

NEMC and its counsel specifically contemplated and accounted for the possibility that Lifespan might not have disclosed all relevant facts about its conduct during the affiliation.  Thus, Lifespan's alleged lack of full disclosure does not render the release unenforceable.

NEMC also argues that a party, especially a fiduciary, cannot be released from claims alleging intentional or reckless misconduct.  But the cases that NEMC cites for that proposition involved releases of liability for future misconduct between parties with an ongoing relationship, not releases of past conduct between parties whose relationship was ending.  <u>See</u>, <u>e.g.</u>, <u>Sharon</u>, 769 N.E.2d at 744 (waiver of liability before participation in extra-curricular activity); <u>Demoulas v. Demoulas Super Markets, Inc.</u>, 677 N.E.2d 159, 171-72 (Mass. 1997) (voting trust agreement); <u>Zavras v. Capeway Rovers Motorcycle Club, Inc.</u>, 687 N.E.2d 1263, 1265 (Mass. App. Ct. 1997) (waiver of liability before dirt-bike race); <u>Burten v. Milton Bradley Co.</u>, 763 F.2d 461, 465 (1st Cir. 1985) (disclosure agreement).  Massachusetts "public policy does not bar a claimant from releasing another from claims arising from past intentional misconduct." <u>Massmanian v. DuBose</u>, No. 07-2511-BLS1, 2008 WL 698472, at *6 (Mass. Super. Ct. Feb. 27, 2009).  Otherwise, it would be virtually impossible to settle disputes involving allegations of intentional or reckless misconduct (or, indeed, even to settle

this case now).

This court therefore concludes that NEMC's liability release is enforceable and that it bars NEMC's tort claims against Lifespan for breach of fiduciary duty (counterclaim #2) and unfair business practices (counterclaim #4).[6]  Summary judgment is therefore granted to Lifespan on those claims.  NEMC may, however, seek indemnification for Lifespan's allegedly tortious conduct under the Restructuring Agreement's indemnification provision (counterclaim #1), because that provision of the contract, by its terms, survives the Restructuring Agreement. Moreover, since the Attorney General was not a party to the Restructuring Agreement, the release does not bar her corresponding claim against Lifespan for breach of fiduciary duty (counterclaim #2).[7]

---

[6]In addition to these tort claims, Lifespan also argues that the release applies to NEMC's quasi-contractual claim of unjust enrichment (counterclaim #3) and its claims challenging the enforceability of the Medicare recovery provision in the Restructuring Agreement (counterclaims #5-11).  This court need not consider those arguments, however, because all of those claims fail on the merits for reasons explained in Parts III.D and III.E, infra.

[7]Lifespan argues that the Attorney General lacks standing to assert such a claim independently of NEMC.  Under Massachusetts law, however, "[t]he Attorney General has both a common-law duty and a specific statutory mandate to protect the public interest and enforce public rights" in the administration of non-profit organizations.  Ciardi v. F. Hoffman-LaRoche, Ltd., 762 N.E.2d 303, 314 n.21 (Mass. 2002); see also Mass. Gen. Laws ch. 12, § 8. "This special status as the representative of the public constitutes a supplement to, rather than a replacement for, the trustees acting in the name of the nonprofit corporation to vindicate its rights."  In re Boston Reg'l Med. Ctr., Inc., 328

**D.   *Unjust enrichment* (counterclaim #3)**

Next, Lifespan seeks summary judgment against NEMC and the Attorney General on their claims of unjust enrichment.  Under Massachusetts law, "unjust enrichment provides an equitable stopgap for occasional inadequacies in contractual remedies at law by mandating that a person who has been unjustly enriched at the expense of another is required to make restitution to the other."  Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 233-34 (1st Cir. 2005) (quoting Fox v. F&J Gattozzi Corp., 672 N.E.2d 547, 552 (Mass. App. Ct. 1996)).  Such a claim "is appropriate where an agreement is too indefinite to be enforced or where no contract is made."  Id. (quotation omitted).

This is not one of those cases.  Lifespan and NEMC entered into a detailed contract setting forth the terms of their affiliation (which the Attorney General approved) and another contract setting forth the terms of their separation.  It is well established under Massachusetts law that "the existence of a valid express contract between the parties ... bars the

---

F. Supp. 2d 130, 147 (D. Mass. 2004).  Thus, the Attorney General has standing to assert her breach of fiduciary duty claim, notwithstanding NEMC's release.  She need not sue NEMC or allege a breach of fiduciary duty by NEMC's directors to proceed with such a claim.

application of the equitable doctrine[]" of unjust enrichment.[8]
Okmyansky v. Herbalife Int'l of Am., Inc., 415 F.3d 154, 162 (1st
Cir. 2005) (citing Boswell v. Zephyr Lines, Inc., 606 N.E.2d
1336, 1342 (Mass. 1993), and Zarum v. Brass Mill Materials Corp.,
134 N.E.2d 141, 143 (Mass. 1956)).  Lifespan's request for
summary judgment on this claim is therefore granted.

## E.  *Medicare reimbursement*

The next issue is whether Lifespan is contractually entitled
to half of the $20.5 million that NEMC received from Medicare as
reimbursement for the loss on sale that NEMC realized when the
parties originally affiliated in 1997.  Lifespan's claim is based
on section 2.10 of the parties' Restructuring Agreement, which
provides that "Lifespan and NEMC shall split on a 50/50 basis any
recovery received from Medicare by NEMC ... for the loss on
sale/depreciation recapture resulting from the Affiliation."
NEMC and the Attorney General argue, in response, that this
provision is inapplicable to the recent Medicare recovery,

---

[8]NEMC and the Attorney General argue that, notwithstanding
any inconsistency between this claim and their contract claims
(counterclaims #1 and #7), they should be allowed to maintain
them both as alternative theories of liability.  See Fed. R. Civ.
P. 8(d) ("A party may state as many separate claims or defenses
as it has, regardless of consistency.").  But even if those
contract claims were abandoned or unsuccessful, the contracts
themselves would still bar this claim.  See Part III.E, infra
(rejecting the parties' only challenges to contractual
enforceability).

lacking in consideration, unconscionable, contrary to public policy, a breach of the parties' original Affiliation Agreement, a breach of fiduciary duty, and an unjust enrichment.  Lifespan has moved for summary judgment on all of those claims.  This court will analyze each of them in turn.

### i.  **Applicability** (counterclaim #11)

First, NEMC and the Attorney General claim that section 2.10 of the Restructuring Agreement does not apply to NEMC's recent Medicare recovery because the asset depreciation that gave rise to that recovery occurred before the parties' affiliation and thus did not "result[] from the Affiliation" within the meaning of section 2.10.  But that reading is inconsistent with the provision's plain meaning, especially its reference to "the loss on sale/depreciation recapture."  The recent Medicare recovery clearly "result[ed] from the Affiliation" because the affiliation was the "sale" (of NEMC to Lifespan) that enabled NEMC to realize a "loss on sale" and ultimately to "recapture" its earlier depreciation under 42 C.F.R. 413.134(f) (1997).  Where, as here, "the words of a contract are clear, they must be construed in their usual and ordinary sense," without resort to extrinsic evidence.  Gen. Convention of the New Jerusalem v. MacKenzie, 874 N.E.2d 1084, 1087 (Mass. 2007).

Even if the contract were ambiguous, however, the extrinsic

evidence in the summary judgment record compels the same conclusion:  that the parties intended for section 2.10 to cover the very Medicare recovery at issue here.  Indeed, the potential for such a recovery was one of the key benefits of the parties' affiliation, and NEMC pursued it throughout their time together. Although Medicare initially denied NEMC's request for reimbursement, the claim was still pending on administrative appeal at the time of the Restructuring Agreement, with its success uncertain.  It is clear from this context that section 2.10 delineated the parties' respective rights to any future recovery, in the event that Medicare changed its decision.  See Robert Indus., Inc. v. Spence, 291 N.E.2d 407, 409 (Mass. 1973) (contract must "be read in the light of the circumstances of its execution").  Nothing in the record supports any other reading. Lifespan is therefore entitled to summary judgment on this claim of inapplicability.


    **ii.  Consideration** (counterclaim #9)

Next, NEMC and the Attorney General claim that section 2.10 is unenforceable because it lacked consideration.  They emphasize, in particular, that section 2.10 was not expressly mentioned in the Restructuring Agreement's recital of consideration and did not play a significant role in the parties'

contractual negotiations.[9]  But neither of those facts is dispositive.  It is a "generally recognized rule that the consideration ... may be something other than what the parties have described as consideration" and "need not be the sole inducement or motivating cause of the promise, or even the prevailing or chief inducement."  Joseph M. Perillo, <u>Corbin on Contracts</u> § 5.7, at 32-33 (1995).

Under Massachusetts law, "[t]he requirement of consideration is satisfied if there is either a benefit to the promisor or a detriment to the promisee," such that the contract constitutes a bargained-for exchange.  <u>Miller v. Cotter</u>, 863 N.E.2d 537, 547 n.16 (Mass. 2007) (quotation omitted).  Here, section 2.10 clearly satisfied that requirement.  By giving each party half (and only half) of any future Medicare recovery, the provision offered both parties a benefit and a detriment.  It was essentially a compromise of a potential future dispute. Moreover, it constituted part of the total payment that Lifespan received in exchange for relinquishing control over NEMC's operations.  NEMC benefitted by being able to make that part of the payment on a contingent (rather than guaranteed) basis, thereby reducing its risk.  Lifespan is thus entitled to summary

---

[9]The recital of consideration mentioned only the $30 million in payments from NEMC to Lifespan.  Nevertheless, the last clause in the recitals section stated more broadly that the Restructuring Agreement was "in consideration of the premises and mutual promises herein made."

judgment on this claim as well.

### iii.  **Unconscionability** (counterclaim #5)

NEMC and the Attorney General also claim that section 2.10 is unconscionable.  Under Massachusetts law, unconscionability requires application of a "two-part test," which asks "whether there was an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the other party."  Zapatha v. Dairy Mart, Inc., 408 N.E.2d 1370, 1377 n.13 (Mass. 1980).  The first part of the test is procedural; the second is substantive.  Id.  The burden is on the party asserting unconscionability to satisfy both parts. See, e.g., Leaf Fin. Corp. V. Carroll, No. 06-10616, 2009 WL 112567, at *4 (D. Mass. Jan. 16, 2009).  Whether that burden has been met is a question of law for the court and is to be determined "as of the time the contract was made," without regard to subsequent developments.  Zapatha, 408 N.E.2d at 1377.

Even assuming arguendo that NEMC and the Attorney General could show procedural unconscionability (which would be difficult in light of the fact that NEMC was represented by sophisticated counsel in the negotiations, as already discussed), they cannot show substantive unconscionability on this record.  Section 2.10 was not "unreasonably favorable" to Lifespan when the parties entered into the Restructuring Agreement.  At that point, neither

party knew whether NEMC would recover anything from Medicare, or the amount of any such recovery.  Medicare had initially denied NEMC's claim for reimbursement, and it was still pending on appeal.  Depending on the appeal's outcome, section 2.10 could have been worthless.  Indeed, NEMC notes that the provision was "largely ignored [during the negotiations] because it was completely speculative."  It is only in hindsight that the provision seems so favorable to Lifespan.  See In re Sullivan, 346 B.R. 4, 30 (Bankr. D. Mass. 2006) (refusing to deem loan terms unconscionable based on "the benefit of hindsight").

Moreover, even with the benefit of hindsight, this court cannot accept the notion that it is substantively unconscionable for these parties, as a condition of their disaffiliation, to split in half a Medicare reimbursement made possible by their affiliation.  If anything, that sort of 50/50 compromise has a ring of fairness to it.  While the amount of money at issue ($10.25 million) is certainly large, it is only a fraction of the total amounts that NEMC agreed to pay Lifespan under the Restructuring Agreement (about $40.25 million), that Lifespan paid to NEMC over the course of their affiliation (about $42 million), or that NEMC would have paid to Lifespan in corporate management fees if their affiliation had continued for even one more year.  And NEMC simultaneously negotiated a very favorable indemnification provision, which gave it some protection against

29

overpayment.[10]

Since section 2.10, when viewed in context, is not unreasonably favorable to Lifespan, this court grants summary judgment against NEMC and the Attorney General on their claim of unconscionability.


   iv.  **Public policy** (counterclaim #6)

Next, NEMC and the Attorney General claim that section 2.10 is unenforceable on public policy grounds.  Whether a contract violates public policy "is a question of law for determination by the judge."  Green v. Richmond, 337 N.E.2d 691, 695 (Mass. 1975), abrogated on other grounds by Wilcox v. Trautz, 693 N.E.2d 141 (Mass. 1998).  The party seeking to invalidate the contract bears the burden of proof.  See Nussenbaum v. Chambers & Chambers, 77 N.E.2d 780, 782 (Mass. 1948); Hastings Assocs., Inc. v. Local 369 Bldg. Fund, Inc., 675 N.E.2d 403, 412-13 (Mass. App. 1997).  As a general matter, Massachusetts "courts are hesitant to invalidate contracts on ... public policy grounds."  A.Z. v. B.Z., 725 N.E.2d 1051, 1058 (Mass. 2000); see also Crimmins & Peirce Co. v. Kidder Peabody Acceptance Corp., 185 N.E. 383, 388 (Mass. 1933) ("Agreements voluntarily made ... are not to be lightly set aside

_____

[10]Indeed, NEMC is attempting to use that provision to offset any payment required by section 2.10.  There is tension, to say the least, between NEMC's attempt to enforce one of the Restructuring Agreement's most favorable provisions while striking one that it now regrets.

on the ground of public policy or because as events have turned it may be unfortunate for one party.").

In this case, NEMC and the Attorney General appear to be invoking the public policy that prohibits a Massachusetts charity from "attempt[ing] to divest itself of a large part of its assets."  See Mass. Charitable Mech. Ass'n v. Beede, 70 N.E.2d 825, 830-31 (Mass. 1947).  But the purported "divestment" was actually a contractual exchange, which offered benefits and burdens to both parties.  See Part III.E.ii, supra.  What NEMC and the Attorney General really seem to be saying is that NEMC paid too much in the deal.  That is simply a recasting of the unconscionability argument, which fails for the reasons already discussed above.  See Part III.E.iii, supra.  This court therefore grants Lifespan's request for summary judgment on the public policy claims as well.

### v.  **Affiliation agreement** (counterclaim #7)

NEMC and the Attorney General also claim that section 2.10 is unenforceable because the Attorney General never received notice of it as required by two provisions in the parties' original Affiliation Agreement.  The first provision (section 3.2) stated that NEMC's "existing assets" or "pre-affiliation assets" must be used only for certain specified purposes and that the parties must notify the Attorney General at least 30 days

before any use inconsistent with those purposes.  The second
provision (section 5) stated that the parties must notify the
Attorney General at least 30 days before any change in NEMC's
membership or control.  Both provisions also stated that, where
required by law, such actions would be subject to judicial
review.

Lifespan argues that this claim is barred by the merger
clause in the Restructuring Agreement, which states that "[t]his
agreement ... constitutes the entire agreement among the parties
hereto with respect to the subject matter hereof ... and
supercedes any and all prior ... agreements, with respect
thereto."  That is true with respect to NEMC, which agreed to the
merger clause.  See, e.g., Sound Techniques, Inc. v. Hoffman, 737
N.E. 2d 920, 926 (Mass. App. Ct. 2000) ("there is no reasonable
basis for ignoring the plain language of the merger clause").
The Attorney General, however, was not a party to the
Restructuring Agreement and never agreed to the merger clause, so
her claim is not barred by it.

The question, then, is whether the Attorney General can
enforce the Affiliation Agreement's notice provisions as an
intended third-party beneficiary.  "Under Massachusetts law, a
contract does not confer third-party beneficiary status unless
the language and circumstances of the contract show that the
parties to the contract clearly and definitely intended the

beneficiary to benefit from the promised performance." <u>Cumis</u>
<u>Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.</u>, 918 N.E.2d 36, 44
(Mass. 2009).  While nothing in the Affiliation Agreement speaks
directly to that issue, the context strongly suggests that the
parties did intend for the Attorney General to benefit from the
notice provisions.  Indeed, those provisions offered little
independent benefit to Lifespan and NEMC.

Even assuming, however, that the Attorney General has the
right to enforce the notice provisions, there is no merit to her
claim that section 2.10 violated them.  As to the provision that
required notice of any change in NEMC's membership or control
(section 5), Lifespan did send the Attorney General a letter in
advance of the Restructuring Agreement expressly stating that
Lifespan "will relinquish corporate control" over NEMC.  That
letter satisfied the notice requirement, regardless of whether
the Attorney General received a copy of the actual agreement
(which the parties dispute).  If the Attorney General believed
that the change of control required legal review, she could have
initiated such review in response to the notice.

As to the other provision (section 3.2), which required
notice in the event that NEMC's "existing assets" or "pre-
affiliation assets" were used for purposes inconsistent with
those specified in the Affiliation Agreement, nothing in section
2.10 triggered that requirement.  Section 2.10 concerned a

33

possible future monetary recovery that NEMC did not begin pursuing until after the parties entered into the Affiliation Agreement and did not actually secure until after their affiliation ended.  As a matter of plain meaning, that recovery was not an "existing asset" of NEMC as of the effective date of the Affiliation Agreement.  It was, by definition, a contingent asset instead.[11]

Moreover, even if the Medicare recovery qualified as an "existing asset," section 2.10 did not use that recovery for purposes inconsistent with those specified in the Affiliation Agreement.  Permissible uses included the "provision of health care services and related support services," as well as "the development of a hospital and physician network in Massachusetts."  Those are precisely the services that Lifespan provided (competently or not).  The Affiliation Agreement clearly permitted NEMC to pay Lifespan for its corporate management services, and the Attorney General has not articulated how the payment in section 2.10 is not just such a payment.

In sum, NEMC cannot assert this claim because it is barred by the merger clause in the Restructuring Agreement.  The

---

[11]It is true, as NEMC and the Attorney General stress, that the Medicare recovery reimbursed NEMC for asset depreciation that occurred before the affiliation.  But that does not make the future monetary recovery an "existing asset."  To the contrary, it was the non-existence (i.e., loss) of asset value, coupled with the affiliation itself (i.e., the sale), that enabled NEMC to recapture its loss on sale.

Attorney General may assert it, since she was not a party to the Restructuring Agreement, but her claim nevertheless fails on the merits because she received the only notice that the Affiliation Agreement required.  Summary judgment is therefore granted to Lifespan.

### vi.   **Fiduciary duty** (counterclaim #8)

NEMC and the Attorney General also claim section 2.10 is unenforceable because Lifespan breached its fiduciary duty by agreeing to it.  But where "the contested action falls entirely within the scope of a contract" between the parties, "it is not subject to question under fiduciary duty principles."  Chokel v. Genzyme Corp., 867 N.E.2d 325, 331 (Mass. 2007).  That is particularly true where, as here, the provision is part of an agreement bringing an end to the parties' fiduciary relationship, and the parties were each represented by sophisticated outside law firms during the negotiations.  See Part III.C, supra (discussing similar considerations in connection with liability release).  Summary judgment is therefore granted to Lifespan on this claim as well.

### vii.   **Unjust enrichment** (counterclaim #10)

NEMC and the Attorney General also claim that enforcing section 2.10 would unjustly enrich Lifespan.  As discussed above,

however, unjust enrichment "provides an equitable stopgap" only in cases "where an agreement is too indefinite to be enforced or where no contract is made." <u>Mass. Eye & Ear</u>, 412 F.3d at 233-34. Unjust enrichment cannot be used to prevent enforcement of an otherwise valid contract. Lifespan is therefore entitled to summary judgment on this claim as well.

### viii.  **Lifespan's right to recovery** (count #1)

Since this court has granted summary judgment to Lifespan on all of the counterclaims challenging the enforceability of section 2.10, Lifespan claims it is also entitled to summary judgment on its affirmative claim for half of the Medicare recovery. But Judge Torres already ruled that Lifespan's other affirmative claim for the $3.66 million payment that NEMC owes under the Restructuring Agreement is so "closely related" to NEMC's counterclaim for indemnification that they must be resolved together. <u>See</u> <u>Lifespan</u>, 2008 WL 310967, at *2-3. The same is true of Lifespan's claim for half of the Medicare recovery. Summary judgment on that claim is therefore inappropriate.

IV.   **Conclusion**

For the reasons set forth above, Lifespan's motion for partial summary judgment[12] is GRANTED in part as to NEMC's counterclaims 2, 3, 4, 5, 6, 7, 8, 9, 10, and 11 and as to the Attorney General's counterclaims 3, 5, 6, 7, 8, 9, 10, and 11, but is otherwise DENIED.   NEMC and the Attorney General's motions for partial summary judgment[13] on the issue of whether Lifespan owed a fiduciary duty to NEMC during their affiliation are GRANTED.   Their joint motion to strike[14] is DENIED as moot, since none of this court's rulings depend upon the challenged documents.

Going forward, the following claims remain in dispute: Lifespan's claim for payments due under the Restructuring Agreement (count #1), NEMC's claim for indemnification under the Restructuring Agreement (counterclaim #1), and the Attorney General's claim for breach of fiduciary duty (counterclaim #2).

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge
District of New Hampshire

---

[12]Document no. 133.

[13]Documents no. 131 and 132.

[14]Document no. 152.

Dated:  July 19, 2010

cc:   Deming E. Sherman, Esq.
      Bruce A. Singal, Esq.
      David A. Willin, Esq.
      Jeffrey T. Rotella, Esq.
      Michelle Peirce, Esq.
      Eric Carriker, Esq.
      Jonathan C. Green, Esq.
      Patrick J. Tarmey, Esq.